## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Richmond Division

| | |
|---|---|
| **SEALED PLAINTIFF 1** | ) |
| **and** | ) |
| **SEALED PLAINTIFF 2,** | ) |
| | ) |
| **Plaintiffs,** | ) Civil Action No. 3:22 cv 670-MHL |
| | ) |
| **v.** | ) |
| | ) |
| **PATRIOT FRONT, et al.** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS NOYCE AND DAIL'S MOTION TO DISMISS

Defendants Nathan Noyce and Thomas Dail, by counsel, respectfully submit this memorandum in support of their motion to dismiss plaintiffs' First Amended Complaint ("the Complaint") under Federal Rule of Procedure 12(b)(6).

### INTRODUCTION

From its opening sentences, and through to its end, the Complaint attempts to portray all of the defendants as being unworthy of the protection of this Court, lumping them together as supposed "white supremacists" and "racists." Continuing the mudslinging, the Complaint draws on the history of unrelated events such as the Unite the Right violence in Charlottesville in 2020, even though the Complaint alleges no participation in that deplorable conflagration by defendants Noyce or Dail, and no nexus between those events and the plaintiffs. But while clearly seeking to claim the moral high ground for themselves, and to smear all of the defendants with as much mud

1

as they can conjure, the plaintiffs here fail in two key respects.  First, they utterly fail to allege any viable causes of action against either Noyce or Dail.  Secondly, they run afoul of the venerated admonition given by Justice Holmes, that "if there is any principle of the Constitution that more imperatively calls for attachment than any other, it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate." *United States v. Schwimmer*, 279 U.S. 644, 654-55  (1929)(Holmes, J., dissenting).

When the background noise that pads the Complaint is tuned out, the Court can observe that none of the counts set forth articulate any cognizable claims against Noyce or Dail.  Instead, the plaintiffs seek to entice this Court into adopting a precedent that would subject disfavored persons to a truly unlimited number of civil actions, self-righteously conscripting this Court into their efforts to attack and destroy those with whom they disagree.   This abuse of the civil justice system cannot be allowed to proceed.

First and foremost, although the plaintiffs have thus far withheld their identities from the defendants,[1] nothing they have alleged provides grounds for their having standing to assert the claims they bring here.

In addition, plaintiffs' claim under 42 U.S.C. § 1985(3) fails to satisfy basic *Twombly* pleading standards as to essential elements of intent, causation, and injury.  Their claim under 42 U.S.C. § 1986 fails both because that claim is dependent on a viable § 1985(3) claim, and also because it is fatally flawed as a stand-alone claim.  Plaintiffs' claim under Virginia Code § 8.01-42.1 fails to pass Constitutional muster under *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), and

---

[1] Defendants object to the plaintiffs' keeping their identities concealed.  It would, in fact, be impossible for defendants to investigate the veracity of plaintiffs' allegations of their suffering without knowing who plaintiffs are and indeed, gaining full discovery as to any and all injuries claimed.  Moreover, defendants cannot know with whom they might prospectively have *res judicata* in the future, unless plaintiffs' identities are uncloaked.

further  fails due to the absence of plausible allegations that Noyce or Dail engaged in any acts of intentional intimidation or harassment.

Plaintiffs' Section 1985(3) and Section 1986 claims fail also for the additional reason that they run afoul of the doctrine that agents of the same principal cannot conspire with each other or with  their principal.

## STANDARD OF REVIEW

A motion invoking Rule 12(b)(6) should be granted if the plaintiffs fail "to state a claim upon which relief can be granted."  As the Fourth Circuit confirmed in *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012), the applicable standard for reviewing such a motion was set forth in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In *Iqbal*, the Supreme Court summarized the new pleading standard it had earlier adopted in *Twombly:*

> [T]he pleading standard Rule 8 announces  . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. . . . A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." . . .  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement.". . . To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." . . .   A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . .. The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 665 (internal citations omitted).

And further:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is

> inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . . . Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."

*Iqbal*, 556 U.S. at 665.

As set forth in the Argument section of this memorandum, the *Twombly / Iqbal* standards directly apply to the plaintiffs' Complaint in this case, in three respects among others:  labels, naked assertions, and conclusions are inadequate; context is critical; and where a complaint pleads facts that are "merely consistent with" a defendant's liability it fails the required plausibility requirement.

Further, the Court in *Twombly* rejected the "just let the case go to discovery and summary judgment" rationale that plaintiffs often invoke in cases such as this one.  The Court stated:

> It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management . . . given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. *See, e.g.*, Easterbrook, *Discovery as Abuse*, 69 B. U. L. Rev. 635, 638 (1989) (Judges can do little about impositional discovery when parties control the legal claims to be presented and conduct the discovery themselves). And it is self-evident that the problem of discovery abuse cannot be solved by careful scrutiny of evidence at the summary judgment stage, much less lucid instructions to juries; the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the [discovery] process will reveal relevant evidence to support a claim.

*Twombly,* 550 U.S. at 559-60.

The plaintiffs in this case have many attorneys and enormous resources on their side. Massive, expensive, drawn out, and invasive discovery will in itself be a huge *in terrorem* victory for the plaintiffs, and probably the only realistic victory they hope to achieve, given the indigence of most of the defendants.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

The Complaint sets forth three claims, under 42 U.S.C. § 1985(3), 42 U.S.C. § 1986, and Virginia Code § 8.01-42.1, against Patriot Front and 27 other defendants (named and unnamed) who are alleged to be members of or affiliated with Patriot Front.  Count I, brought under § 1985(3), is a conspiracy claim against all the defendants.  The other two counts allege claims against certain subsets of the numerous defendants.

To say the Complaint describes the defendants in a tendentious way is an understatement. The Complaint in fact uses the term "white supremacist" 12 times and the word "racist" multiple times. The unfortunate reality is that while such terms have no clear content and are almost always regarded as mere expressions of opinion– *see, e.g., Jorjani v. New Jersey Institute of Technology,* 2019 WL 1125594, (D. N.J. Mar. 12, 2012)  -- they nonetheless pack a hefty punch.  While Noyce and Dail would refute these pernicious labels, even if this Court assumes the plaintiffs' allegations to be true for purposes of considering the Motion to Dismiss, the Court must observe that the existence and persistence of racism and white supremacy in society at large does not constitute a particularized injury to any persons, much less to our plaintiffs.  If it did, then any number of persons could file an infinite number of civil actions against any number of defendants, without end.

The meat of the Complaint lies in its description of an unfortunate and regrettable act of vandalism, when a mural devoted to Richmond icon Arthur Ashe at the City of Richmond's Battery Park was painted over. Neither in this motion nor elsewhere do defendants or their counsel seek to defend or excuse this vandalism. But here, we are not faced with a claim brought by the owner of the defaced mural (the City of Richmond), nor with a criminal prosecution. The Complaint asks this Court to expand the consequences suffered by the perpetrators by metastasizing the number of potential plaintiffs, treating an isolated act of vandalism as a violation of the civil rights of virtually any person claiming to have taken offense.

**ARGUMENT**

**I.**

**PLAINTIFFS LACK STANDING TO MAKE THEIR CLAIMS, WHICH ARE BASED ON DAMAGE TO PUBLIC PROPERTY, AND WHICH IDENTIFY AS PLAINTIFFS' ALLEGED INJURY ONLY AN AMORPHOUS AND SUBJECTIVE "FEAR" THAT HAS NO LIMITING PRINCIPLE.**

Standing is an essential and unchanging part of the case-or-controversy requirement of Article III of the Constitution. *See, e.g., Allen v. Wright*, 468 U.S. 737, 751 (1984). The Supreme Court has established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 505 U.S. 555, 560-61 (1992). Second, there must be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant. *Id*. Third, it must be likely that the injury will be redressed by a favorable decision. *Id*. Further, the Supreme Court has consistently held that a plaintiff raising only a generally available grievance—claiming only harm

to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.  *Id*. at 573-74.  Plaintiffs' claims violate these fundamental standing principles in multiple respects.

First, the plaintiffs claim no property interest in the public park affected, and no greater rights to use Battery Park than any other members of the public.  Irrespective of what use any particular citizens might make of that park, any injuries alleged derive from the harm done to the park by the vandalism.  There is no allegation in the Complaint that any defendant threatened or menaced either plaintiff, nor that the plaintiffs suffered any physical harm in any way.  To the contrary, the injuries relied upon may be fairly characterized as the plaintiffs' subjective, emotional responses to a public event – one they do not even claim to have witnessed in person.  If the plaintiffs have a cause of action for such harms, so too must every other member of the public – an impossible burden on the courts, and on our current defendants, as well as any other citizen who might in the future stand similarly accused.  The Court must ask itself, if these plaintiffs were to prevail, how many other plaintiffs might come forward against our defendants?  None of those new plaintiffs would be bound to the outcome of this case by *res judicata*, so each would be entitled to invoke the precedent of this case and force the defendants to fend with an unlimited number of court attacks.

To illustrate the plaintiffs' lack of standing, suppose a claim were brought over a mere act of negligence, by which someone caused a fire in a public park. To repair the damage from the fire, the park was shut down for a period of time, preventing public use. No one would contend that every public patron could sue the person who caused the fire for loss of use of the park.  They may find themselves inconvenienced, but they have not suffered any particularized injury.  They

would be improperly "seeking relief that no more directly and tangibly benefits [them] than it does the public at large," to quote the *Lujan* case above.  The highly politicized content of the Complaint does not allow the plaintiffs to except themselves from this standard.

Plaintiffs here have alleged no "legally protected interest" in individual claims for use of the park.  And their claims also fail the requirement that there must be "a causal connection between the injury and the conduct complained of—the injury must be fairly  traceable to the challenged action of the defendant."  Although the vandalism should be condemned and never repeated, the perpetrators are not alleged to have left any threatening messages.  Plaintiffs instead state, "Tensions were high in Virginia in the late summer and early fall of 2021, as the community braced for the start of the civil trial stemming from the Charlottesville Unite the Right 2017 white supremacist rally."  Compl., ¶ 45.  It may well be that our plaintiffs were upset about events in Charlottesville, but defendants' act of vandalism does not provide plaintiffs with an opportunity to seek compensation for feelings brought on by unrelated events.  The Complaint does not even allege that either plaintiff had any role in the Charlottesville trial, that Sealed Plaintiff 2 even knew about it, that either plaintiff had any objective reason to "brace" for its commencement, or that there was any nexus at all between the proceedings in Charlottesville and the vandalism in Richmond's Battery Park.

Plaintiffs also fail the standing requirement to be "concrete."  Plaintiffs allege that painting over the former mural – a regrettable, yet wholly non-violent act -- instilled in them a subjective fear that was of indeterminate length and indefinite strength.  Moreover, this alleged fear was of indeterminate effect, allegedly causing plaintiffs to "stop and/or limit" their use of the park, ¶¶ 10-11, to "wonder if they or their neighbors would be targeted by Patriot Front," ¶ 76, to "consider[] placing their oldest child in therapy," ¶  84, to have "racing thoughts," ¶ 80, and to find access to

the park "more difficult," ¶ 81.  If such a shapeless, unbounded, subjective claim were to be deemed sufficient to meet the requirement of concreteness, that requirement would have no real substance.

Finally, plaintiffs' claims fail the "actual or imminent" standing requirement. Plaintiffs do not allege that in the 16 months since the mural vandalism, any defendant has committed any unfriendly act toward the plaintiffs or in or about Battery Park, or targeted any persons wishing to use the park.  The Complaint is devoid of any allegation of basis for any ongoing fear or threat of injury.

In summary, as the Supreme Court emphasized in *Lujan*, the party invoking federal jurisdiction bears the burden of establishing the core requirement of standing.  505 U.S. at 561. Plaintiffs have not met this burden. Their Complaint should be dismissed.


## II.

### PLAINTIFFS' §§ 1985(3) AND 1986 CLAIMS ARE BARRED BY THE DOCTRINE THAT AGENTS CANNOT CONSPIRE WITH THEIR PRINCIPALS.

To allege a viable § 1985(3) claim, plaintiffs must of course establish the existence of a conspiracy. As § 1986 incorporates § 1985 – i.e., "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title …"  -- a conspiracy is a prerequisite for this claim as well. Plaintiffs' own pleadings, however, negate the existence of a conspiracy.

In Complaint ¶ 92, plaintiffs allege as follows:

> Defendant Patriot Front is vicariously liable for the violations of section 1985 by its agents, each of whom acted within the scope of their agency. At the time of the conspiracy alleged herein, Defendant Patriot Front members acted as its agents within their roles as members of Defendant Patriot Front.

Plaintiffs make similar allegations with regard to their § 1986 claim in ¶ 108 and their Virginia Code claim in ¶ 115. But under Virginia law, as under the laws of other jurisdictions, agents of the same principal cannot conspire with each other or with their principal because they are deemed one legal entity. *See, e.g., Owen v. Liberty University,* 2020 WL 1856798 (W.D. Va. Apr. 13, 2020) at *17 (collecting cases for the rule that a conspiracy action cannot lie where a principal and its agents, or two agents of the same principal, are alleged to have conspired with each other); *Rosenthal v. R. W. Smith Co.*, 260 F.Supp.3d 580, 593-94 (W.D. Va. 2017) ("There cannot be a conspiracy between agents of a corporation acting within the scope of their duties . . . when agents are acting within the scope of their duties, there is only one entity acting – the principal itself") ; *Rogers v. Deane,* 992 F.Supp.2d  621, 633 (E.D. Va. 2014), *aff'd*, 594 Fed. Appx 768 (4th Cir. 2014) ("If a principal/agent or an employer/employee relationship exists between the parties, the parties are not separate entities") (collecting cases under Virginia law rejecting conspiracies between principals and agents).

Although Patriot Front is not a corporation, the intra-corporate conspiracy doctrine, which is similarly based on the premise that agents and principals form a single legal entity and cannot conspire with each other, confirms that plaintiffs' conspiracy allegations in this case are insufficient. The intra-corporate conspiracy doctrine recognizes that a corporation cannot conspire with its agents because the agents' acts are the corporation's own. See *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002) ("[U]nder the intracorporate immunity doctrine, acts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation"). Moreover, suing the agents individually does not destroy "the immunity granted under the doctrine." *Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985).

In *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342 (4th Cir. 2013), the Fourth Circuit applied this doctrine to § 1985(3) claims. Plaintiffs in that case alleged that a landlord and its agents, motivated by racial animus, interfered with the plaintiffs' opportunity to sell their business.  As three of the defendants in that case were employees of the same company, however, the Court concluded that they could not have conspired with each other.  *Id*. at  353-54 ; *see also Buschi*, 775 F.2d at 251-52 (applying doctrine to § 1985(3) claims).

Accordingly, here, as in the cases cited, plaintiffs' conspiracy claims must be dismissed.

### III.

### PLAINTIFFS HAVE NOT PLEADED AND CANNOT PLEAD THE NECESSARY ELEMENTS OF A 42 U.S.C. § 1985(3) CLAIM.

Section 1985(3) conspiracy claims have been narrowly circumscribed by the Supreme Court and the Fourth Circuit.  Plaintiffs' proposed broad and novel use of § 1985(3), if permitted, would represent a major and dangerous expansion of this section directly in conflict with these cases.

Section 1985(3) states, in relevant part:

If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

The starting point for the modern interpretation of § 1985(3) is the Supreme Court's decision in *Griffin v. Breckenridge*, 403 U.S. 88, 98–99 (1971).  In *Griffin*, a group of African-

11

Americans was assaulted by a group of whites while traveling on an interstate highway in Mississippi. The African-Americans filed an action for damages pursuant to § 1985(3). The issue before the Supreme Court was whether § 1985(3) reached individuals acting in a purely private capacity. Although the Court held that the statute does create a cause of action for certain kinds of private action interfering with federally protected rights to travel and Thirteenth Amendment rights, the Court expressed considerable concern over the broad language of § 1985(3). The Court cautioned that although § 1985(3) was designed to reach private conspiracies, Congress did not intend it to "apply to all tortious, conspiratorial interferences with the rights of others." 403 U.S. at 101.

In *United Brotherhood of Carpenters v. Scott*, 463 U.S. 825 (1983), the Court considered the application of § 1985(3) to a conspiracy directed by a pro-union group against a group of non-union employees working for a non-union contractor. The conspiracy resulted in a physical attack upon the non-union workers, who subsequently brought an action for damages under § 1985(3). The district court found that such an attack evidenced a discriminatory animus against non-union workers as a class, and constituted an interference with the right of association, in violation of § 1985(3). On appeal, the Fifth Circuit affirmed. The Supreme Court, however, reversed. The Court found disconcerting the argument that § 1985(3) provides "a remedy for every concerted effort by one political group to nullify the influence or do injury to a competing group by use of otherwise unlawful means." *Id*. at 836. The Court reasoned:

> To accede to that view would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role which the courts should not be quick to assume. If respondents' submission were accepted, the proscription of § 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings.

12

*Id*.

In *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), the Supreme Court refused to extend § 1985(3) to claims against persons who organized and coordinated antiabortion demonstrations.  In the course of that opinion, the Court stated:

> Our discussion in *Carpenters* makes clear that it does not suffice for application of § 1985(3) that a protected right be incidentally affected. A conspiracy is not "for the purpose" of denying equal protection simply because it has an effect upon a protected right. The right must be *"aimed at," 463* U. S., at 833 (emphasis added); its impairment must be a conscious objective of the enterprise. Just as the "invidiously discriminatory animus" requirement, discussed above, requires that the defendant have taken his action "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," *Feeney,* 442 U. S., at 279, so also the "intent to deprive of a right" requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it. That was not shown to be the case here, and is on its face implausible.

506 U.S. at 275-76

In *Harrison v. KVAT Food Management, Inc.,* 766 F.2d 155 (4th Cir. 1985), the Fourth Circuit, rejecting a contrary decision by the Second Circuit, held that Republicans as a class are not protected by Section 1985(3), even if it is alleged that defendants' conduct aimed to discourage the participation of a Republican in the affairs of his party.  The Fourth Circuit stated:

> [A]nalyzing the *Scott* decision, we find little support for the contention that § 1985(3) includes in its scope of protection the victims of purely political conspiracies. Indeed, the opinion in *Scott* exhibits a noticeable lack of enthusiasm for expanding the coverage of § 1985(3) to any classes other than those expressly provided by the Court. . . . the Court provided no authority on which to base the extension of § 1985(3) protection urged upon us here. . .  We are concerned here with a statute enacted to fulfill a particular purpose and designed to meet particular conditions. . .  In fact, the Court in *Scott* expressed uncertainty over whether even the use of unlawful conduct in the deprivation of rights necessarily calls for a remedy. The Court remarked: "[W]e find difficult the question of whether § 1985(3) provided a remedy for every concerted effort by one political group to nullify the influence of or do other injury to a competing group by use of otherwise unlawful means." *Carpenters v. Scott*, 463 U.S. at 836.

13

*Id.* at 161-63.

The scope and elements of a § 1985(3) conspiracy claim must be viewed against the background of the reluctance to expand such a claim shown in these binding precedents. These elements are: (1) a conspiracy by two or more persons; (2) who are motivated by a specific, class-based, invidiously discriminatory purpose; (3) to deprive the plaintiff of the equal enjoyment of rights secured by law to all; (4) that results in injury to the plaintiff; (5) as a consequence of an overt act committed by the defendants in connection with the conspiracy. *Thomas v. Salvation Army*, 841 F.3d at 637. Properly interpreted in accordance with the *Griffin, Scott, Bray*, and *Harrison* cases, plaintiffs' allegations do not satisfy these elements for several reasons.

First, § 1985(3) "applies only to such conspiracies as are 'aimed at interfering with rights . . . protected against private, as well as official, encroachment.'… There are few such rights (we have hitherto recognized only the Thirteenth Amendment right to be free from involuntary servitude . . and, in the same Thirteenth Amendment context, the right of interstate travel. " *Bray*, 506 U.S. at 278 (internal citations omitted). The plaintiffs' claims do not involve involuntary servitude or right of interstate travel and are therefore foreclosed in accordance with *Bray*.

Second, as noted above, the Supreme Court in *Bray* emphasized that the "'intent to deprive of a right'" requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it." Plaintiffs' allegations do not meet this stringent standard. Context, as the *Twombly* decision requires, is critical here. The vandalism alleged in the Complaint did not occur in a vacuum. To the contrary, it occurred in a political environment in which statues of Confederate generals such as General Lee were being badly defaced with apparent impunity. One may not approve of General Lee or the cause for which he fought, but it remains true that many citizens

14

admire him and many more strongly disapprove of the defacement of his and other statues of Confederate Generals and political leaders.  The issue is obviously one on which emotions run high, and precipitous and poorly thought out actions may occur.  In this milieu, the vandalism described in the Complaint can readily be interpreted as an ill-conceived protest against the defacement and removal of Confederate statues, not as an attempt with the conscious and specific objective, which *Bray* requires, of denying African-American persons, or anyone else, use of the park. This interpretation is at least as plausible as the interpretation plaintiffs insist on, and in accordance with *Twombly*, where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Third, as discussed earlier as to standing, the plaintiffs' claims are remarkably indefinite and boundaryless.  Allowing them to proceed as § 1985(3) claims would be to take a large step toward applying § 1985(3) "to all tortious, conspiratorial interferences with the rights of others," despite the Supreme Court's warning against this in *Griffin*.

Finally, § 1985(3) has a causation requirement – "whereby another is injured in his person or property."  For the reasons discussed earlier as to standing, plaintiffs' allegations do not plausibly allege this required element.

## IV.

### PLAINTIFFS HAVE NOT PLEADED, AND CANNOT PLEAD, A VIABLE CLAIM UNDER 42 U.S.C. § 1986.

The broad construction that underlies plaintiffs' § 1986 claim has no support in any case law.  No case known to defendants has ever affirmatively upheld a stand-alone § 1986 claim with anything approaching substantial analysis.  Generally, the courts treat § 1986 as dependent on a

viable § 1985(3) claim, and thus, the two stand or fall together. *See, e.g., Trerice v. Summons*, 1081, 1085 (10th Cir. 1985); *Davis v. Hudgins*, 896 F. Supp.2d 561, 571 (E.D. V. 1995), *aff'd*, 87 F.3d 1308 (4th Cir. 1996). In this case, since plaintiffs cannot allege a viable § 1985(3) claim, their § 1986 claim should fail as well.

Moreover, even if plaintiffs had stated a viable § 1985(3) claim, the § 1986 count would not survive. An interpretation giving it stand-alone viability would impose amorphous and virtually unlimited obligations on even private citizens to prevent alleged violations by others of § 1985. This is not consistent with basic principles of statutory construction. *See, e.g., Nat'l Labor Relations Board v. Wheeling Elec. Co.,* 444 F.2d 783, 787 (4th Cir. 1971) (where a literal interpretation of a statute would not accord with intended purpose of legislation or produce an absurd result, courts must look beyond words of the statute); *United States v. American Trucking Ass'n*, 310 U.S. 534, 543 (1940) ("Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole,' this Court has followed [the purpose of the act] rather than the literal words."). Moreover, such a broad interpretation would be unconstitutional under the void for vagueness and overbreadth doctrines, for no private citizen would have fair notice of the criteria by which he or she could be held liable under § 1986 for the conduct of others, e.g., in a mass demonstration. Under the void for vagueness doctrine, a law cannot be enforced if it is so vague or confusing that the average person could not figure out what is being prohibited or what the penalties are for breaking that law. *See, e.g., Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048-51 (1991) (holding that attorney disciplinary rule was unconstitutionally vague as applied); *Keyishian v. Board of Regents*, 385 U.S. 589-603-04 (holding that restrictions on government employee speech was unconstitutionally vague). Under the overbreadth doctrine, a statute that

proscribes not merely unprotected but protected speech as well does not pass constitutional muster. *See, e.g., R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (striking down bias-motivated criminal ordinance where it proscribed not only fighting words but protected speech). Accordingly, insofar as § 1986 must be interpreted in this case at all, it must be limited to persons who had an independent, recognized duty to prevent unlawful conduct, such as sheriffs or the police.

## V.

### VIRGINIA CODE § 8.01-42.1 VIOLATES THE FIRST AMENDMENT AND MUST BE STRICKEN; IN ANY EVENT, PLAINTIFFS HAVE FAILED TO ALLEGE CLAIMS SUFFICIENT TO INVOKE THAT STATUTE

Plaintiffs' claims under Va. Code § 8.01-42.1 fail as a matter of law for three reasons. First, in accordance with the Supreme Court's decision in *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), the statute is unconstitutional as violative of the First Amendment.   Second, the statute is unconstitutional under the void for vagueness doctrine. Third, apart from the statute's unconstitutionality, insofar as the statute's key terms "intimidation" and "harassment" can be given objective meaning, the plaintiffs' factual allegations do not satisfy the statutory requirements.

According to the Complaint, the defendants painted over the Arthur Ashe mural in City of Richmond's Battery Park.  They then placed Patriot Front insignia where the mural had been. They did not place highly offensive symbols, such as a burning cross, a noose or a swastika; nor did they stencil any threats or offensive/vulgar epithets.  The plaintiffs admit that at the time of the act, they had no knowledge of what the Patriot Front insignia might signify, and needed to research the issue.  After researching the insignia, the plaintiffs, according to their allegations,  concluded that Patriot Front was allegedly a "white supremacist" organization.  Upon reaching this surmise, they became fearful.

17

Va. Code § 8.01-42.1 provides as follows:

An action for injunctive relief or civil damages, or both, shall lie for any person who is subjected to acts of (i) intimidation or harassment, (ii) violence directed against his person, or (iii) vandalism directed against his real or personal property, where such acts are motivated by racial, religious, gender, disability, gender identity, sexual orientation, or ethnic animosity.

Plaintiffs make no allegations under parts (ii) or (iii), so the Court need consider only whether plaintiffs have sufficiently alleged that they have been "subjected to acts of intimidation or harassment" under part (i). The plaintiffs must therefore establish that "intimidation or harassment" occurred, and also that it was directed *at them*.

The St. Paul Bias-Motivated Crime Ordinance at issue in the *City of St. Paul* case was quite similar to the Virginia statute, albeit the Saint Paul ordinance was a criminal statute. It provided:

Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.

A group of teenagers who were charged under the ordinance challenged it under the First Amendment, arguing it was overly broad and based on the content of speech. While the trial court agreed, the state supreme court reversed on the grounds that the ordinance was defined in a way that limited its scope to "fighting words." The state supreme court also ruled that, while the ordinance was content-based, it was not unconstitutional for that reason because it met the strict scrutiny standard.

The United States Supreme Court reversed. Justice Scalia, writing for the majority, held while the ordinance may extend only to fighting words, it distinguishes among types of fighting

words according to their content, i.e., it is limited to fighting words that insult or incite violence on the basis of race, religion, or gender. The city, the Court held, may not constitutionally impose special penalties on speakers who discuss or espouse certain subjects, so the statute is void in its entirety.

The Virginia statute must be declared void, both facially and as applied to this case, on the same First Amendment grounds and reasoning as in *City of St. Paul*. The factual crux of this case is that the defendants are being sued based on their viewpoint or alleged viewpoint. There is not in this case even the posting of an offensive symbol as in the *City of St. Paul*. The plaintiffs did not even know about the Patriot Front until they researched its insignia and reached their own conclusion, from sources unidentified, that the Patriot Front was a "white supremacist" organization, at which point the plaintiffs claim to have grown fearful.  The direct application of the *City of St. Paul* to this case is not weakened by the fact that the Virginia statute provides for a civil action.  The Supreme Court held in *Snyder v. Phelps*, 562 U.S. 443 (2011) that the Free Speech Clause of the First Amendment can serve as a defense in state civil actions (in that case, a claim for intentional infliction of emotional distress).

*Virginia v. Black*, 538 U.S. 343 (2003), is not contrary authority.  In that case the Supreme Court partially rejected a Constitutional challenge to a Virginia statute that outlawed cross burning, holding that "Virginia may choose to regulate this subset of intimidating messages in light of cross burning's long and pernicious history as a signal of impending violence." *Id.* at 363.   No cross burning or anything remotely comparable has been alleged in this case.  Certainly, there is no historical context for treating painting over a mural, as an expression of disagreement with its content, as if it were "a signal of impending violence."

19

The impermissible vagueness doctrine also voids the Virginia statute. As the Supreme Court held in *Hill v. Colorado*, 530 U.S. 703, 732 (2000), a statute can be impermissibly vague for either of two reasons: First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; second, if it authorizes or encourages arbitrary and discriminatory enforcement. The "intimidation" and "harassment" terms in the Virginia statute suffer from both defects. They are as impermissibly vague as the words "obscene," "vulgar," "profane," and "indecent" found unconstitutionally vague in *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) and the "conduct that presents a serious potential risk of physical injury to another" found unconstitutionally vague in *Johnson v. U.S.*, 576 U.S. 591 (2015).

It might be contended that "harassment," at least,  has been imparted a definite meaning from its use in contexts such as sexual harassment and domestic abuse. These contexts, however, do not raise First Amendment concerns. As the Supreme Court has noted, laws "capable of reaching expression sheltered by the First Amendment" must "have a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *accord FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012).

The recent decision by the federal district court for the Southern District of New York in *Volokh, et al. v. Letitia James, in her official capacity as Attorney General of New York,* 2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023), supports the conclusion that the Virginia statute is constitutionally infirm. In that case, the Southern District granted a preliminary injunction against enforcement of New York's "Hateful Conduct Law." The law required that social media networks create a complaint mechanism for three types of "hateful conduct": (1) conduct that "vilifies"; (2) conduct that "humiliates"; and (3) conduct that "incites violence." More completely, the law defined "hateful conduct" as:

[T]he use of a social media network to vilify, humiliate, or incite violence against a group or a class of persons on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression.

*Id*. at *2.   The court granted the injunction because it found the law unconstitutionally indefinite under the First Amendment.  As the court stated:

> The potential chilling effect to social media users is exacerbated by the indefiniteness of some of the Hateful Conduct Law's key terms. It is not clear what the terms like "vilify" and "humiliate" mean for the purposes of the law. While it is true that there are readily accessible dictionary definitions of those words, the law does not define what type of "conduct" or "speech" could be encapsulated by them. . . the law does not put social media users on notice of what kinds of speech or content is now the target of government regulation.

*Id*. at *10.

The same criticism – that they are indefinite and do not provide fair notice – can be said as to "intimidation" and "harassment" under the Virginia statute where, as here, the intimidation and harassment are claimed to have arisen from a constitutionally protected viewpoint.

Given their vagueness, the Virginia statute's "intimidation" and "harassment" terms could be given an array of meanings, but surely under most of them the plaintiffs' allegations would not pass muster.  Of decisive importance should be that no highly offensive symbols, such as a burning cross or a swastika or offensive or vulgar epithets were placed on the mural and at no point did the defendants menace, confront, or interact at all with the plaintiffs. In none of the cases interpreting the Virginia statue have the plaintiffs prevailed where there was no direct interaction. To the contrary, in *Sines v. Kessler*, 324 F.Supp.3d 765, 800-01 (W.D. Va. 2018), the court dismissed claims under the statute where the plaintiffs did not plausibly allege that the particular defendants at issue directed their chants against those particular plaintiffs.  Moreover,  in this case there is the factor of  plaintiffs' research, in which some unknown third parties, almost certainly hostile to the Patriot Front, imparted information (or rather, allegations) to the plaintiffs hostile to the Patriot Front. There is also the aspect that the most plausible interpretation of defendants' motives was

indignation at the widespread defacement of Confederate statutes, not hostile intent directed specifically toward the plaintiffs. Accordingly, even apart from the statute's constitutional defects the plaintiffs' claims fail as a matter of law.

CONCLUSION

For the reasons stated, defendants Nathan Noyce and Thomas Dail request that the plaintiffs' amended complaint be dismissed in its entirety.

Respectfully submitted,

NATHAN NOYCE
THOMAS DAIL

By:_____/s/_____
    Counsel

Bradley P. Marrs (VSB#25281)
Marrs & Henry
7202 Glen Forest Drive, Suite 307
Richmond, VA  23226
Tel. (804) 662-5716
Fax (804) 662-5712
bmarrs@marrs-henry.com

Glen K. Allen, *Pro Hac Vice pending*
Glen Allen Law
5423 Springlake Way
Baltimore, MD  21212
Tel. (410) 802-6453
glenallenlaw@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2023, a true and accurate copies of the foregoing were

served via ECF procedures of this Court to the following counsel of record:

Michael R. Shebelskie
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219-4074
mshebelskie@huntonak.com

Ryan P. Phair
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW, Suite 900
Washington, DC  20037-1701
rphair@huntonak.com

Edward G. Caspar
Arthur Ago
Lawyers' Committee for Civil Rights Under Law
1500 K Street, NW, Suite  900
Washington, DC  20005
ecaspar@lawyerscommittee.org
aago@lawyerscommittee.org

_____/s/_____
Bradley P. Marrs (VSB#25281)
Marrs & Henry
7202 Glen Forest Drive, Suite 307
Richmond, VA  23226
Tel. (804) 662-5716
Fax (804) 662-5712
bmarrs@marrs-henry.com
*Counsel for defendants*
*Nathan Joyce and Thomas Dail*