## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Richmond Division

| | |
|---|---|
| SEALED PLAINTIFF 1 | ) |
| and | ) |
| SEALED PLAINTIFF 2, | ) |
| | ) |
|     Plaintiffs, | ) Civil Action No. 3:22 cv 670-MHL |
| | ) |
| v. | ) |
| | ) |
| PATRIOT FRONT, et al. | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM IN SUPPORT
## OF DEFENDANTS' AMENDED MOTION TO DISMISS

Defendants Nathan Noyce, Thomas Dail, Paul Gancarz, Daniel Turetchi, and Aedan Tredinnick (together "Defendants"), by counsel, respectfully submit this amended memorandum in support of their motion to dismiss plaintiffs' First Amended Complaint ("the Complaint") under Federal Rule of Procedure 12(b)(6), pursuant to this Court's order of July 7, 2023.

### INTRODUCTION

From its opening sentences and through to its end, the Complaint attempts to portray all the Defendants as unworthy of the protection of this Court, lumping them together as supposed "white supremacists" and "racists."  Continuing the mudslinging, the Complaint draws on the history of unrelated events such as the Unite the Right violence in Charlottesville in 2020, even though the Complaint alleges no participation in that deplorable conflagration by the Defendants

and no nexus between those events and the plaintiffs.  But while seeking to claim the moral high ground for themselves and smear all the Defendants with as much mud as they can conjure, the plaintiffs here fail in two key respects.  First, they utterly fail to allege any viable causes of action against any Defendant.  Secondly, they run afoul of the venerated admonition by Justice Holmes, that "if there is any principle of the Constitution that more imperatively calls for attachment than any other, it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate." *United States v. Schwimmer*, 279 U.S. 644, 654-55  (1929) (Holmes, J., dissenting).

When the background noise that pads the Complaint is tuned out, the Court can observe that none of the Complaint's counts articulate any cognizable claims against the Defendants. Instead, plaintiffs seek to entice this Court into adopting a precedent that would subject disfavored persons to a truly unlimited number of civil actions, conscripting this Court into their efforts to attack and destroy those with whom they disagree. For the reasons summarized below, this abuse of the civil justice system cannot be allowed to proceed.

First, although the plaintiffs have thus far withheld their identities from the Defendants,[1] nothing they have alleged provides grounds for their having standing to assert the claims they bring here.

Second,  plaintiffs' claims under 42 U.S.C. § 1985(3) fail to satisfy basic *Twombly* pleading standards as to the essential elements of intent, causation, and injury, especially in light of the Supreme Court's recent *Counterman v. Colorado,* -- U.S. – (June 27, 2023) case, which has

---

[1] Defendants object to the plaintiffs' keeping their identities concealed.  It would, in fact, be impossible for Defendants to investigate the veracity of plaintiffs' allegations of their suffering without knowing who plaintiffs are and indeed gaining full discovery as to any and all injuries claimed.  Moreover, Defendants cannot know with whom they might prospectively have *res judicata* in the future, unless plaintiffs' identities are uncloaked.

elevated the pleading requirements in "true threat" cases. Plaintiffs' companion claim under 42 U.S.C. § 1986 fails both because that claim is dependent on a viable § 1985(3) claim and because it is fatally flawed as a stand-alone claim.

Third, plaintiffs' claim under 42 U.S.C. § 1986 is time-barred in accordance with plaintiffs' own allegations.

Fourth, plaintiffs' claim under Virginia Code § 8.01-42.1 fails, especially in light of the *Counterman* decision, due to the absence of plausible allegations that any of the Defendants engaged in intentional intimidation or harassment. The claim also fails to pass Constitutional muster under *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) and other relevant Supreme Court decisions.

Finally, plaintiffs' conspiracy claims under §§ 1985(3) and 1986 claim run afoul of the doctrine that agents of the same principal cannot conspire with each other or with their principal.

## STANDARD OF REVIEW

A motion invoking Rule 12(b)(6) should be granted if the plaintiffs fail "to state a claim upon which relief can be granted." As the Fourth Circuit confirmed in *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012), the applicable standard for reviewing such a motion was set forth in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In *Iqbal*, the Supreme Court summarized the new pleading standard it had earlier adopted in *Twombly*:

> [T]he pleading standard Rule 8 announces  . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. . . . A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." . . .  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement.". . . To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." . . .  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . .. The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully. . . .

> Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 665 (internal citations omitted).

And further:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . .  Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . . . Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"— "that the pleader is entitled to relief."

*Iqbal*, 556 U.S. at 665.

As set forth in the Argument section of this memorandum, the *Twombly / Iqbal* standards directly apply to the plaintiffs' Complaint in this case, in three respects among others:  labels, naked assertions, and conclusions are inadequate; context is critical; and where a complaint pleads facts that are "merely consistent with" a defendant's liability it fails the required plausibility requirement.

Further, the Court in *Twombly* rejected the "just let the case go to discovery and summary judgment" rationale that plaintiffs often invoke in cases such as this one.  The Court stated:

> It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management . . . given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. *See, e.g.*, Easterbrook, *Discovery as Abuse*, 69 B. U. L. Rev. 635, 638 (1989) (Judges can do little about impositional discovery when parties control the legal claims to be presented and conduct the discovery themselves). And it is self-evident that the problem of discovery abuse cannot be solved by careful scrutiny of

4

evidence at the summary judgment stage, much less lucid instructions to juries; the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the [discovery] process will reveal relevant evidence to support a claim.

*Twombly,* 550 U.S. at 559-60.

The plaintiffs in this case have many attorneys and enormous resources on their side. Massive, expensive, drawn out, and invasive discovery will in itself be a huge *in terrorem* victory for the plaintiffs, and probably the only realistic victory they hope to achieve, given the indigence of most of the defendants.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

The Complaint sets forth three claims, under 42 U.S.C. § 1985(3), 42 U.S.C. § 1986, and Virginia Code § 8.01-42.1, against Patriot Front and 27 other defendants (named and unnamed) who are alleged to be members of or affiliated with Patriot Front.  Count I, brought under § 1985(3), is a conspiracy claim against all the defendants.  The other two counts allege claims against certain subsets of the numerous defendants.

To say the Complaint describes the defendants in a tendentious way is an understatement. The Complaint in fact uses the term "white supremacist" 12 times and the word "racist" multiple times. The unfortunate reality is that while such terms have no clear content and are almost always regarded as mere expressions of opinion– *see, e.g., Jorjani v. New Jersey Institute of Technology,* 2019 WL 1125594, (D. N.J. Mar. 12, 2012)  -- they nonetheless pack a hefty punch.  While Defendants would refute these pernicious labels, even if this Court assumes the plaintiffs' allegations to be true for purposes of considering the Motion to Dismiss, the Court must observe that the existence and persistence of racism and white supremacy in society at large does not constitute a particularized injury to any persons, much less to our plaintiffs.  If it did, then any

number of persons could file an infinite number of civil actions against any number of defendants, without end.

The meat of the Complaint lies in its description of an unfortunate and regrettable act of vandalism, when a mural devoted to Richmond icon Arthur Ashe at the City of Richmond's Battery Park was painted over.  Neither in this motion nor elsewhere do Defendants or their counsel seek to defend or excuse this vandalism.  But here, we are not faced with a claim brought by the owner of the defaced mural (the City of Richmond), nor with a criminal prosecution.  The Complaint asks this Court to expand the consequences of this regrettable incident  by metastasizing the number of potential plaintiffs by treating an isolated act of vandalism as a violation of the civil rights of virtually any persons claiming to have taken offense.

## ARGUMENT

## I.

## PLAINTIFFS LACK STANDING TO MAKE THEIR CLAIMS, WHICH ARE BASED ON DAMAGE TO PUBLIC PROPERTY, AND WHICH IDENTIFY AS PLAINTIFFS' ALLEGED INJURY ONLY AN AMORPHOUS AND SUBJECTIVE "FEAR" THAT HAS NO LIMITING PRINCIPLE.

Standing is an essential and unchanging part of the case-or-controversy requirement of Article III of the Constitution. *See, e.g., Allen v. Wright*, 468 U.S. 737, 751 (1984).  The Supreme Court has established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  *Lujan v. Defenders of Wildlife*, 505 U.S. 555,  560-61 (1992). Second, there must be a causal connection between the injury and the conduct complained of—the injury must be fairly  traceable to the challenged action of the defendant.  *Id*. Third, it must be likely that the injury will be redressed by a favorable decision.  *Id*.  Further, the Supreme Court has

consistently held that a plaintiff raising only a generally available grievance—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy. *Id*. at 573-74. Plaintiffs' claims violate these fundamental standing principles in multiple respects.

First, the plaintiffs claim no property interest in the public park affected, nor any greater rights to use Battery Park than any other members of the public. Irrespective of what use any particular citizens might make of that park, any injuries alleged derive from the harm done to the park by the vandalism. There is no allegation in the Complaint that any defendant threatened or menaced either plaintiff, nor that the plaintiffs suffered any physical harm in any way. To the contrary, the injuries relied upon may be fairly characterized as the plaintiffs' subjective, emotional responses to a public event – one they do not even claim to have witnessed in person. If the plaintiffs have a cause of action for such harms, so too must every other member of the public – an impossible burden on the courts, and on our current defendants, as well as on any other citizen who might in the future stand similarly accused. The Court must ask itself, if these plaintiffs were to prevail, how many other plaintiffs might come forward against our defendants? None of those new plaintiffs would be bound to the outcome of this case by *res judicata*, so each would be entitled to invoke the precedent of this case and force the defendants to fend off an unlimited number of court attacks.

To illustrate the plaintiffs' lack of standing, suppose a claim were brought over a mere act of negligence, by which someone caused a fire in a public park. To repair the damage from the fire, the park was shut down for a period of time, preventing public use. No one would contend that every public patron could sue the person who caused the fire for lost use of the park. They may find themselves inconvenienced, but they have not suffered any particularized injury. They

would be improperly "seeking relief that no more directly and tangibly benefits [them] than it does the public at large," to quote the *Lujan* case above.  The highly politicized content of the Complaint does not allow the plaintiffs to except themselves from this standard.[1]

Plaintiffs here have alleged no "legally protected interest" in individual claims for use of the park.  Their claims also fail the requirement that there must be "a causal connection between the injury and the conduct complained of—the injury must be fairly  traceable to the challenged action of the defendant."  Although the vandalism should be condemned and never repeated, the perpetrators are not alleged to have left any threatening messages. Plaintiffs instead state, "Tensions were high in Virginia in the late summer and early fall of 2021, as the community braced for the start of the civil trial stemming from the Charlottesville Unite the Right 2017 white supremacist rally."  Compl., ¶ 45.  It may well be that our plaintiffs were upset about events in Charlottesville, but defendants' alleged act of vandalism does not provide plaintiffs with an opportunity to seek compensation for feelings brought on by unrelated events.  The Complaint does not even allege that either plaintiff had any role in the Charlottesville trial, that Sealed Plaintiff 2 even knew about it, that either plaintiff had any objective reason to "brace" for its commencement, or that there was any nexus at all between the proceedings in Charlottesville and the vandalism in Richmond's Battery Park.

Plaintiffs must also satisfy the "fairly traceable" component of the standing requirements, which "ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct."  *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000).  While the defendants' conduct need not be last link in the causal chain, the

[1] Indeed, our plaintiffs seem to believe that the political nature of Defendants' expressive acts excepts them. That is, plaintiffs ask this Court to suppress political expression more so than it would other acts.  The First Amendment forbids this.

plaintiffs must be able to demonstrate that the alleged harm was caused by the defendants as opposed to the "independent action of some third party not before the court." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018). This traceability requirement is a critical failing that destroys  the viability of the plaintiffs' complaint.

Plaintiffs' allegations make indisputably clear that their anxiety about Patriot Front arose from a description or characterization of Patriot Front provided to them by an unknown entity or person. *See* Complaint at ¶ 74. Neither the Patriot Front logo placed over the Arthur Ashe mural nor the Patriot Front stickers allegedly placed on lampposts communicated anything to the plaintiffs. Plaintiffs allegedly researched the stickers and learned from some unnamed source information about Patriot Front -- information that, almost certainly, characterized Patriot Front in a hostile manner.

Plaintiffs might contend that what and how they were told about the Patriot Front  is a factual question that should not be resolved on a motion to dismiss. The plaintiffs, however, have the burden of establishing every element of their standing, including traceability, at the outset of the case. Their own allegations point directly and necessarily to information provided by this unknown third party or entity as the source of the fearfulness that plaintiffs characterize as their injury. When plaintiffs filed their Complaint, they knew or should have known what they had been told about the Patriot Front, and by whom. Plaintiffs have inexplicably omitted this critical information.

Plaintiffs also fail the standing requirement to be "concrete."  Plaintiffs allege that painting over the former mural – a regrettable, yet wholly non-violent act -- instilled in them a subjective fear that was of indeterminate length and indefinite strength.  Moreover, this alleged fear was of indeterminate effect, allegedly causing plaintiffs to "stop and/or limit" their use of the park, ¶¶ 1011, to "wonder if they or their neighbors would be targeted by Patriot Front," ¶ 76, to "consider[]

placing their oldest child in therapy," ¶ 84, to have "racing thoughts," ¶ 80, and to find access to the park "more difficult," ¶ 81. If such a shapeless, unbounded, subjective claim were deemed sufficient to meet the requirement of concreteness, that requirement would have no real substance.

In summary, as the Supreme Court emphasized in *Lujan*, the party invoking federal jurisdiction bears the burden of establishing the core requirement of standing. 505 U.S. at 561. Plaintiffs have not met this burden. Their complaint should be dismissed.

## II.

### PLAINTIFFS HAVE NOT PLEADED AND CANNOT PLEAD THE NECESSARY ELEMENTS OF A 42 U.S.C. § 1985(3) CLAIM.

### A.

### Plaintiffs' Attempted Novel and Expansive Use of § 1985(3) Contravenes Supreme Court and Fourth Circuit Precedents

Section 1985(3) conspiracy claims have been narrowly circumscribed by the Supreme Court and the Fourth Circuit. Plaintiffs' proposed broad and novel use of § 1985(3), if permitted, would represent a major and dangerous expansion of this section directly in conflict with these cases.

Section 1985(3) states, in relevant part:

If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

The starting point for the modern interpretation of § 1985(3) is the Supreme Court's decision in *Griffin v. Breckenridge*, 403 U.S. 88, 98–99 (1971). In *Griffin*, a group of African Americans was assaulted by a group of whites while traveling on an interstate highway in Mississippi. The African-Americans filed an action for damages pursuant to § 1985(3). The issue before the Supreme Court was whether § 1985(3) reached individuals acting in a purely private capacity. Although the Court held that the statute does create a cause of action for certain kinds of private action interfering with federally protected rights to travel and Thirteenth Amendment rights, the Court expressed considerable concern over the broad language of § 1985(3). The Court cautioned that although § 1985(3) was designed to reach private conspiracies, Congress did not intend it to "apply to all tortious, conspiratorial interferences with the rights of others." 403 U.S. at 101.

In *United Brotherhood of Carpenters v. Scott*, 463 U.S. 825 (1983), the Court considered the application of § 1985(3) to a conspiracy directed by a pro-union group against a group of nonunion employees working for a non-union contractor. The conspiracy resulted in a physical attack upon the non-union workers, who subsequently brought an action for damages under § 1985(3). The district court found that such an attack evidenced a discriminatory animus against non-union workers as a class, and constituted an interference with the right of association, in violation of § 1985(3). On appeal, the Fifth Circuit affirmed. The Supreme Court, however, reversed. The Court found disconcerting the argument that § 1985(3) provides "a remedy for every concerted effort by one political group to nullify the influence or do injury to a competing group by use of otherwise unlawful means." *Id*. at 836. The Court reasoned:

> To accede to that view would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role which the courts should not be quick to assume. If respondents' submission were accepted, the proscription of § 1985(3) would arguably reach the claim that a political party has

11

interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings.

*Id.*

In *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), the Supreme Court refused to extend § 1985(3) to claims against persons who organized and coordinated antiabortion demonstrations.  In the course of that opinion, the Court stated:

Our discussion in *Carpenters* makes clear that it does not suffice for application of § 1985(3) that a protected right be incidentally affected. A conspiracy is not "for the purpose" of denying equal protection simply because it has an effect upon a protected right. The right must be *"aimed at," 463* U. S., at 833 (emphasis added); its impairment must be a conscious objective of the enterprise. Just as the "invidiously discriminatory animus" requirement, discussed above, requires that the defendant have taken his action "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," *Feeney,* 442 U. S., at 279, so also the "intent to deprive of a right" requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it. That was not shown to be the case here, and is on its face implausible.

506 U.S. at 275-76.

In *Harrison v. KVAT Food Management, Inc.,* 766 F.2d 155 (4th Cir. 1985), the Fourth Circuit, rejecting a contrary decision by the Second Circuit, held that Republicans as a class are not protected by Section 1985(3), even if it is alleged that defendants' conduct aimed to discourage the participation of a Republican in the affairs of his party.  The Fourth Circuit stated:

[A]nalyzing the *Scott* decision, we find little support for the contention that § 1985(3) includes in its scope of protection the victims of purely political conspiracies. Indeed, the opinion in *Scott* exhibits a noticeable lack of enthusiasm for expanding the coverage of § 1985(3) to any classes other than those expressly provided by the Court. . . . the Court provided no authority on which to base the extension of § 1985(3) protection urged upon us here. . .  We are concerned here with a statute enacted to fulfill a particular purpose and designed to meet particular conditions. . .  In fact, the Court in *Scott* expressed uncertainty over whether even the use of unlawful conduct in the deprivation of rights necessarily calls for a remedy. The Court remarked: "[W]e find difficult the question of whether § 1985(3) provided a remedy for every concerted effort by one political group to nullify the influence of or do other injury to a competing group by use of otherwise unlawful means." *Carpenters v. Scott*, 463 U.S. at 836.

12

*Id.* at 161-63.

The scope and elements of a § 1985(3) conspiracy claim must be viewed against the background of the reluctance to expand such a claim shown in these binding precedents. These elements are: (1) a conspiracy by two or more persons; (2) who are motivated by a specific, class based, invidiously discriminatory purpose; (3) to deprive the plaintiff of the equal enjoyment of rights secured by law to all; (4) that results in injury to the plaintiff; (5) as a consequence of an overt act committed by the defendants in connection with the conspiracy. *Thomas v. Salvation Army*, 841 F.3d at 637. Properly interpreted in accordance with the *Griffin, Scott, Bray*, and *Harrison* cases, plaintiffs' allegations do not satisfy these elements for several reasons.

First, § 1985(3) "applies only to such conspiracies as are 'aimed at interfering with rights . . . protected against private, as well as official, encroachment.'… There are few such rights (we have hitherto recognized only the Thirteenth Amendment right to be free from involuntary servitude . . and, in the same Thirteenth Amendment context, the right of interstate travel. " *Bray*, 506 U.S. at 278 (internal citations omitted). The plaintiffs' claims do not involve involuntary servitude or right of interstate travel and are therefore foreclosed in accordance with *Bray*.

Second, as noted above, the Supreme Court in *Bray* emphasized that the "'intent to deprive of a right'" requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it." Plaintiffs' allegations do not meet this stringent standard. Context, as the *Twombly* decision requires, is critical here. The vandalism alleged in the Complaint did not occur in a vacuum. To the contrary, it occurred in a political environment in which statues of Confederate generals such as General Lee were being badly defaced with apparent impunity. One may not approve of General Lee or the cause for which he fought, but it remains true that many

citizens admire him and many more strongly disapprove of the defacement of his and other statues of Confederate Generals and political leaders.  The issue is obviously one on which emotions run high, and precipitous and poorly thought out actions may occur.  In this milieu, the vandalism described in the Complaint can readily be interpreted as an ill-conceived protest against the defacement and removal of Confederate statues, not as an attempt with the conscious and specific objective, which *Bray* (and *Counterman*) require, of denying African-American persons, or anyone else, use of the park. This interpretation is at least as plausible as the interpretation plaintiffs insist on, and in accordance with *Twombly*, where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Third, as discussed earlier as to standing, the plaintiffs' claims are remarkably indefinite and boundaryless.  Allowing them to proceed as § 1985(3) claims would be to take a large step toward applying § 1985(3) "to all tortious, conspiratorial interferences with the rights of others," despite the Supreme Court's warning against this in *Griffin*.

Finally, § 1985(3) has a causation requirement – "whereby another is injured in his person or property."  For the reasons discussed earlier as to standing, plaintiffs' allegations do not plausibly allege this required element.

### B.

### Plaintiffs' Allegations Fail to Satisfy Fourth Circuit and Supreme Court Pleading Standards for § 1985(3) Conspiracy Claims

As this Court noted in *Smith v. Town of South Hill*, 611 F.Supp.3d 148, 187-88 (E.D. Va. 2020), when plaintiffs assert claims of conspiracy to violate civil rights under § 1985 they must meet a high threshold to establish a prima facie case. *See also Simmons v. Poe*, 47 F.3d 1370, 1376-77 (4th Cir. 1995); *A Society Without a Name for People Without a Home v. Virginia*, 699

F.Supp.2d 787, 796 (E.D. 2010), *aff'd,* 655 F.3d 342 (4th Cir. 2011). The Fourth Circuit emphasized in *Simmons* that a § 1985 conspiracy claim requires plaintiffs to show a "meeting of the minds" among conspirators and courts to look closely as to whether "a plaintiff has set forth sufficient facts to establish a § 1985 conspiracy." 47 F.3d at 1377. The Fourth Circuit and this Court have specifically rejected § 1985 claims in many cases where the purported conspiracies were alleged in a conclusory manner, in the absence of concrete supporting facts. *See, e.g., Simmons; Town of South Hill; A Society Without a Name.* These strict requirements specifically for § 1985 conspiracy pleading are in addition to those required generally for pleading conspiracies under *Twombly. See, e.g., Society Without a Name*, 699 F.3d at 798: "ASWAN fails to allege with any specificity…the specific communications amongst the conspirators, or the manner in which any such communications were made…" *See also Twombly*, 550 U.S. at 554-55: "These bare assertions ... amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim.... As such, the allegations are conclusory and not entitled to be assumed true."

Plaintiffs' conspiracy allegations do not satisfy these standards. As to defendants Turetchi and Tredinnick (and 21 other alleged conspirators) they merely repeat in cookie cutter fashion the conclusory phrase "was present for, and participated in, a meeting on or about October 12, 2021, planning the vandalism of the Arthur Ashe mural in Battery Park, Richmond, Virginia." This phrase fails to provide the required "specific communications amongst the conspirators" or concrete detail about what the conspirators allegedly agreed to, *e.g.,* what their alleged role was to be, as to what actions and goals.

Indeed, the plaintiffs' cut-and-paste phrase is ambiguous as to whether the conspirators actually agreed to anything. It first states that the conspirators "were present for, and participated in, a meeting." Then it adds "planning the vandalism of the Arthur Ashe mural." The phrase thus

does not even clearly allege the alleged conspirators agreed to the plan, only that they allegedly "participated in" a meeting in which the planning allegedly occurred. The phrase does not say the alleged planning was the only topic at the meeting, does not indicate who among the alleged conspirators said anything, does not state whether the meeting was in person or telephonic, and does not say who if any of the alleged conspirators approved the alleged plans. And the phrase says nothing about what the alleged planning consisted of, a particularly critical point since none of the alleged conspirators except Noyce, Dial, and John Doe 1 had any involvement in the actual vandalism.

The allegations regarding Paul Gancarz have a little more detail, but here too lack the concrete specificity necessary to pass muster under the stringent § 1985 conspiracy pleading standards. Given that plaintiffs' allegations are indefinite as to what was discussed at the alleged meeting, and by whom, or what the alleged planning consisted of, it does not necessarily follow that, even assuming Mr. Gancarz was a Network Director, he had knowledge of or control over what could have been a rogue operation.

## C.

### Plaintiffs' Allegations Fail to Satisfy the *Mens Rea* Requirement Established by the Supreme Court's *Counterman v. Colorado* Decision

The Supreme Court's recent decision in *Counterman v. Colorado*, summarized below, is relevant to all of plaintiffs' claims against all Defendants.

**Basic Facts**.  A man in Colorado named Counterman sent hundreds of unwanted Facebook messages to a woman named C.W., a local singer and musician.  C.W. did not know Counterman. Some of Counterman's messages were innocuous, except they came from a stranger. Some, however, expressed anger and envisaged harm befalling C.W., e.g., "You're not being good for human relations. Die." The messages put C.W. in fear and upended her life. She believed

16

Counterman was threatening her, became fearful he was following her, and suffered from severe anxiety. Eventually she contacted the Colorado authorities, who prosecuted Counterman under a statute making it unlawful to "[r]epeatedly . . . make[] any form of communication with another person" in "a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress."

Counterman moved to dismiss the charge on First Amendment grounds, arguing that his messages were not "true threats" and therefore could not form the basis of a criminal prosecution. Following Colorado law, the trial court rejected that argument under an objective standard, finding that a reasonable person would consider the messages threatening. The case went to a jury, which convicted Counterman. Counterman appealed, arguing that the First Amendment required the State to show not only that his statements were objectively threatening, but that he was aware of their threatening character. The Colorado Court of Appeals disagreed and affirmed his conviction; the Colorado Supreme Court denied review. The U.S. Supreme Court granted certiorari to address (1) whether the First Amendment requires proof of a defendant's subjective mindset in "true threat" cases, and (2) if so, what *mens rea* standard is sufficient.

**Holding.**  In a majority opinion written by Justice Kagan, the Supreme Court held: (1) the First amendment does require proof of a defendant's subjective mindset in "true threat" cases, and (2) the appropriate mens rea standard is recklessness, i.e,, a mental state in which a person "consciously disregard[s] a substantial [and unjustifiable] risk that the conduct will cause harm to another."  Slip Opinion (No. 22-138, June 27, 2023)) (Majority Opinion) at 11 (quoting *Voisine v. United States*, 579 U.S. 686, 689 (2016)).  In explaining the rationale of its holding, the Court stated:

> Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. . . . The result is "self-censorship" of speech that could not be proscribed—a "cautious and restrictive exercise" of First Amendment freedoms. . . . And an important tool to prevent

that outcome—to stop people from steering "wide[] of the unlawful zone"—is to condition liability on the State's showing of a culpable mental state.

*Id*. at 6-7 (case citations omitted).  The Court then continued:

Such a requirement comes at a cost: It will shield some otherwise proscribable (here, threatening) speech because the State cannot prove what the defendant thought. But the added element reduces the prospect of chilling fully protected expression. As this Court has noted, the requirement lessens "the hazard of self-censorship" by "compensat[ing]" for the law's uncertainties. . . . "

*Id.* at 7 (case citations omitted).

In supporting its holding, the Court relied on *New York Times v. Sullivan*, 376 U.S. 254 (1964), among other cases.  *See, e.g., id.* at  8 (citing *Sullivan* for the proposition that "without such a subjective mental-state requirement, the uncertainties and expense of litigation will deter speakers from making even truthful statements").

**Concurrence.** In her concurring opinion, Justice Sotomayor emphasized *inter alia* that the *Sullivan* recklessness standard adopted by the Court requires "a high degree of awareness that a statement was probably threatening or serious doubts as to the threatening nature of the statement." Slip Opinion (Justice Sotomayor Concurrence) at 21-22. Only this stringent recklessness standard, she warned, could avoid the "chilling that would arise from a more amorphous and easily satisfied standard."  *Id.* at 22. She also cautioned that "[e]specially in a climate of intense polarization, it is dangerous to allow prosecutions for heated words based solely on an amorphous recklessness standard."  *Id*. at 23.

Plaintiffs' § 1985 and §1986 claims are incontrovertibly "true threat" claims. The logic and essence of these claims is that the plaintiffs allegedly felt threatened by Defendants' alleged actions in posting Patriot Front insignia on the stencilled-over Arthur Ashe mural and that Defendants' conduct, although manifestly expressive, was unprotected by the First Amendment. Plaintiffs'

complaint uses variations of the word "intimidate" nearly a dozen times, together with multiple uses of "fear," "anxiety," "harassment," and similar allegations.

As previously discussed, the Supreme Court in *Counterman* established that a *mens rea* element of at least recklessness is required in "true threat" cases to defeat First Amendment protection. Plaintiffs' Complaint, however, is devoid of plausible allegations that Defendants consciously disregarded a substantial and unjustifiable risk that their conduct would cause the harm of which the plaintiffs complain, i.e., that the plaintiffs, who were not known to the Defendants, would become so fearful from the Defendants' stencilling over of the Arthur Ashe mural and posting of Patriot Front insignia that they would stop walking their dog in the park and "limit" their use of the park in other ways.  This absence of plausible allegations of subjective intent is emphatically true as to Defendants Turetchi and Tredinnick, as to whom, as previously discussed, the complaint provides only sparse, cut-and-paste conclusory allegations. But it is true also as to Defendants Gancarz, Noyce, and Dail.  As to these Defendants as well, the plaintiffs' Complaint does not allege a plausible factual basis for concluding that the Defendants knew anything about where the unnamed plaintiffs resided or knew or recklessly disregarded their awareness that these plaintiffs, anomalously in the polarized and rough and tumble political discourse that prevails today -- which unfortunately includes widespread destruction and defacement of statues for political reasons  -- would limit their use of the Battery Park for some indefinite periods based on the Defendants' actions.

Any contention that the Defendants' requisite *mens rea* could be inferred from their alleged conduct alone contravenes the holding and tenor of *Counterman* and other Supreme Court cases. The Court in *Counterman* stated repeatedly that the Court's requirement of an additional subjective element *increased* the burden that needed to be surmounted before a "true threat" would become actionable or punishable. Indeed, the Court acknowledged that some threats that could be

objectively established would nonetheless *not* be actionable or punishable if the subjective element were not also proven. *See Counterman* (majority Opinion) at 7 ("Such a requirement comes at a cost: It will shield some otherwise proscribable (here, threatening) speech because the State cannot prove what the defendant thought. But the added element reduces the prospect of chilling fully protected expression"). The facts in *Counterman* underscore this. In that case, Counterman made numerous menacing statements to C.W. even after she tried to block him, yet the Supreme Court held that these actions by themselves, without additional evidence of subjective intent, were insufficient. *See also Counterman,* (Sotomayor concurrence) at 10 (emphasizing that the Supreme Court in *Virginia v. Black*, 538 U.S. 343 (2003), in striking down as unconstitutional the portion of the cross burning statute that provided that burning of a cross would be prima facie evidence of an intent to intimidate, rejected the proposition that "the all-important intent requirement could be satisfied by the mere conduct itself.")

### III.

### PLAINTIFFS HAVE NOT PLEADED AND CANNOT PLEAD A VIABLE CLAIM UNDER 42 U.S.C. § 1986.

The broad construction that underlies plaintiffs' § 1986 claim has no support in any case law. No case known to defendants has ever affirmatively upheld a stand-alone § 1986 claim with anything approaching substantial analysis. Generally, the courts treat § 1986 as dependent on a viable § 1985(3) claim, and thus, the two stand or fall together. *See, e.g., Trerice v. Summons*, 1081, 1085 (10th Cir. 1985); *Davis v. Hudgins*, 896 F. Supp.2d 561, 571 (E.D. V. 1995), *aff'd*, 87 F.3d 1308 (4th Cir. 1996). In this case, since plaintiffs cannot allege a viable § 1985(3) claim, their § 1986 claim should fail as well.

Moreover, even if plaintiffs had stated a viable § 1985(3) claim, the § 1986 count would not survive. An interpretation giving it stand-alone viability would impose amorphous and virtually

unlimited obligations on even private citizens to prevent alleged violations by others of § 1985. This is not consistent with basic principles of statutory construction. *See, e.g., United States v. American Trucking Ass'n*, 310 U.S. 534, 543 (1940) ("Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole,' this Court has followed [the purpose of the act] rather than the literal words.").

## IV.

## PLAINTIFFS' §§ 1985(3) AND 1986 CLAIMS ARE BARRED BY THE DOCTRINE THAT AGENTS CANNOT CONSPIRE WITH THEIR PRINCIPALS

To allege a viable § 1985(3) claim, plaintiffs must of course establish the existence of a conspiracy. As § 1986 incorporates § 1985 – i.e., "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title …" -- a conspiracy is a prerequisite for this claim as well. Plaintiffs' own pleadings, however, negate the existence of a conspiracy.

In Complaint ¶ 92, plaintiffs allege as follows:

> Defendant Patriot Front is vicariously liable for the violations of section 1985 by its agents, each of whom acted within the scope of their agency. At the time of the conspiracy alleged herein, Defendant Patriot Front members acted as its agents within their roles as members of Defendant Patriot Front.

Plaintiffs make similar allegations with regard to their § 1986 claim in ¶ 108 and their Virginia Code claim in ¶ 115.  But under Virginia law, as under the laws of other jurisdictions, agents of the same principal cannot conspire with each other or with their principal because they are deemed one legal entity.  *See, e.g., Owen v. Liberty University,* 2020 WL 1856798 (W.D. Va. Apr. 13, 2020) at *17 (collecting cases for the rule that a conspiracy action cannot lie where a principal and its agents, or two agents of the same principal, are alleged to have conspired with

each other);  *Rosenthal v. R. W. Smith Co.*, 260 F.Supp.3d 580, 593-94 (W.D. Va. 2017) ("There cannot be a conspiracy between agents of a corporation acting within the scope of their duties  . . . when agents are acting within the scope of their duties, there is only one entity acting – the principal itself") ;  *Rogers v. Deane,* 992 F.Supp.2d  621, 633 (E.D. Va. 2014), *aff'd*, 594 Fed. Appx 768 (4th Cir. 2014) ("If a principal/agent or an employer/employee relationship exists between the parties, the parties  are  not  separate  entities") (collecting  cases  under  Virginia  law  rejecting conspiracies between principals and agents).

Although Patriot Front is not a corporation, the intra-corporate conspiracy doctrine, which is similarly based on the premise that agents and principals form a single legal entity and cannot conspire  with  each  other,  confirms  that  plaintiffs'  conspiracy  allegations  in  this  case  are insufficient. The intra-corporate conspiracy doctrine recognizes that a corporation cannot conspire with its agents because the agents' acts are the corporation's own. See *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002) ("[U]nder the intracorporate immunity doctrine, acts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation"). Moreover, suing the agents individually does not destroy "the immunity granted under the doctrine." *Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985).

In *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342 (4th Cir. 2013), the Fourth Circuit applied this doctrine to § 1985(3) claims. Plaintiffs in that case alleged that a landlord and its agents, motivated by racial animus, interfered with the plaintiffs' opportunity to sell their business.  As three of the defendants in that case were employees of the same company, however, the Court concluded that they could not have conspired with each other.  *Id*. at  353-54 ; *see also Buschi*, 775 F.2d at 251-52 (applying doctrine to § 1985(3) claims).

Accordingly, here, as in the cases cited, plaintiffs' conspiracy claims must be dismissed.

# V.

## THE PLAINTIFFS' § 1986 CLAIMS ARE TIME-BARRED

Section 1986 of the Civil Rights laws incorporates its own one-year statute of limitations, i.e., "no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued." Based on plaintiffs' own allegations in their complaint as amplified by their memorandum in opposition to defendants' initial motion to dismiss, this one-year statute of limitations bars plaintiffs' § 1986 claims.

Plaintiffs filed their complaint on October 18, 2022. Their complaint alleges and their memorandum argues, however, that defendants' alleged "campaign of vandalism" began in the summer of 2021 with the posting of stickers in the Battery Park neighborhood, *see* Complaint, ¶¶ 48 and 74 and Memo. in Opp. at page 3 and page 24, footnote 4; and, according to plaintiffs, culminated in the stenciling of the Arthur Ashe mural on October 18, 2021, *see* Complaint ¶ 51, Memo. in Opp. at 4. The summer of 2021 was approximately 16 or 17 months prior to the filing of plaintiffs' Complaint and the stenciling of the mural was one year and one day before the filing the Complaint.  Section 1986's one-year limitation period is not subject to tolling.  *See, e.g., Johns v. Home Depot U.S.A., Inc.*, 221 F.R.D. 400, 401 (S.D.N.Y 2004); *Smith v. Orange County*, 1995 WL 405018 at * 1 (E.D.N.Y. June 27, 1995); *Bieros v. Nicola*, 839 F.Supp. 332, 337 (E.D. Pa. 1993).  Plaintiffs' § 1986 claims, accordingly, are time-barred.

# VI.

## PLAINTIFFS HAVE NOT PLEADED AND CANNOT PLEAD VIABLE CLAIMS UNDER VIRGINIA CODE § 8.01-42.1;  IF THAT STATUTE WERE INTERPRETED SUCH THAT PLAINTIFFS' CLAIMS SURVIVE, THE STATUTE IS UNCONSTITUTIONAL ON FIRST AMENDMENT GROUNDS

Under any reasonable construction of Virginia Code § 8.01-42.1's key terms "harassment" and "intimidation" – especially the definition of "intimidation" set forth in

*Virginia v. Black* -- plaintiffs' allegations are insufficient to state a claim. The salient characteristics of plaintiffs' factual allegations are: (1) there was no confrontation or even encounter between the plaintiffs and the Defendants and the Defendants did not use symbols with a "long and pernicious history as a signal of impending violence"; 2) a third party, undoubtedly hostile to the Defendants, interpreted the Patriot Front logos and values to the plaintiffs; and (3) the plaintiffs' core factual allegations involved damage to public property to which plaintiffs had no greater rights than the general public. These salient aspects sharply distinguish plaintiffs' factual allegations from the facts in any of the cases that have applied the Virginia statute, *e.g., Berry v. Target Corp.*, 214 F. Supp. 3d 530, 535 (E.D. Va. 2016) (defendant accosted plaintiff while shopping and used a racial slur); *Salim v. Dahlberg*, 170 F. Supp. 3d 897, 913 (E.D. Va. 2016) (passenger in plaintiff's taxi "engaged in an alcohol-fueled rant against Muslims and Arabs that culminated in [passenger] punching [plaintiff] multiple times"); *Law v. Hilton Domestic Operating Co.*, 2020 WL 7130785 (E.D. Va. Dec. 4, 2020) (defendant hotel's security guard aggressively and insultingly interrogated African-American plaintiff); *Williams v. AM Lapomarda*, 2020 WL 3643466 (E.D. Va. July 6, 2020) (defendant allowed employee to call plaintiff, a Muslim woman, a "security risk" and call police to have her removed from store); and *Frazier v. Cooke*, 2017 WL 5560864 (E.D. Va. Nov. 17, 2017) (defendants "used racial slurs and physically attacked [plaintiffs] because of their race"). All these cases involved the defendants' physical invasion of plaintiffs' space and confrontational use of verbal threats and insults, not as in this case a presentation of the defendants' ideology by an unknown source undoubtedly hostile to the Defendants.

Moreover, as discussed in Section II C, the Supreme Court in its recent *Counterman* decision substantially enhanced the requirements for pleading and proving a true-threat claim, such as plaintiffs' § 8.01-42.1 claim. Plaintiffs, accordingly, must provide factual allegations

that not only plausibly describe an objective threat but the Defendants' subjective awareness of that objective threat in accordance with the *mens rea* standards set forth in *Counterman*. *Counterman* and the Supreme Court's earlier *Virginia v. Black* decision foreclose the tactic of simply describing the conduct that allegedly constituted the alleged threat to satisfy the subjective intent requirement. More is required; if it were not, the *Counterman mens rea* requirement would be toothless and would not achieve the Court's explicit goal of obviating the chilling effect of the "true threat" doctrine. The Court's discussion of its rationale for its *mens rea* requirement, indeed, bears repeating, as it applies with great precision to this case:

> The reason relates to what is often called a chilling effect. Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. . . Or he may simply be concerned about the expense of becoming entangled in the legal system. The result is "self-censorship" of speech that could not be proscribed—a "cautious and restrictive exercise" of First Amendment freedoms. . . . And an important tool to prevent that outcome—to stop people from steering "wide[] of the unlawful zone"—is to condition liability on the State's showing of a culpable mental state.

The *Counterman mens rea* requirements, in short, were created to prevent a cautious and restrictive exercise of precious First Amendment rights. They should be allowed to exercise this freedom-enhancing effect in this case.

Assuming *arguendo*, however, that plaintiffs' factual allegations were deemed sufficient to state a claim under the statute, the statute would become subject to constitutional challenge, as explained below.

First, the statute would be void for vagueness, as applied to this case. Vague laws offend important values: they fail to provide people of ordinary intelligence a reasonable opportunity to understand what is prohibited; they create the risk of arbitrary and discriminatory enforcement; and where the statute abuts on sensitive areas of First Amendment freedoms, they inhibit the exercise of those freedoms. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09

(1972); *White Coat Waste Project v. Greater Richmond Transit Co.*, 463 F.Supp.3d 661, 707 (E.D. Va. 2020). The statute, again assuming it were interpreted such that plaintiffs' allegations state a claim, would contravene all these values.

To illustrate, consider the allegation that the defendants placed Patriot Front stickers in a community that was 77% African-American. If the area were 50% African-American, would defendants' actions still be actionable?  How does one select the boundaries of the community – a few square blocks or square miles? Would the actions have been actionable if leaflets instead of stickers were involved? With respect to defacing the mural (or a statue), are the political views of the person depicted on the mural or statue a factor in determining whether the defacement is actionable? Are defendants barred from even speaking to an African-American audience?  If we accept that the Defendants, despite their unpopular views, are entitled under the First Amendment to actively promote them, these questions are consequential, but no answers are ascertainable from the statute. On the facts of this case, "intimidation" and "harassment," like the "outrageousness" at issue in *Snyder v. Phelps*, 562 U.S. at 460-61, would have "an inherent subjectiveness about [them] which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression."  *See also Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts.").

As a consequence of the Virginia statute's vagueness, it would also be unconstitutionally overbroad. As this Court explained in *White Coat Waste Project*, a law is overbroad and subject to facial challenge where a substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep. 463 F. Supp.3d at 693. On the assumption that the Virginia statute were given the broad construction the plaintiffs urge and require to prevail, the

statute would indeed make actionable a substantial amount of activity protected by the First Amendment. Its lack of narrowly drawn and definite standards would be analogous to the permit regulations invalidated by the Supreme Court in *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992).  *See also City of Lakewood v. Plain Dealer Publishing Co*., 486 U.S. 750, 759 (1988) ("[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.")

Finally, if given this broad and amorphous construction the Virginia statute would violate viewpoint neutrality as illustrated by the *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) case. Although plaintiffs attempt to depict the present case as turning on the mere posting of the Patriot Front stickers, it is manifestly the *content* of the stickers and the Patriot Front's ideology that, on plaintiffs' theory, makes the Defendants' conduct actionable under the Virginia statute. Plaintiffs have not plausibly alleged that the content of Patriot Front's ideology, although disfavored and intensely disliked by many, is constitutionally unprotected.

## CONCLUSION

For the reasons stated, Defendants request that the plaintiffs' amended complaint be dismissed in its entirety.

Respectfully submitted,

NATHAN NOYCE
THOMAS DAIL
PAUL GANCARZ
 DANIEL TURETCHI
 AEDAN TREDINICK


By:_____/s/_____
     Counsel

Bradley P. Marrs (VSB#25281)
Marrs & Henry
7202 Glen Forest Drive, Suite 307
Richmond, VA  23226
Tel. (804) 662-5716
Fax (804) 662-5712
bmarrs@marrs-henry.com


Glen K. Allen, *Pro Hac Vice*
Glen Allen Law
5423 Springlake Way
Baltimore, MD  21212
Tel. (410) 802-6453
glenallenlaw@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2023, a true and accurate copies of the foregoing were

served via ECF procedures of this Court to the following counsel of record:

Michael R. Shebelskie
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219-4074
mshebelskie@huntonak.com

Ryan P. Phair
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW, Suite 900
Washington, DC  20037-1701
rphair@huntonak.com

Edward G. Caspar
Arthur Ago
Lawyers' Committee for Civil Rights Under Law
1500 K Street, NW, Suite  900 Washington, DC  20005 ecaspar@lawyerscommittee.org
aago@lawyerscommittee.org

_____/s/_____
Bradley P. Marrs (VSB#25281)
Marrs & Henry
7202 Glen Forest Drive, Suite 307
Richmond, VA  23226
Tel. (804) 662-5716
Fax (804) 662-5712
bmarrs@marrs-henry.com
*Counsel for Defendants*
*Noyce, Dail, Gancarz, Turetchi and Tredinnick*