UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| SEALED PLAINTIFFS 1 and 2 | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 3:22 cv 670-MH |
| v. | ) | |
| | ) | |
| PATRIOT FRONT, et al. | ) | |
| | ) | |
| Defendants. | ) | |

REPLY MEMORANDUM IN FURTHER
SUPPORT OF DEFENDANTS' AMENDED MOTION TO DISMISS

Defendants Noyce, Dail, Gancarz, Turetchi, and Tredinnick (together "Defendants"), by counsel, respectfully submit this reply memorandum in further support of their Amended Motion to Dismiss plaintiffs' First Amended Complaint ("complaint") under FRCP 12(b)(6).

INTRODUCTION

Plaintiffs in their opposition memorandum continue to characterize the Defendants as "white supremacists," adding now a new slur -- that they are members of an "organized hate group." No one, obviously, is asking the plaintiffs or this Court to approve of the Defendants' ideology, and certainly not the distorted versions plaintiffs ascribe to them. But there is a danger to the fair adjudication of this important case arising from plaintiffs' ongoing resort to inflammatory labels. These labels are an attempted improper shortcut to satisfying plaintiffs' specific pleading obligations.

Name calling aside, plaintiffs are required to clearly demonstrate all elements of standing. They have not done so. They are required to meet a high threshold to establish a prima facie case for their civil rights conspiracy claims; they have fallen short here as well. They need to show

how their factual allegations fit into the required elements of Virginia Code § 8.01-42.1, but cannot do so. Plaintiffs' heavy reliance on cases involving violent actions by the Ku Klux Klan, the January 6 defendants, the demonstrators at Charlottesville, and others bear no fair resemblance to the alleged facts in this case and show that the plaintiffs cannot support their claims without grasping at straws.

Plaintiffs also fail to come to grips with the Supreme Court's recent *Counterman v. Colorado,*143 S.Ct 2106 (June 27, 2023) decision. They first express doubt that the case applies to civil matters, even though numerous statements in the majority, concurring, and dissenting opinions show that the decision applies to such cases. They further seek to minimize *Counterman*'s impact on their pleading burdens in this case. The Court in *Counterman*, however, made abundantly clear that it was markedly enhancing such pleading standards by adding a subjective *mens rea* requirement for "true threat" cases, which this case assuredly is. The Court's enhanced pleading standards are comparable to the elevated pleading requirements for defamation effected by the Court's *New York Times v. Sullivan*, 376 U.S. 254 (1964) case.  Plaintiffs' complaint does not come close to meeting these stringent new standards.

In two other respects as well, plaintiffs' opposition memorandum fails to ward off Defendants' motion to dismiss. First, as explained in Defendants' initial memorandum, the doctrine that agents cannot conspire with their principals bars plaintiffs' § 1985 and § 1986 conspiracy claims. Plaintiffs' argument that this doctrine does not apply to unincorporated associations such as Patriot Front ignores the more fundamental legal principle that under Virginia law, agents of the same principal cannot conspire with each other or with the principal, and plaintiffs' complaint repeatedly alleges that the Defendants are agents of the same principal, i.e., Patriot Front.  Second, plaintiffs' § 1986 claim is time-barred. As explained in this memorandum,

even assuming the discovery rule applies as plaintiffs contend, in accordance with plaintiffs' own allegations all elements triggering their duty of inquiry were present in the summer of 2021, well outside the applicable one-year limitations period.

In *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), *Snyder v. Phelps*, 502 U.S. 443 (2011), and many other cases, the Supreme Court has stood firm against penalizing parties based on the emotional antipathy many feel toward those parties' statements or ideologies. These cases, both in their general tenor and their particular application to this case, along with the other cases cited in Defendants' memoranda, demonstrate that Defendants here should not be punished for having disfavored views. Plaintiffs' complaint, accordingly, should be dismissed.

## ARGUMENT

### I.    PLAINTIFFS LACK STANDING TO MAKE THEIR CLAIMS.

Plaintiffs bear the burden of establishing standing at the time they bring suit. *Carney v. Adams*, 141 S.Ct. 493, 497 (2020).  Plaintiffs must, accordingly, clearly allege facts demonstrating each element of standing, i.e., that they have (1) suffered a concrete and particularized injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) is likely to be redressed by a favorable judicial decision.  *Spokeo v. Robins*, 578 U.S. 330, 338 (2016).  The cases on which plaintiffs rely to establish their standing in reality undermine it, for they demonstrate how far plaintiffs' factual allegations fall short of satisfying their required burden.

The following are summaries of five cases ("Plaintiffs' Cases") on which plaintiffs primarily rely in their opposition memorandum to support their standing argument.  Comparing the facts in these cases to plaintiffs' factual allegations shows dramatically that plaintiffs' standing arguments impermissibly rely on conjecture and speculation:

- *Fisher v. Shamburg*, 624 F.2d 156 (10ᵗʰ Cir. 1980). As the plaintiff Fisher, a black man, was entering a restaurant, the defendant Shamburg, a white man who was there with two other white men, uttered a racial slur at Fisher and later criminally assaulted him.
- *Vietnamese Fisherman's Ass'n v. Knights of Ku Klux Klan*, 518 F. Supp. 993 (S.D. Tex. 1981). Members of the Ku Klux Klan, wearing their robes, fired cannons and burned crosses in the presence of Vietnamese fishermen in Texas and burned the fishermen's shrimp boats.
- *Sines v. Kessler*, 324 F. Supp.3d 765 (W.D. Va. 2018). This case arose from the tumultuous and violent events at the Unite the Right Rally in Charlottesville on August 11 and 12, 2017.
- *Nat'l Coal. On Black Civic Participation v. Wohl*, 512 F. Supp.3d 500 (S.D.N.Y. 2021). Plaintiffs alleged that defendants sent threatening robocalls containing false information intended to prevent African-American recipients from voting by mail.
- *Thompson v. Trump*, 590 F. Supp.3d 46 (D.D.C. 2022). This opinion arose from the violent and gargantuan events of January 6, 2021. As to one of the plaintiffs, Congressman Swalwell, the court addressed the issue of Article III standing on the premise that Congressman Swalwell suffered only emotional injuries relating to the January 6 events.

Plaintiffs thus rely on cases involving criminal assaults on black persons, Ku Klux Klan attacks on Vietnamese fishermen, the riotous events at Charlottesville, the January 6 attacks on the Capitol, and directed robo calls that made false and threatening statements. None of Plaintiffs' Cases bear a fair and relevant resemblance to the plaintiffs' factual allegations regarding Defendants' conduct in this case. To the contrary, the contrast is striking.

**In all Plaintiffs' Cases - but not in this case - the defendants directly confronted the plaintiffs**. "Confrontation" is a weak word to describe the various defendants' conduct toward the plaintiffs in nearly all the Plaintiffs' Cases, involving as they did criminal assaults, cross burning, racially offensive signs and chanting while engaging in riotous behavior, and other violent actions. Even the robo call case involved the defendants' invasion of the plaintiffs' private space with false and threatening messages. No conduct remotely like this is set forth in plaintiffs' allegations in this case. There was no confrontation; indeed, there were no encounters at all. There

4

were no signs or messages that, in the words of the Supreme Court in *Virginia v. Black*, had "a long and pernicious history as a signal of impending violence."   538 U.S. 343, 363 (2011) (referring to cross burning).

Plaintiffs are attempting to construct their claims based on their assertions of subjective fear alone. Their logic, essentially, is "I experienced fear; therefore I was threatened; therefore I was injured; therefore I have standing." But subjective fear or other emotional reaction without facts that objectively describe a <u>true threat</u> is not a basis for alleging a constitutional violation.  In *Virginia v. Black*, the Supreme Court defined an objectively verifiable true threat:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . . Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Id*. at 359-60.  The painstaking care with which the Court addressed why cross burning meets these stringent definitions bespeaks a reluctance to open the floodgates on constitutional claims based on subjective fear, where the objective facts show no confrontations and no messages with a "long and pernicious history as a signal of impending violence."

**In none of Plaintiffs' Cases was there – as in the present case – the critical involvement of an unknown third party in the chain of causation leading to plaintiffs' alleged injuries.** As explained in Defendants' opening memorandum, a critical aspect of plaintiffs' allegations, which their complaint largely conceals, has the following components: a) the Defendants' political ideology, while objectionable to many, is protected by the First Amendment; b) that ideology could be described in neutral terms or it could be described in inflammatory and hostile terms; c) some unknown independent third party, for its own motives and reasons, chose to describe that ideology to the plaintiffs in a way that resulted in the plaintiffs' alleged emotional injuries. Against

5

this background, the plaintiffs have failed to demonstrate, as they must, that the alleged harm was caused by the Defendants as opposed to the "independent action of some third party not before the court." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018).

Plaintiffs in their opposition counter with the contention that this "fairly traceable" component of the standing requirements is easily satisfied. It is enough, they assert, that Defendants' actions are merely one of many causes of the plaintiffs' alleged injuries. But the Fourth Circuit in *Frank Krasner Enters., Ltd. v. Montgomery Cty*, 401 F.3d 230 (4th Cir. 2005) and other cases has made clear that the "fairly traceable" requirement is not so toothless.

In *Frank Krasner*, a Maryland county passed a law that denied public funding to venues that display or sell guns. The Montgomery County Agricultural Center ("Ag Center") was a venue subject to this law. As the law increased the Ag Center's costs for allowing gun exhibitors to rent space in its venue, it stopped renting them space. Frank Krasner Enterprises, Ltd. ("Krasner") was one such gun exhibitor. Krasner sued the county, alleging violations of its First and Fourteenth Amendment rights. In this context, the Fourth Circuit addressed the issue of Krasner's standing.

Although the Fourth Circuit explicitly acknowledged that the county law was the reason the AgCenter declined to rent space to Krasner – in other words, was a cause, and an important one, of Krasner's alleged injuries – it nonetheless held Krasner failed to establish the causation (fair traceability) requirement for standing. 401 F.3d at 234-35. Citing its decision in *Burke v. City of Charleston*, 139 F.3d 401 (4th Cir. 1998) (discussed in the next subsection) and numerous cases from outside the Fourth Circuit, including the Supreme Court's decision in *Allen v. Wright*, 468 U.S. 737 (1984), the court held that "[t]he purported injury here, like that of the painter in *Burke* . . . is not directly linked to the challenged law because an intermediary . . . stands directly between the plaintiffs and the challenged conduct in a way that breaks the causal chain." *Id*. at 235. In this

6

case, as in *Frank Krasner* and the cases discussed in that decision, an intermediary stands directly between the plaintiffs and the challenged conduct in a way that breaks the causal chain. Plaintiffs' own allegations point directly and necessarily to information provided by an unknown third party as the source of the fearfulness that plaintiffs characterize as their injury.

**Unlike any of Plaintiffs' Cases, in this case harm to public property is at the core of plaintiffs' allegations.** Even when a plaintiff satisfies the basic constitutional requirements for standing, federal courts will not adjudicate a "generalized grievance shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This latter requirement was not an issue in Plaintiffs' Cases but is central to the standing question in this case, given that plaintiffs' allegations explicitly predicate their alleged injury on their emotional reactions to vandalism that harmed public property. See Plaintiffs' Opp. Memo. at 20 ("The sole act alleged in this case to be the source of Plaintiffs' injuries is the defacement of the Arthur Ashe mural."). In addition to the reasons presented in Defendants' initial memorandum, the Fourth Circuit's decision in *Burke v. City of Charleston* demonstrates why plaintiffs fail this requirement.

In the *Burke* case, a man named Klenk, who owned a building in Charleston, South Carolina, commissioned an artist, Burke, to paint a mural for the building. The Charleston Board of Architectural Review denied Klenk a permit and issued a stop work order. Burke, not Klenk, sued Charleston in federal court, asserting that the permit denial violated Burke's First and Fourteenth Amendment rights. Burke asserted he had standing because the permit denial caused him to "fear [his] work would not be permitted" in other parts of Charleston. The district court held Burke had standing but denied his claims on other grounds. Finding no standing, the Fourth Circuit reversed. It held that

> federal courts are venues preserved for those who have a direct stake in the outcome
> of the controversy which they seek to litigate. Like the thousands upon thousands of

> Charlestonians and Charleston visitors who would likely take pleasure in Burke's creation were they only allowed to view it there on Klenk's wall, Burke himself, although the creator of the work, lacks such a direct stake, and as a consequence the district court lacked jurisdiction to adjudicate his claims.

139 F.3d at 407. The plaintiffs in this case similarly lack standing.  Like Burke, the logic of their theory of injury leads inescapably through harm done to a mural for which they had no greater rights than the general public.

**In none of Plaintiffs' Cases was the plaintiff's alleged claim as nebulous as plaintiffs' claims in this case.** As discussed in Defendants' opening memorandum, despite the standing requirement that a claim be concrete and particularized, plaintiffs' claims encompass such amorphous alleged injuries as "racing thoughts," finding access to the park "more difficult," and "wonder[ing] if they or their neighbors would be targeted by Patriot Front." Further evidence of the boundaryless nature of plaintiffs' claims is shown by their vacillation in their opposition memorandum between, on the one hand, describing Defendants' alleged wrongdoing as a "months long campaign of vandalism" beginning in the summer of 2021 that caused plaintiffs to experience fear (Pls' Memo. in Opp. at 25; see also First Amended Complaint at ¶ 3) and, on the other hand, asserting that plaintiffs' claims are predicated solely on the vandalism of the Arthur Ashe mural on October 18, 2021 and every other action attributed to the Defendants is only "context." Plaintiffs'  Memo. in Opp. at 20**.** Plaintiffs' claims thus simultaneously include and exclude Defendants' alleged actions prior to October 18, 2021.  This is far from a concrete and particularized claim.

## II. PLAINTIFFS HAVE NOT PLEADED AND CANNOT PLEAD THE NECESSARY ELEMENTS OF A 42 U.S.C. § 1985(3) CLAIM.

To validate their **§** 1985 conspiracy claims, plaintiffs seek a novel and expansive interpretation of that statute. Plaintiffs' allegations, however, fail to satisfy the substantive

8

requirements for such claims set forth by Supreme Court and Fourth Circuit precedents, the new *mens rea* requirements imposed by the Supreme Court's *Counterman v. Colorado* decision, or the stringent pleading rules for § 1985 conspiracies that predated *Counterman.*

Plaintiffs' § 1985 conspiracy claims fail on substantive grounds – i.e., plaintiffs' failure to set forth substantive rights Defendants allegedly violated that are protected by § 1985.  As explained in Defendants' initial memorandum, under the Supreme Court's *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), decision, "There are few such rights (we have hitherto recognized only the Thirteenth Amendment right to be free from involuntary servitude . . and, in the same Thirteenth Amendment context, the right of interstate travel.)"  506 U.S. at 278 (internal citations omitted).  The plaintiffs dispute the Defendants' assertion, based on *Bray*, that § 1985 is limited to claims that involve Thirteenth Amendment involuntary servitude or right of interstate travel. They cite *Sines v. Kessler* to support their position. But the court in *Sines* actually agreed with this assertion. 324 F.3d at 781.

The *Sines* court did, however, conclude that implicit in the Thirteenth Amendment is a right to be free from racial violence. *Id*. The court, based on the many allegations of violence at the Charlottesville events, then allowed the plaintiffs' § 1985 conspiracy claims to proceed on the predicate that plaintiffs had the right to be free from conspiracies to commit racial violence. The *Sines* decision thus unduly expanded the scope of § 1985 claims, in contravention of *Bray* and other relevant cases.  In any event, the plaintiffs' allegations in the present case, unlike those in *Sines* involving the Charlottesville disaster, do not support the *Sines v. Kessler* theory of claims based on an alleged conspiracy to commit racial violence.  Plaintiffs do not even contend they do.

Plaintiffs, instead, seek to expand the scope of § 1985 in a different direction, by implying into the Thirteenth Amendment a right to be free from conspiracies to deprive African Americans of the use of places of public accommodation. In support of this theory, they cite the *Fisher v.*

*Shamburg* case previously discussed, in which a black man was criminally assaulted when he tried to enter a restaurant. The relevant factual gap between the criminal assault in *Fisher* and the factual allegations in this case about covering over a mural and putting stickers on lampposts is very great. Allowing a § 1985 action predicated on the Thirteenth Amendment to proceed based on the latter set of facts would open up the § 1985 action in precisely the way the Supreme Court in *Griffin v. Breckenridge,* 403 U.S. 88, 101 (1971), warned against: that it should not be allowed to "apply to all tortious, conspiratorial interferences with the rights of others." It would set a precedent that would lead to federalizing a broad array of tort and quasi tort claims.

There is an important First Amendment aspect to these issues as well.  As discussed, the Patriot Front logos on the stickers and the mural were not threatening in themselves. Allegedly, plaintiffs *interpreted* these  as threatening after their supposed research.  Even assuming *arguendo* that the information third parties provided to plaintiffs led them to conclude that Patriot Front is a "white supremacist" organization, our nation remains committed to protecting even offensive and hurtful speech on public issues "to ensure that we don't stifle public debate," *Snyder v. Phelps*, 502 U.S. at 461.  Moreover, under *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969), legal attacks on abstract advocacy, however repugnant to many, must be rejected;  only incitement to imminent lawless action may become the basis of a suit. In basing their action on their anxiety alone, without confrontations or incitement to imminent lawless action, plaintiffs are improperly seeking to use § 1985 as an end run around basic First Amendment values and protections.

In addition,  the Supreme Court in *Bray* emphasized that the "intent to deprive of a right" element requires that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it.  This admonition is particularly apposite as to Defendants Gancarz, Turetchi, and Tredinnick

who are not alleged to have had any involvement in the vandalism itself but only to have been present at a meeting in which the vandalism was allegedly in some unspecified way "planned."

As to the Supreme Court's *Counterman v. Colorado* case, plaintiffs' opposition raises two basic issues:  first, whether that decision applies to noncriminal cases; and second, assuming it does apply to this civil case, what impact it has on the plaintiffs' pleading burden.

**Does the *Counterman* decision apply to noncriminal cases?** Several factors weigh decisively in favor of an affirmative answer to this question. First, in both the majority and concurring opinions, cases applying the First Amendment to civil cases, especially *New York Times v. Sullivan*, are repeatedly recognized as relevant precedents.  Second, Justice Barrett in her dissent stated: "This case is about the scope of the First Amendment, not the interpretation of a criminal statute. Accordingly, the Court's holding affects the *civil* consequences for true threats just as much as it restricts criminal liability." 143 S.Ct. at 2140 (Barrett dissent) (emphasis in original).  Third, the Supreme Court has held that the First Amendment applies in state tort cases. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011).

**What impact does the *Counterman mens rea* requirement have on plaintiffs' pleading burden?** Plaintiffs in their opposition seek to minimize the impact of the *Counterman* decision on their pleading requirements, but this effort cannot be squared with the spirit or letter of that important case.  All opinions in *Counterman* – majority, concurring, and dissent -- agree that the decision's impact will be analogous to the profound impact *New York Times v. Sullivan* has had on the law of defamation.  *See, e.g., id.* at 2131 (Sotomayor concurring opinion). The *Sullivan* actual malice standard is "famously daunting."  *Tah v. Global Witness Publishing, Inc*., 991 F.3d 237, 240 (D.C. Cir. 2021) (internal citation and quotation marks omitted).  Indeed, it has been described as "almost impossible." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 771 (1985) (White, J., concurring in judgment).  Justice Kagan in her opinion acknowledged

11

that because of the strictness of the new *mens rea* standard many cases that meet the objective criteria of a true threat would nonetheless be rendered nonactionable. *Counterman*, at 2115.

Moreover, the rationales for the new *mens rea* requirement as expressed by both Justice Kagan and Justice Sotomayor are relevant in determining the impact of Counterman on this case.

**Justice Kagan***:*

> The reason [for the new *mens rea* requirement] relates to what is often called a chilling effect. Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. . .  Or he may simply be concerned about the expense of becoming entangled in the legal system. The result is "self-censorship" of speech that could not be proscribed—

*Id*. 2114-15 (internal citations and quotation marks omitted).

**Justice Sotomayor**:

> Lest there be any doubt, the First Amendment stakes around the definition of "true threats" are high indeed.  . . .  First Amendment vigilance is especially important when speech is disturbing, frightening, or painful, because the undesirability of such speech will place a heavy thumb in favor of silencing it. . . .
> Many of this Court's true-threats cases involve such charged political speech. . . . Much of this speech exists in a gray area where it will be quite hard to predict whether a jury would find it threatening. And the ubiquity of such speech raises the possibility of highly discretionary enforcement. . .  A jury's determination of when angry hyperbole crosses the line will depend on amorphous norms around language, which will vary greatly from one discursive community to another.  Juries' decisions will reflect their "background knowledge and media consumption.". . . .  "[S]peakers whose ideas or views occupy the fringes of our society have more to fear, for their violent and extreme rhetoric, even if intended simply to convey an idea or express displeasure, is more likely to strike a reasonable person as threatening." *United States v. White*, 670 F.3d 498, 525 (C.A.4 2012) (FLOYD, J., concurring in part and dissenting in part).

*Id.* at 2122-23 (internal citations and quotation marks omitted).  The speech-chilling, selective enforcement, and jury concerns identified by the justices apply with great precision to this case.

Against this background, plaintiffs' efforts to squeeze inferences of subjective intent out of their complaint's spindly allegations contravene the manifest purpose of *Counterman's* new *mens rea* requirement. As explained in Defendants' opening memorandum, plaintiffs' allegations do not even satisfy the objective criteria for a true threat or the Supreme Court's and Fourth Circuit's stringent requirements for pleading § 1983 and § 1986 conspiracies. *A fortiorari* they fail the new *Counterman* requirements. Prominent among these pleading deficiencies are the following.

**Use of undifferentiated "Defendants" allegations**. Use of dragnet, undifferentiated allegations about "Defendants" is a pleading flaw. *See, e.g., Fox v. City of Greensboro*, 807 F.Supp.2d 476, 493 (M.D.N.C. 2011). Such unparticularized use of "defendants" occurs frequently in plaintiffs' complaint and arguments. *See, e.g.,* Memo in Opp. at 16 ("Defendants' actions here were just another part of this campaign [of alleged intimidation]. Moreover, the fact that Defendants were masked and acted under cover of darkness in destroying the mural . . ." Although plaintiffs repeatedly lump all Defendants together in this manner, they fail to allege specific and concrete facts showing that these five individual Defendants were involved in the alleged leafletting plaintiffs describe as a "campaign of vandalism" allegedly preceding the mural defacement; that these five Defendants were aware the plaintiffs were following the *Sines v Kessler* trial 70 miles away and were made fearful from what they learned or were told about it; that these Defendants knew the racial demographics of the areas surrounding Battery Park; nor that these Defendants except Noyce and Dial were involved in choosing the location or any other aspect of the October 18 vandalism.

**Improper use of Defendants' alleged ideology as a basis for drawing unfavorable inferences.** Given the conclusory and undifferentiated nature of plaintiffs' allegations, they attempt to fill their numerous inferential gaps by repeated references to the alleged hatefulness of Defendants' alleged ideology. But this tactic does violence to the long line of Supreme Court cases,

including *Counterman*, in which the Court has sought to create and protect breathing space for the expression of dissident opinions. *Keyishian v. Board of Regents*, 385 U.S. 589 (1967) is an older but highly apposite case in this tradition. There, the Court disapproved the attribution to an individual member of an organization of all the actions or principles of the organization: "Under our traditions beliefs are personal and not a matter of mere association and . . . men in adhering to a political party or other organization . . . do not subscribe unqualifiedly to all of its platforms or asserted principles." *Id*. at 606 (quoting *Schneiderman v. U.S.*, 320 U.S. 118, 136 (1943)).

### III.     THE PLAINTIFFS' § 1986 CLAIMS ARE TIME-BARRED.

Plaintiffs parry Defendants' argument that plaintiffs' § 1986 claims are time-barred with the contention that the discovery rule applies and plaintiffs did not discover the vandalism to the Arthur ash mural until October 21, 2021. Plaintiffs' contention, however, is undermined by the duty of inquiry that modifies the discovery rule. When that duty of inquiry is applied to plaintiffs' allegations, it becomes clear that plaintiffs' § 1986 claims are in fact time-barred.

The duty of inquiry was expressed well by a case on which the plaintiffs themselves rely, namely, *Salcedo v. Town of Dudley*, 629 F. Supp.2d 86 (D. Mass. 2009): "A plaintiff does not have to possess actual knowledge of every element of the claim for it to accrue; instead, it accrues as soon as a plaintiff possesses knowledge of the  facts sufficient to put [her] on inquiry notice of a possible claim. . .  A plaintiff thus has a duty to exercise reasonable diligence to investigate and protect his rights within the limitations period." *Id*. at 97-98 (internal citations and quotation marks omitted). Law in the Fourth Circuit is in accord.  *See, e.g., Doe v. Virginia Polytechnic Inst.*, 617 F.Supp.3d 412, 432 (W.D. Va. 2022).

The path to application of the duty of inquiry in this case is not straight, but only because plaintiffs alter their characterization of their claims to suit their needs to respond to different legal challenges.  On the one hand, seeking to avoid the one-year limitations bar, they assert that "[t]he

14

sole act alleged in this case to be the source of Plaintiffs' injuries is the defacement of the Arthur Ashe mural. The allegations regarding Patriot Front's prior actions merely provide context for that incident." Plaintiffs' Memo. in Opp. (ECF Document 106) at 20.  On the other hand, when plaintiffs seek to describe in inflammatory terms the allegedly intimidating effects of Defendants' alleged actions, for example in seeking to sustain their claims under Virginia statute § 8.01-42.1, they characterize Defendants' alleged actions as "months-long vandalism of Plaintiffs' neighborhood culminating in the destruction of the Arthur Ashe mural" (*id*. at 25) and as a "campaign of vandalism" (*id*).  The "months-long campaign of vandalism" paradigm is the dominant one; plaintiffs' memorandum in opposition uses the word "campaign" 16 times.

Plaintiffs knew about Patriot Front's alleged "campaign of vandalism" in the summer of 2021, well before October 18, 2021. Plaintiffs acknowledged this unequivocally as to Sealed Plaintiff 1 in plaintiffs' initial opposition memorandum.  See Plaintiffs' Memo. in Opp. (ECF Document 82) at 25 n. 4.  If this "campaign of vandalism" was truly as widespread and dramatically threatening in the summer and fall of 2021 as plaintiffs allege – such that Plaintiff Sealed Plaintiff 1 and other residents of the Battery Park area were aware of it – then Sealed Plaintiff 2 also had reason to know about it. The two requirements for the duty to inquire – a "plaintiff must know that he has been hurt and who inflicted the injury," *Virginia Polytechnic*, 617 F. Supp.3d at 432 – accordingly were present, the limitations clock began running, and plaintiffs' § 1986 conspiracy claim is time-barred.

This continuing violation doctrine that plaintiffs invoke is not appropriately applied to the present facts.  The continuing violation theory should not provide a means of relieving plaintiff from its duty of reasonable diligence in pursuing its claims.  *Spencer v. Town of Chapel Hill*, 290 F. Supp.2d 655, 662 (M.D. N. C. 2003).  Moreover, it should not be applied unless the event within

the statute of limitations is necessary to discern the pattern of violations. *Salcedo v. Town of Dudley*, 629 F.Supp.2d 86, 98 n.8 (D. Mass. 2009).  The very fact that the plaintiffs have characterized the Defendants' alleged conduct as a "campaign of vandalism" shows they recognized from the summer of 2021 that there was an alleged pattern of alleged vandalism.

## IV.   PLAINTIFFS HAVE NOT PLEADED, AND CANNOT PLEAD, A VIABLE CLAIM UNDER 42 U.S.C. § 1986.

With one exception, the plaintiffs in their opposition memorandum accurately enumerate the four elements of a § 1986 claim. They do not, however, accurately apply them.

**Existence of § 1985 Conspiracy**.  Defendants dispute this for the reasons set forth in arguments I and II.

**Defendants' Knowledge of the § 1985 Conspiracy**. Defendants dispute this for the reasons set forth in Argument II regarding plaintiffs' failure to meet § 1985 conspiracy pleading standards.  Defendants would note that the *Clark v. Clabaugh*, 20 F.3d 1290 (3d Cir. 1994) opinion on which plaintiffs rely requires proof of "*actual* knowledge," not merely "knowledge" as the plaintiffs state.  *Id*. at 1295.  The "actual" modifier underscores that plaintiffs must allege and prove the Defendants' focused attention on the essential aspects and aims of the § 1985 conspiracy, not merely the Defendants' alleged presence in an environment where the conspiracy may (or may not) have been discussed.  *See Hampton v. City of Chicago*, 484 F.2d 602, 610 (7th Cir. 1973) (requiring actual knowledge and finding plaintiffs' allegations insufficient in this regard). In any event, by either standard, plaintiffs' cookie cutter phrase does not pass muster.

Plaintiffs' reliance on *Waller v. Butkovich*, 584 F. Supp. 909 (M.D.N.C. 1984), and *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), does not change this conclusion.  Both cases are from 1984, well before the *Simmons*, *Twombly*, *Society Without a Name*, and other cases heightened the requirements for conspiracy pleading. The court in *Waller*, in fact, explicitly

16

rejected the more rigorous pleading requirements for civil rights conspiracies that the Fourth Circuit and Supreme Court later adopted.  584 F. Supp. at 930.

**Defendants' Power to Prevent or Aid in Preventing Wrongs Conspired to Be Done.**

Plaintiffs' § 1985 claims are deficient also with respect to the "power to prevent" element as to defendants Turetchi and Tredinnick, who have been entangled in this case by the plaintiffs' copy-and-paste "was present for, and participated in, a meeting" allegations.  Plaintiffs do not allege that these Defendants had managerial or supervisory authority at the meeting, either in general or over the planning in particular. Nor do they allege that these Defendants or Defendant Gancarz were asked to approve or did approve the alleged planning or were asked to comment or did comment on the alleged plan.  If merely attending - probably telephonically  - a meeting with a sizable number of participants at which an alleged conspiracy was addressed in unspecified ways by unknown persons is enough to make a person liable under § 1986, that provision is indeed unconstitutionally vague, for it suffers intensely from the dangerous  aspects of vague statutes.

The cases on which plaintiffs rely are readily distinguishable. In the *Perez* and *Waller* cases, the § 1986 defendants had managerial or supervisory authority – indeed, in *Waller* the defendants were federal officials who had infiltrated the organizations;  in *Vietnamese Fisherman*, the defendant whom the court chided for not attempting to dissuade the other defendants was the "Grand Dragon" of the Ku Klux Klan; and in *Cullum*, the § 1986 defendants were corporate managers of the same large drugstore chain who had spoken with each other about the plaintiff.

## V.  PLAINTIFFS' § 1985(3) AND § 1986 CLAIMS ARE BARRED BY THE DOCTRINE THAT AGENTS CANNOT CONSPIRE WITH THEIR PRINCIPALS.

 Plaintiffs acknowledge that under Fourth Circuit law, the intracorporate conspiracy doctrine applies to § 1985(3) conspiracies.  Plaintiffs could hardly avoid this concession, for Fourth Circuit law is quite clear on this point.  *See, e.g.,* Painter's *Mill Grille, LLC v. Brown*, 716 F.3d 342 (4th

Cir. 2013). Moreover, the Fourth Circuit is not an outlier. *See Bowie v. Maddox*, 642 F.3d 1122,1130 (D.C. Cir. 2011). Plaintiffs, however, contend that *Painter's Mill* and the other cases cited in Defendants' initial memorandum are inapplicable because Patriot Front is an unincorporated association. This argument suffers from multiple flaws.

First, the argument is a red herring. Defendants' argument rests not on the intracorporate conspiracy doctrine *per se* but on the more general rule that agents of the same principal cannot conspire with themselves or with the principal. The viability of this general rule under Virginia law, which applies here, is incontrovertible. *See, e.g., Fox v. Deese*, 234 Va. 412, 362 S.E.2d 699, 708 (1987); *Michigan Mut Ins. Co. v. Smoot*, 128 F. Supp.2d 917, 925 (E.D. Va. 2000); *Rogers v. Deane,* 992 F.Supp.2d 621, 633 (E.D. Va. 2014), *aff'd*, 594 Fed. Appx 768 (4th Cir. 2014). Plaintiffs in their complaint repeatedly – in ¶¶ 92, 108, and 115 – allege that the Patriot Front members acted as Patriot Front's agents.

In any event, carving out unincorporated associations from the intracorporate conspiracy doctrine is inconsistent with plaintiffs' own pleadings. Federal Rule 17(b)(3) provides that an unincorporated association may sue or be sued to enforce a substantive right under the Constitution. Plaintiffs necessarily relied on this rule to sue Patriot Front. Moreover, plaintiffs expressly allege that Patriot Front has the legal capacity to form an agency relationship. The *Nguyen v. Hoang*, 318 F.Supp.3d 983, 1024 (S.D. Tex. 2018) and *Sirajullah v. State Med. Inter-Insurance Exchange*, 1988 WL 53210 (N.D. Ill. May 17, 1988) cases on which plaintiffs rely are based on Texas and Illinois law, not Virginia law.

Plaintiffs' additional argument that the rule does not apply because defendants John Does 7 and 8 were not alleged to be members or agents of Patriot Front is also flawed. Counsel for this motion to dismiss are not representing John Does 7 and 8. Insofar, however, as plaintiffs'

argument has an impact on the Defendants represented for this motion to dismiss, Defendants note that, for the reasons stated in Argument II, the conspiracy allegations against John Does 7 and 8 do not meet the stringent standards for pleading § 1985 conspiracies.  Moreover, a comparison of ¶¶ 92 and 93 of the complaint shows that John Does 7 and 8 are not even alleged to have been co-conspirators in the alleged conspiracy involving the Defendants represented for this motion but rather in a separate conspiracy.

The *Phoenix Restoration Corporation v. Rodriguez*, 403 F. Supp.2d 510 (E.D. Va. 2005), case on which plaintiffs rely provides anemic support. The intracorporate conspiracy doctrine issue in that case was addressed only briefly and indirectly in the context of question about supplemental jurisdiction. Moreover, although plaintiffs cite the case for the broad proposition that "[t]he participation of a single non-employee means the claim is not barred," the court did not seem to be making such a broad holding.

### V.     PLAINTIFFS' FACTUAL ALLEGATIONS ARE INSUFFICIENT TO SUPPORT THEIR CLAIMS UNDER VIRGINIA CODE § 8.01-42; IF THAT STATUTE WERE INTERPRETED TO ALLOW THEIR CLAIMS, IT WOULD VIOLATE THE FIRST AMENDMENT

As explained in Defendants' opening memorandum,  in no case involving the distinctive aspects of the present facts, i.e., no confrontation, a critical role played by third party, and  no signs or symbols with a long and pernicious history of impending violence, has a claim under Virginia Code § 8.01-42.1 been upheld.  Nothing in plaintiffs' opposition alters this conclusion.

 As explained earlier in this memorandum, plaintiffs' allegations neither describe an objective threat, satisfy the stringent conspiracy pleading requirements,  nor allege the requisite *mens rea*.  This analysis dooms plaintiffs' claims under the Virginia statute as well.

Defendants' opening memorandum supported their contention that the Virginia statute is unconstitutionally vague and overbroad with multiple illustrations. Plaintiffs disparage these

illustrations as an irrelevant "parade of horribles."  In the First Amendment context, however, the fear of chilling protected expression "has led courts to entertain facial challenges based merely on hypothetical applications of the law to nonparties." *Preston v. Leake*, 660 F.3d 726, 738 (4th Cir. 2011).  Under this type of facial challenge, a statute may be invalidated as overbroad as long as a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.  *United States v Miselis*, 972 F.3d 518, 530 (4th Cir. 2020).  As shown by the Defendants' illustrations, the unconstitutional applications of the Virginia statute are manifold and its "plainly legitimate sweep" quite narrow.  Moreover, such illustrations also expose the lack of viewpoint neutrality in the statute, as in the statute at issue in *R.A.V. v. City of St. Paul*.

## CONCLUSION

For the reasons stated, Defendants request that the plaintiffs' amended complaint be dismissed in its entirety.  Defendants respectfully request oral argument on their motion.

NATHAN NOYCE, THOMAS DAIL
DANIEL TURETCHI, AEDAN TREDINNICK,
and PAUL GANCARZ


By:_____/s/_____
         Counsel

Bradley P. Marrs
(VSB#25281)
Marrs & Henry
7202 Glen Forest Drive, Suite 307
Richmond, VA  23226
Tel. (804) 662-5716
bmarrs@marrs-henry.com

Glen K. Allen, *Pro Hac Vice*
Glen Allen Law
5423 Springlake Way
Baltimore, MD  21212 Tel. (410) 802-6453
glenallenlaw@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2023, true and accurate copies of the foregoing were served via ECF procedures of this Court to the all counsel of record.

_____/s/_____
Bradley P. Marrs (VSB#25281)
Marrs & Henry
7202 Glen Forest Drive, Suite 307
Richmond, VA  23226
Tel. (804) 662-5716
Fax (804) 662-5712
bmarrs@marrs-henry.com
*Counsel for defendants*
*Nathan Joyce, Thomas Dail,*
*Daniel Turetchi, Aedan Tredinnick,*
*And Paul Gancarz*