IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SEALED PLAINTIFF 1,

and

SEALED PLAINTIFF 2,

Plaintiffs,

v.                                                     Civil Action No. 3:22-cv-00670

PATRIOT FRONT, *et al.*,

Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on Defendants Nathan Noyce, Thomas Dail, Paul

Gancarz, Daniel Turetchi, and Aedan Tredinnick's (collectively, "Defendants")[1] Amended

Motion to Dismiss (the "Motion" or "Motion to Dismiss"). (ECF No. 102.)[2] Sealed Plaintiff 1

and Sealed Plaintiff 2 ("Plaintiffs") responded in opposition to the Motion, (ECF No. 106), and

Defendants replied, (ECF No. 107). On March 27, 2024, the Court heard oral argument.

The matter is ripe for disposition. For the reasons that follow, the Court will deny

Defendants' Motion in its entirety. (ECF No. 102.)

---

[1] The Clerk has entered default against the following four Defendants: (1) Patriot Front; (2) Thomas Rousseau; (3) William Ring; and, (4) Jacob Brown. (ECF Nos. 104, 105, 118.) Plaintiffs also bring this lawsuit against John Does 1–19. For clarity, unless otherwise specified, the Court's references to "Defendants" throughout this Memorandum Opinion shall refer only to the five Defendants who have joined this motion to dismiss: Messrs. Noyce, Dail, Gancarz, Turetchi, and Tredinnick.

[2] The Court employs the pagination assigned by the CM/ECF docketing system.

## I. Factual and Procedural Background

A.      Summary of Allegations in the First Amended Complaint[3]

1.      Patriot Front's Ideology and Connection to Vandalism

The First Amended Complaint (the "Amended Complaint") states that Patriot Front, a white supremacist[4] group, "calls for the formation of a white ethnostate." (ECF No. 31 ¶ 1.) The group formed in 2017 after "splinter[ing] from Vanguard America, one of the central white supremacist groups that marched at the Unite the Right rally in Charlottesville, Virginia in August 2017." (ECF No. 31 ¶ 14.) At the time Plaintiffs filed their Amended Complaint, Patriot Front's website promoted its mission of "a hard reset on the nation we see today – a return to the traditions of our [European] forefathers" who "left their European homes . . . [and who] found a common cause and a common identity as Americans." (ECF No. 31 ¶ 1 (alterations in original).)

---

[3] In considering the Motion, (ECF No. 102), the Court will assume the well-pleaded factual allegations in the First Amended Complaint to be true and will view them in the light most favorable to Plaintiffs. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

"[I]t is important to remember that [this] summary is a recounting of *allegations*. While the Court does not repeatedly state 'Plaintiffs *allege* . . . ,' this summary should not be taken as the Court's endorsement of one version of the facts." *Sines v. Kessler*, 324 F. Supp. 3d 765, 774 (W.D. Va. 2018) (emphases in original).

[4] During oral argument, counsel for Defendants stated that members of Patriot Front are not white supremacists. Instead, he suggested that they are white *separatists* of the "good fences make good neighbors" variety. The Court must read the well-pleaded facts favorably, and the Amended Complaint refers to the members of Patriot Front as "white supremacist[s]." (ECF No. 31 ¶ 1.)

Separately, the Court cannot reasonably infer that Patriot Front seeks separation for any reason other than white supremacy. Patriot Front's website and its published manifesto are quoted by Plaintiffs in the Amended Complaint. For example, the manifesto, among other things, calls for "the formation of a white ethnostate", (ECF No. 31 ¶ 1), comprised of true Americans who descend from European conquerors who founded this country "in the flames of conquest." (ECF No. 31 ¶ 12.)

Patriot Front published an online manifesto to articulate its ideology. (ECF No. 31 ¶ 12.) This manifesto provides that "'the varied nations and cultures of Europe forged [the United States] in the flames of conquest,' and that true Americans share a 'pan-European identity.'" (ECF No. 31 ¶ 12.) According to Patriot Front, "'[t]o be an American is to be a descendant of conquerors . . . . This unique identity was given to us by our [European] ancestors, and this national spirit remains firmly rooted in our blood.'" (ECF No. 31 ¶ 12 (alterations in original).) Patriot Front advertises its ideology "through masked marches and vandalism, which it calls 'activism.'" (ECF No. 31 ¶ 15.) The Plaintiffs allege that "[r]esponding to directives from the group's leaders, Patriot Front's members have defaced murals honoring Black Americans, targeted LGBTQ+ events, and destroyed public and private property as part of their campaign to promote their extreme" beliefs. (ECF No. 31 ¶ 2.)

Through its marches and acts of vandalism, Patriot Front has "intimidated communities based on race and sexual orientation across the country and deterred community members from accessing public amenities." (ECF No. 31 ¶ 2.) Patriot Front has been connected to "dozens of acts of property damage and defacement of public art that supports racial justice and LGTBQ+ inclusion all over the country." (ECF No. 31 ¶ 16.) For example, "[f]rom August through October, 2021, Patriot Front members vandalized murals honoring Black lives in Norfolk, VA, Raleigh, NC, Lafayette, IN, St. Paul, MN and elsewhere", including Richmond. (ECF No. 31 ¶¶ 3, 20.)

Patriot Front, through its members and affiliates, also damages and defaces property by placing Patriot Front stickers and spray-painting Patriot Front logos and insignia, using stencils, on the property. (ECF No. 31 ¶¶ 16–18.) "Patriot Front's leadership . . . require[s] members" "to publicly place a certain number of Patriot Front stickers and spray-painted stencils" in a

community "in order to remain a member in good standing." (ECF No. 31 ¶ 17.)  Patriot Front's stickers and stencils are "intentionally branded", (ECF No. 31 ¶ 18), so that the messaging for any vandalism specifically identifies Patriot Front whether it appears in Richmond or Norfolk Virginia, North Carolina, Indiana, or Minnesota.

Members must receive approval from Patriot Front regional and national leadership before committing "any high-profile acts of vandalism." (ECF No. 31 ¶ 17.)  Members must also purchase Patriot Front's stickers and stencils from National Director and Founder Thomas Rousseau, who in turn "distributes every stencil." (ECF No. 31 ¶¶ 17, 21, 23.)  To ensure the uniformity of Patriot Front's spray-painted logos and insignia, Patriot Front's leadership provides "detailed instructions . . . on what color paints to use" as well as instructions "on sharing stencils." (ECF No. 31 ¶ 18.)

### 2.    Patriot Front's Structure

"Patriot Front is well-organized and follows a defined hierarchical structure." (ECF No. 31 ¶ 21.)  The organization has geographical chapters, referred to as "networks", throughout the country. (ECF No. 31 ¶ 22.)  The highest-ranking members in each network serve as Network Directors. (ECF No. 31 ¶ 22.)  Network Directors report regularly to Thomas Rousseau, the National Director, and bear "responsib[ility] for organizing and executing" Patriot Front events, including its marches and acts of vandalism. (ECF No. 31 ¶ 22.)

Defendant Paul Gancarz (also known as "Samuel VA"), at all times relevant to this case, served as "Patriot Front's Network Director for the region covering Virginia, the District of Columbia, Maryland, and Delaware." (ECF No. 31 ¶ 24.)  In this role, Mr. Gancarz supervises Patriot Front activities in this region. (ECF No. 31 ¶ 24.)  Patriot Front requires him, as Network Director, to approve any large-scale mural cover-ups in his region before members initiate them.

(ECF No. 31 ¶ 24.)  Defendants Nathan Noyce (also known as "Roger VA"), Thomas Dail (also known as "Kenneth VA"), Daniel Turetchi (also known as "Grant MD"), and Aedan Tredinnick (also known as "Vincent VA") served as members of Patriot Front at all times relevant to this case.  (ECF No. 31 ¶¶ 25, 26, 27, 30.)

### 3.    Battery Park and the Arthur Ashe Mural

The City of Richmond owns and manages Battery Park ("Battery Park" or the "Park"), a public park located in Richmond, Virginia near "Jackson Ward, the historically Black center of Richmond."  (ECF No. 31 ¶¶ 42, 43.)  The Park's public amenities include walking paths, "two playgrounds, basketball courts, restrooms, horseshoe pits, a community center that houses a free computer lab, and a swimming pool."  (ECF No. 31 ¶¶ 3, 42.)

A neighborhood, also named "Battery Park" (the "Battery Park Neighborhood" or the "Neighborhood"), surrounds the Park.  (ECF No. 31 ¶ 43.)  United Census Bureau data lists the racial composition of zip code 23222, which encompasses the Battery Park Neighborhood, as "77.7% Black and 17.5% White."  (ECF No. 31 ¶¶ 6, 43.)  For many years, Battery Park had "the only public swimming pool [Black residents] felt comfortable using as children" after government-imposed segregation ended and racial tensions in Richmond (and the country) remained fraught.  (ECF No. 31 ¶ 44.)

Plaintiffs, both long-term residents of the Battery Park Neighborhood, live near the Park. (ECF No. 31, at ¶¶ 10, 11.)  Plaintiffs and their families "regularly used the Park and its amenities, including the basketball and tennis courts, playgrounds, and paths, on a near daily basis."  (ECF No. 31 ¶¶ 10, 11.)  They also frequently used the Park's tunnel, which connects the north and south sides of the Park, to access various amenities throughout the Park, including playgrounds and basketball courts.  (ECF No. 31 ¶¶ 81, 82.)

In July 2017, the Park unveiled "a mural honoring Black tennis star Arthur Ashe" who grew up in segregated Richmond, Virginia. (ECF No. 31 ¶¶ 4, 40, 41, 44.) "In addition to being the first Black man to win the U.S. Open in 1968, Mr. Ashe was a committed humanitarian whose work included establishing the African American Athletic Association and raising money for the United Negro College Fund. (ECF No. 31 ¶ 4.) A group of Black-led local artists completed the mural over approximately three weeks. (ECF No. 31 ¶ 40.)



(ECF No. 31 ¶ 41.)

Located "at the entrances and inside of a pedestrian tunnel joining south and north ends of the Park," the mural "depicted images of Mr. Ashe's face and of him holding the trophy after winning Wimbledon in 1975." (ECF No. 31 ¶ 41.) The mural also "listed several of Mr. Ashe's tennis achievements" inside the tunnel. (ECF No. 31 ¶ 41.) "Generations of Black Americans and others have looked up to Mr. Ashe as a role model." (ECF No. 31 ¶ 4.) The mural served as

"a symbol" of Battery Park Neighborhood's "support for and pride in Black lives and Black accomplishments." (ECF No. 31 ¶ 49.)

### 4.    Events Predating the Vandalism of the Arthur Ashe Mural

In August 2017, about a month after the mural's unveiling, several white supremacist groups marched at the Unite the Right rally in Charlottesville, Virginia. (ECF No. 31 ¶ 14.) At the rally, which occurred approximately an hour's drive away from Richmond, a white supremacist attendee drove a car "into a group of peaceful counter[-]protesters, murdering Heather Heyer and injuring dozens of others." (ECF No. 31 ¶ 45.) A group of counter-protestors who attended the rally later sued the organizers and participants of the rally in the Western District of Virginia federal court. (ECF No. 31 ¶ 46.) The media covered the lawsuit and resulting trial extensively. (ECF No. 31 ¶ 47.) Jury selection for the trial began on October 25, 2021. (ECF No. 31 ¶ 47.)

Beginning in the summer of 2021, Patriot Front began targeting the Battery Park community. (ECF No. 31 ¶ 3.) That summer, residents of the Battery Park Neighborhood, including Sealed Plaintiff 1, began to notice "that Patriot Front stickers were being placed on lampposts, stop signs, and elsewhere throughout the [N]eighborhood." (ECF No. 31 ¶¶ 48, 74.) Other residents of the Battery Park Neighborhood also noticed that Patriot Front stickers had been placed in the Park itself. (ECF No. 31 ¶ 48.) "The stickers continued to appear into the fall of 2021." (ECF No. 31 ¶ 48.)

After discovering the Patriot Front stickers, Sealed Plaintiff 1 researched what they signified and discovered their connection to Patriot Front. (ECF No. 31 ¶ 74.) Through this research, Sealed Plaintiff 1 learned that Patriot Front identifies as "a white supremacist group."

7

(ECF No. 31 ¶ 74.)  Sealed Plaintiff 1 felt "shocked, angry, and hurt that a white supremacist group was actively pushing propaganda in their neighborhood."  (ECF No. 31 ¶ 74.)

Patriot Front's scheme to target the Battery Park community culminated in the vandalism to and destruction of the Arthur Ashe mural on or about October 18, 2021, seven days before jury selection in the Charlottesville Unite the Right trial was to begin.  (ECF No. 31 ¶¶ 3, 47.)

> ### 5. Patriot Front Members and Non-Members Attend a Meeting and Plan to Vandalize the Arthur Ashe Mural

On or about October 12, 2021, Patriot Front members, including Defendants, attended and participated in a meeting to plan the vandalism of the Park's Arthur Ashe mural.  (ECF No. 31 ¶¶ 24–25, 50.)  Defendant Gancarz, in his role as Network Director, was "directly involved in, consulted on, and approved" the vandalism of the Arthur Ashe mural.  (ECF No. 31 ¶ 24.)  John Does 7 and 8, who were not members of Patriot Front at the time, also attended and participated in the October 12, 2021 meeting.  (ECF No. 31 ¶¶ 37–38, 50.)

This meeting occurred approximately two weeks before jury selection began in the trial connected with the Charlottesville Unite the Right rally.  (ECF No. 31 ¶ 49.)  Patriot Front members had "decided to escalate their tactics targeting Battery Park.  Beyond putting up stickers, as Patriot Front members had previously done," Defendants and other Patriot Front members and non[-]members "prepared to destroy a symbol of the [N]eighborhood's support for and pride in Black lives and Black accomplishments:  the Arthur Ashe mural."  (ECF No. 31 ¶ 49.)

> ### 6. Defendants Nathan Noyce, Thomas Dail, and John Doe 1 Vandalize the Arthur Ashe Mural

During "the early morning hours on or about October 18, 2021", just days after the October 12 meeting, Defendants Nathan Noyce, Thomas Dail, and John Doe 1 arrived at the

mural.  (ECF No. 31 ¶ 51.)  Mr. Noyce and Mr. Dail were wearing baseball hats identical to hats

worn by other Patriot Front members "around the country, as shown in the following picture

from the Patriot Front website:"  (ECF No. 31 ¶ 53.)



(ECF No. 31 ¶ 53.)

     Mr. Noyce and Mr. Dail obscured their faces with masks.  (*See* ECF No. 31 ¶ 53.)  As

John Doe 1 filmed and illuminated the tunnel with a flashlight, Mr. Dail "removed a can of spray

paint" from his backpack and raised it over a sign commemorating Arthur Ashe's induction into

the International Tennis Hall of Fame.  (ECF No. 31 ¶¶ 54, 57.)



**Ashe was the first African-American man inducted into the international Tennis Hall of fame.**

(ECF No. 31 ¶ 56.)  Before Mr. Dail sprayed over the sign, Mr. Noyce, who was wearing a

headlamp for additional lighting, advised:  "'[S]hake it, it's not going to spray well if you don't

shake it.'"  (ECF No. 31 ¶¶ 55, 57.)  Mr. Dail then shook the spray paint and spray-painted over

the sign in white.  (ECF No. 31 ¶¶ 57–58.)



(ECF No. 31 ¶ 58.)

      Mr. Noyce then removed another can of spray paint from Mr. Dail's backpack and spray-

painted over another sign touting Arthur Ashe's victory at Wimbledon and identifying Mr. Ashe

as "the first African-American male to be ranked #1 in the world."  (ECF No. 31 ¶ 59.)



(ECF No. 31 ¶ 59.) As John Doe 1 continued to film, Mr. Dail and Mr. Noyce continued

spraying white paint over several more signs celebrating Arthur Ashe's historic achievements.

(ECF No. 31 ¶ 60, images at 18.)

Next, Mr. Dail and Mr. Noyce "removed Patriot Front stencils and cans of spray paint of

different colors from the backpack that [Mr.] Dail had been carrying." (ECF No. 31 ¶ 61.)

Working together, Mr. Dail and Mr. Noyce spray-painted in red and blue paint Patriot Front

stencils over the now painted-over signs that had celebrated Mr. Ashe's achievements. (ECF No.

31 ¶ 62.)



(ECF No. 31 ¶ 62.)



(ECF No. 31 ¶ 62.)  As Mr. Noyce and Mr. Dail covered the signs with Patriot Front stencils,

John Doe 1, who continued to film, provided suggestions and encouragement, stating, for

example, "[F]or the next one, y'all can switch colors for the different stencils . . . try to mix it up

a little bit."  (ECF No. 31 ¶ 63.)

After Mr. Dail and Mr. Noyce finished adding Patriot Front stencils to the white-washed

signs touting Arthur Ashe's achievements, John Doe 1 asked:  "[Y]ou want to get his face or

something?"  (ECF No. 31 ¶ 65.)  Mr. Dail and Mr. Noyce then approached the mural's

depiction of Arthur Ashe's face, and John Doe 1 stated:  "F[*****]g n*****'s face."  (ECF No.

31 ¶ 65.)  Mr. Noyce and Mr. Dail then sprayed white paint over two depictions of Arthur Ashe's

face, and sprayed Patriot Front stencils in red and blue paint on top.  (ECF No. 31 ¶¶ 67–70.)

Patriot Front kept John Doe 1's footage of the vandalism for recruitment purposes,

prominently featuring it in a video highlighting Patriot Front's "nationwide acts of vandalism

occurring in October 2021."  (ECF No. 31 ¶ 71.)  "Patriot Front Network Directors then used this

video as part of their efforts to recruit new members."  (ECF No. 31 ¶ 71.)

### 7.      **Battery Park Neighborhood Residents Discover the Vandalism**

On October 21, 2021, four days before jury selection in the Charlottesville Unite the Right trial began, Battery Park Neighborhood residents, including Sealed Plaintiff 1, discovered that the Arthur Ashe mural had been vandalized.  (ECF No. 31 ¶¶ 5, 47, 72, 76.)  Sealed Plaintiff 1 discovered the vandalized mural during their regular morning walk on October 21, 2021.  (ECF No. 31 ¶ 76.)  Upon "seeing the spray-painted Patriot Front logos" on the mural, "Sealed Plaintiff 1 immediately felt a sense of fear and apprehension at being in the Park."  (ECF No. 31 ¶ 76.)  This feeling stemmed in part from the timing of the vandalism in relation to the upcoming Unite the Right-related civil trial in Charlottesville, Virginia.  (ECF No. 31 ¶¶ 47, 76.)  Given the close timing, "Sealed Plaintiff 1 interpreted the vandalism as a warning from . . . Patriot Front that Black residents of the [N]eighborhood and those who opposed white supremacy were not safe."  (ECF No. 31 ¶ 76.)  Moreover, "Sealed Plaintiff 1 was especially unnerved because of . . . [the] presence in Virginia of the defendants in [the Charlottesville Unite the Right case]."  (ECF No. 31 ¶ 79.)

In addition to feeling personally threatened by Patriot Front, Sealed Plaintiff 1 wondered if "they or their neighbors would be targeted by Patriot Front and worried for the safety of their children."  (ECF No. 31 ¶ 78.)  One resident who grew up near Battery Park described the vandalism as "a violation of . . . a sacred space."  (ECF No. 31 ¶ 75.)  Sealed Plaintiff 1 "spent most of the rest of the day speaking with neighbors" who "shared a sense of fear and a sense that the [P]ark was no longer safe."  (ECF No. 31 ¶ 77.)  Sealed Plaintiff 1's fear also stemmed from the fact "that their home, which is close to the Park, had signs showing their support of Black Lives Matter and the LGBTQ+ community."  (ECF No. 31 ¶ 78.)  Out of fear of "being targeted", Sealed Plaintiff 1 removed their signs associated with Black Lives Matter.  (ECF No.

31 ¶ 78.)  As a result of the vandalism to the mural, Sealed Plaintiff 1 "lost sleep, had racing

thoughts, and felt anxious."  (ECF No. 31 ¶ 80.)

Sealed Plaintiff 2, a long-time resident of Battery Park Neighborhood, also felt fear and

concern as a result of the vandalism to the mural.  (ECF No. 31 ¶¶ 82–84.)  Specifically, "Sealed

Plaintiff 2 lost sleep and felt anxious, fatigued, and scared as a result of the vandalism."  (ECF

No. 31 ¶ 83.)  Sealed Plaintiff 2 also worried about the vandalism's impact on their family.

(ECF No. 31 ¶ 84.)  "Sealed Plaintiff 2 regularly considered placing their oldest child in therapy

as a result of the stress and anxiety [their] child felt because of the vandalism."  (ECF No. 31

¶ 84.)

By the evening of October 21, 2021, "Park officials had painted over . . . Patriot Front's

insignia with black paint."  (ECF No. 31 ¶ 72.)



(ECF No. 31 ¶ 72.)  "[T]he mural, which had taken months of planning and work to create, was effectively ruined and the Black man it celebrated erased."  (ECF No. 31 ¶ 72.)  It took many months for full restoration of the mural to occur.  (ECF No. 31 ¶ 73.)

As a result of the mural's defacement, both Plaintiffs "and their children substantially curtailed or even eliminated their use of the Park, feeling compelled to avoid the Park's playground, paths, basketball and tennis courts, and other available amenities."  (ECF No. 31 ¶ 6.)  After the vandalism, Sealed Plaintiff 1 no longer allowed their children to go to the park alone.  (ECF No. 31 ¶ 80.)  "Sealed Plaintiff 1 also started avoiding the Park at dusk."  (ECF No. 31 ¶ 80.)  Sealed Plaintiff 1 also "interpreted the vandalism as a warning" that Black Battery Park residents "and those who opposed white supremacy were not safe."  (ECF No. 31 ¶ 76.)  Similarly, Sealed Plaintiff 2 no longer allowed "[a minor] family member to walk [their] dog near the Park or meet friends [there]."  (ECF No. 31 ¶ 84.)  Sealed Plaintiff 2's family friends also began to "refuse[] to meet Sealed Plaintiff 2 or their family members at the Park, because of the vandalism."  (ECF No. 31 ¶ 85.)

After the vandalism, the City of Richmond "locked the tunnel [containing] the mural," depriving Plaintiffs of its use and making it more difficult for them to access Park amenities.  (ECF No. 31 ¶¶ 81, 82.)  "[F]or a period of time in the immediate aftermath of the vandalism, the tunnel connecting the north and south sides of the Park was completely shuttered both day and night."  (ECF No. 31 ¶ 81.)  This made it more difficult for Sealed Plaintiff 1 and their neighbors to access the southern area of the Park, where basketball courts and a playground are located.  (ECF No. 31 ¶ 81.)  Even after the City reopened the tunnel, Sealed Plaintiff 2 and their family continued to avoid going "through the tunnel to make use of [the Park's] various amenities"—

15

something Sealed Plaintiff 2 and their family had done prior to the vandalism. (ECF No. 31 ¶ 82.)

B.     **Procedural History**

On October 18, 2022, Plaintiffs—then referred to as Plaintiffs Doe 1 and Doe 2—filed their first Complaint against Defendants Patriot Front, Thomas Rousseau, Paul Gancarz, Nathan Noyce, Thomas Dail, and John Does 1–23. (ECF No. 1.) On October 21, 2022, Plaintiffs filed a Motion for Leave to Proceed Under Sealed Names, requesting "leave to maintain this action as Sealed Plaintiff 1 and Sealed Plaintiff 2 in order to protect their and their families' safety." (ECF No. 12; ECF No. 13, at 1.) On November 1, 2022, before any Defendant was served, the Court granted this request "without prejudice to Defendants should they wish to challenge this designation." (ECF No. 24, at 1.)[5]

On December 5, 2022, Plaintiffs filed their Amended Complaint against Defendants Patriot Front, Thomas Rousseau, Paul Gancarz, Nathan Noyce, Thomas Dail, Daniel Turetchi, Jacob Brown, William Ring, Aedan Tredinnick, and John Does 1–19. (ECF No. 31.) In the Amended Complaint, Plaintiffs assert three causes of action:

---

[5] Defendants state in their motion to dismiss briefing that they "object to the [Plaintiffs] keeping their identifies concealed." (ECF No. 103, at 2 n.1.) Defendants explain that "[i]t would . . . be impossible for Defendants to investigate the veracity of [P]laintiffs' allegations of their suffering without knowing who [P]laintiffs are." (ECF No. 103, at 2 n.1.) As noted above, the Court granted Plaintiffs' Motion for Leave to Proceed Under Sealed Names "without prejudice to Defendants should they wish to challenge this designation." (ECF No. 24, at 1.) If Defendants wish to challenge this designation, they may file an appropriate motion to that effect. They have not done so during the time in which this Court must take the Plaintiffs' well-plead allegations as true.

To the extent Defendants contend the sealing designation impacts their ability to conduct discovery, the parties, through counsel, should meet and confer in accordance with the applicable federal and local rules prior to the filing of such a motion.

(1) <u>**Count I**</u>, **42 U.S.C. § 1985(3),** against Defendants Patriot Front, Noyce, Dail, Gancarz, Turetchi, Brown, Ring, Tredinnick, and John Does 1 through 19:

   **Conspiracy to Violate Civil Rights Under the Ku Klux Klan Act of 1871;**

(2) <u>**Count II**</u>, **42 U.S.C. § 1986**, against Defendants Patriot Front, Rousseau, Noyce, Dail, Gancarz, Turetchi, Brown, Ring, Tredinnick, and John Does 1 through 8:

   **Action for Neglect to Prevent Interference with Civil Rights Under the Ku Klux Klan of 1871;** and,

(3) <u>**Count III**</u>, **Va. Code § 8.01-42.1**, against Defendants Patriot Front, Noyce, Dail, and John Doe 1:

   **Civil Action for Racial, Religious, or Ethnic Harassment**.

(ECF No. 31 at 28, 30, 33.)

Viewing the well-pleaded factual allegations to be true and viewing them in the light most favorable to the Plaintiffs, Count I asserts that Defendants "each agreed, coordinated, and executed a common plan with at least one other person to interfere with Black patrons of the Park and those opposed to white supremacy in their enjoyment of a place of public accommodation, the Park, in denial of their equal protection of the law and equal privileges thereunder." (ECF No. 31 ¶ 88.) The overt acts identified in furtherance of the conspiracy include "discussing the procurement and distribution of paint, stencils, and other supplies," "procuring paint, stencils, and other supplies," and attending the October 12, 2021 meeting "to plan the acts of vandalism and destruction of property." (ECF No. 31 ¶ 89.) Racial animus motivated the conspiracy. (ECF No. 31 ¶ 88.) Defendants Noyce and Dail, along with John Doe 1, "prepared for the attack and arrived with the necessary supplies and a clear plan to vandalize the Arthur Ashe mural," and then "worked together" to carry out the purpose of their conspiracy. (ECF No. 31 ¶ 90.) As a result of Defendants' conspiracy and conduct, Plaintiffs allege a deprivation of rights and privileges as citizens of the United States, "including the right

17

to equal protection of the laws, to equal privileges thereunder, to enjoy Battery Park, a place of public accommodation, and to do so without fear or intimidation on account of race." (ECF No. 31 ¶ 94.) This deprivation resulted in "injury to [the Plaintiffs'] person, including emotional injury", and the Plaintiffs seek "compensatory, consequential, and punitive damages, in an amount to be determined by the Court." (ECF No. 31 ¶ 95.)

Count II states that Defendants each had knowledge of the conspiracy to interfere with Black patrons, and those opposed to white supremacy, in their enjoyment of the Park, a place of public accommodation. (ECF No. 31 ¶¶ 88, 98.) In addition, each Defendant "had the power to prevent, or aid in preventing, the wrongs conspired to be done," but neglected to do so. (ECF No. 31 ¶ 99; *see also* ECF No. 31 ¶¶ 101–04, 106.) Plaintiffs suffered injuries and damages as a direct result of Defendants' failure to act. (ECF No. 31 ¶ 109.)

Finally, Count III states that Defendants Noyce and Dail, among others, "knew that Arthur Ashe was celebrated as a successful Black tennis player," "knew that the Arthur Ashe mural was located in a park in a predominantly Black neighborhood," "destroyed the Arthur Ashe mural, specifically images depicting Arthur Ashe, while Defendant John Doe 1" used a racial slur, and thereby "subjected Plaintiffs to intimidation and harassment motivated by racial animosity." (ECF No. 31 ¶¶ 112, 113.) Plaintiffs again suffered injuries and "grievous[] damage[] as a direct and proximate result of Defendants' acts of intimidation and harassment." (ECF No. 31 ¶ 116.)

18

On July 25, 2023, pursuant to the Court's Order, (ECF No. 96), Defendants filed an Amended Motion to Dismiss. (ECF No. 102.)[6]  On August 7, 2023, Plaintiffs responded in opposition, (ECF No. 106), and on August 14, 2023, Defendants replied, (ECF No. 107).

## II. Standards of Review

### A.    Rule 12(b)(1)

In a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenging the Court's subject-matter jurisdiction, the burden rests with the plaintiff, as the party asserting jurisdiction, to prove that federal jurisdiction is proper.[7]  *See Int'l Longshoremen's Ass'n v. Va. Int'l Terminals, Inc.*, 914 F. Supp. 1335, 1338 (E.D. Va. 1996) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th

---

[6] On March 1, 2023, Defendants Nathan Noyce and Thomas Dail filed a Motion to Dismiss. (ECF No. 66.) On March 21, 2023, Defendants Daniel Turetchi and Aedan Tredinnick filed a Motion to Dismiss. (ECF No. 75.) That same day, Defendant Paul Gancarz also filed a Motion to Dismiss. (ECF No. 77.) In support of their Motions to Dismiss, Defendants Daniel Turetchi, Aedan Tredinnick, and Paul Gancarz adopted and incorporated the dismissal arguments made by Defendants Noyce and Dail. (ECF No. 76, at 1; ECF No. 78, at 1.)

On June 28, 2023, Defendants filed a Notice of Supplemental Authority (the "Notice"). (ECF No. 94.) In the Notice, Defendants contend that the Supreme Court of the United States' recent opinion in *Counterman v. Colorado*, 600 U.S. 66 (2023), issued June 27, 2023, "is directly relevant to issues presently before the Court on the [D]efendants' motion[s] to dismiss." (ECF No. 94, at 1.) Defendants offered a round of supplemental briefing regarding the effect of the *Counterman* decision. (ECF No. 94, at 2.) In response to this latest Notice, and in the interest of judicial economy, the Court ordered Defendants to file an amended motion consolidating all issues and denied their prior motions to dismiss as moot. (ECF No. 96, at 1–2.)

[7] Defendants have raised the issue of standing within the context of their motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because challenges to standing are generally addressed under Rule 12(b)(1) for lack of subject matter jurisdiction, the Court will recharacterize Defendants' challenge to standing from a motion to dismiss for failure to state a claim under Rule 12(b)(6) to a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). *See Williams v. AM Lapomarda*, No. 3:19cv631 (DJN), 2020 WL 3643466, at *6 (E.D. Va. July 6, 2020) (citing *Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 311 (4th Cir. 2009)).

Cir. 1982)). A motion to dismiss pursuant to Rule 12(b)(1) can attack subject-matter jurisdiction

in two ways. *See Kerns v. U.S.*, 585 F.3d 187, 192 (4th Cir. 2009) (citing *Adams*, 697 F.2d

at 1219). Defendants' motion attacks the Amended Complaint on its face, asserting that it fails

to state a claim upon which subject-matter jurisdiction can lie. *See Int'l Longshoremen's Ass'n*,

914 F. Supp. at 1338 (citing *Adams*, 697 F.2d at 1219). "When a defendant makes [such] a facial

challenge to subject[-]matter jurisdiction, 'the plaintiff, in effect, is afforded the same procedural

protection as he [or she] would receive under a Rule 12(b)(6) consideration.'" *Kerns*, 585 F.3d

at 192 (quoting *Adams*, 697 F.2d at 1219). In such a challenge, a court assumes the truth of the

facts alleged by plaintiff. *See Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (citing *Adams*,

697 F.2d at 1219).[8]

**B.    Rule 12(b)(6)**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint;

importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the

applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir.

1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356

(1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual

information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

---

[8] Alternatively, and not relevant here, a Rule 12(b)(1) motion may also challenge the
existence of subject-matter jurisdiction in fact, apart from the pleadings. *See Richmond,
Fredericksburg & Potomac R.R. Co. v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams*,
697 F.2d at 1219); *see also Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (citing *Adams*, 697
F.2d at 1219). In such a case, because a party challenges the court's "'very power to hear the
case' . . . the trial court is free to weigh the evidence to determine the existence of its
jurisdiction." *Int'l Longshoremen's Ass'n*, 914 F. Supp. at 1338 (quoting *Mortensen v. First
Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "'[N]o presumptive truthfulness
attaches to the plaintiff's allegations, and the existence of disputed material facts will not
preclude the trial court from evaluating for itself the merits of jurisdictional claims.'" *Id.*
(quoting *Mortensen*, 549 F.2d at 891); *see also Adams*, 697 F.2d at 1219.

550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for

relief must contain . . . a short and plain statement of the claim showing that the pleader is

entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief

are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate

some factual enhancement within the complaint to cross the line between possibility and

plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009)

(quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

        A complaint achieves facial plausibility when the facts contained therein support a

reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S.

at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific

and requires "the reviewing court to draw on its judicial experience and common sense."

*Francis*, 588 F.3d at 193 (citation omitted). The court must assume all well-pleaded factual

allegations to be true and determine whether, viewed in the light most favorable to the plaintiff,

they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington*

*Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012)

(concluding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all

of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor

of the plaintiff'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435,

440 (4th Cir. 2011)). This principle applies only to factual allegations, however, and "a court

considering a motion to dismiss can choose to begin by identifying pleadings that, because they

are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S.

at 679.

### III.  Analysis

Defendants' Motion seeks to dismiss all three counts in Plaintiffs' Amended Complaint on the following bases:  (1) Plaintiffs fail to establish Article III standing; (2) Plaintiffs' § 1985(3) and § 1986 claims fail under the intracorporate conspiracy doctrine; (3) Plaintiffs fail to plead the elements of their § 1985(3) and § 1986 claims; (4) Plaintiffs' § 1986 claim is time-barred; (5) Plaintiffs' Virginia Code § 8.01-42.1 claim fails under multiple constitutional challenges; and (6) Plaintiffs fail to plead at least recklessness which, according to Defendants, is necessary for each of Plaintiffs' three claims to survive.

For the reasons articulated below and at this stage of the case, all of Defendants' challenges fail.  The bulk of Defendants' challenges effectively amount to factual, rather than legal, disputes regarding whether Plaintiffs will be able to prove, for instance, their alleged injuries and each of their claims.  Accepting Plaintiffs' well-pleaded factual allegations as true and drawing reasonable inferences in their favor, as the Court must do at the motion to dismiss stage, the Court concludes that Plaintiffs state plausible claims.  Furthermore, Plaintiffs' claims survive Defendants' constitutional challenges.  Thus, Defendants' Motion to Dismiss must be denied.  The parties will develop a full factual record through discovery which will determine whether these claims survive beyond this procedural stage.

### A.    Plaintiffs Satisfy Each of the Three Elements of Article III Standing

Defendants contend that Plaintiffs fail to meet the standing requirements under Article III of the United States Constitution.  (ECF No. 103, at 6–10.)  Because standing is a jurisdictional question, the Court examines this argument first.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible

and without exception.'" (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884))).

Defendants argue that Plaintiffs lack standing to pursue their claims against them because Plaintiffs allege no concrete, particularized injury-in-fact or, alternatively, because their injuries are not fairly traceable to Defendants' purported wrongdoing. (ECF No. 103, at 6–10.) The Court concludes that Plaintiffs have standing to pursue their claims.

### 1. The Three-Part Test Used to Evaluate Article III Standing

Article III, Section 2, clause 1 of the Constitution limits federal court jurisdiction to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. As the United States Supreme Court has explained, an "essential and unchanging part of the case-or-controversy requirement" is that a plaintiff must establish Article III standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). In *Spokeo, Inc. v. Robins*, the Supreme Court reiterated that, to establish standing, a plaintiff must have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant; and[,] (3) that is likely to be redressed by a favorable judicial decision."[9] 578 U.S. 330, 338 (2016) (citing *Lujan*, 504 U.S. at 560–61; *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

As the party invoking federal jurisdiction, Plaintiffs bear the burden of properly alleging standing. *Lujan*, 504 U.S. at 561; *see also Balzer & Assocs., Inc. v. Union Bank & Trust Co.*, No. 3:09cv273 (HEH), 2009 WL 1675707, at *2 (E.D. Va. June 15, 2009) ("On a motion to dismiss pursuant to Rule 12(b)(1), the party asserting jurisdiction has the burden of proving subject matter jurisdiction." (citing *Richmond, Fredericksburg & Potomac R.R. v. U.S.*, 945 F.2d

---

[9] Defendants do not challenge whether Plaintiffs' injuries are redressable by a favorable judicial decision. Therefore, this Memorandum Opinion addresses only the first two parts of the test to evaluate Article III standing.

765, 768 (4th Cir. 1991))). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc.*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

"'At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice [to satisfy these elements], for on a motion to dismiss [the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim.'" *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 329 (4th Cir. 2008) (alterations in original) (quoting *Lujan*, 504 U.S. at 561).

## 2.    **Plaintiffs State a Cognizable Injury-in-Fact**

### a.    **Legal Standard:  Demonstrating an Injury-in-Fact**

To establish an injury-in-fact, a plaintiff must demonstrate that they suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). For an injury to be "'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (citing *Lujan*, 504 U.S. at 560 n.1). Thus, an "undifferentiated, generalized grievance" that all citizens share would not qualify as particularized. *Lance v. Coffman*, 549 U.S. 437, 442 (2007). "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc.*, 578 U.S. at 339 n.7. The proper inquiry is whether "each individual suffers a particularized harm." *Id.* For an injury to be "concrete," it must be "real," and not "abstract." *Id.* at 340 (citation omitted). That said, an injury need not be "tangible" to be "concrete." *Id.*

Emotional distress, without any showing of physical injury, can suffice to show a concrete and particularized injury for the purposes of standing under Plaintiffs' causes of action

24

under 42 U.S.C. § 1985, 42 U.S.C. § 1986, and Va. Code § 8.01-42.1. *See Sines v. Kessler*, 324 F. Supp. 3d 765, 774–75, 797 (W.D. Va. 2018) (plaintiff who witnessed a defendant drive "his car into a crowd of counter-protestors after the 'Unite the Right' rally" and as a result "suffered severe emotional distress and shock" had standing to pursue § 1985(3) and § 1986 claims because the defendant-driver drove his car into the crowd "in furtherance of [a] conspiracy" to commit racial violence that "was reasonably foreseeable to" the defendant-driver's co-conspirators); *Thompson v. Trump*, 590 F. Supp. 3d 46, 72 (D.D.C. 2022) (recognizing in case stemming from January 6, 2021 Capitol attack that § 1985 "makes no distinction between physical and emotional injury, and in that sense it aligns with the common law tradition of permitting recovery for emotional distress for certain torts without a showing of physical injury"); *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 515–16 (S.D.N.Y. 2021) (plaintiffs demonstrated "a 'concrete and particularized' injury for the purposes of" § 1985(3) claim where plaintiffs alleged that racially motivated robocalls were intimidating, had "'irreversibly undermined her confidence in voting by mail,'" and were "'particularly traumatic'"); *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1412 (4th Cir. 1992) (plaintiff had viable claim under Va. Code § 8.01-42.1 where he was the target of verbal racial animosity but did not experience physical harm or direct physical threats).

### b. Plaintiffs State a Cognizable Injury-in-Fact Stemming from Defendants' Vandalism

Defendants provide three arguments explaining why Plaintiffs fail to state a cognizable injury-in-fact. Each argument founders. Plaintiffs' injuries are both "particularized" and "affect[ed] [them] in a personal and individual way." *See Spokeo, Inc.*, 578 U.S. at 330–31.

i.   **Plaintiffs Sufficiently Establish an Interest in the Park
to Allege Injury-in-Fact**

First, Defendants argue that Plaintiffs lack standing because they "claim no property

interest in the public park affected, nor any greater rights to use Battery Park than any other

member[] of the public." (ECF No. 103, at 7.) Defendants aver that, as a result, Plaintiffs fail to

allege any "'legally protected interest' in individual claims for use of the park." (ECF No. 103,

at 8.) Defendants contend that, as a result, Plaintiffs fail to establish an injury-in-fact.

To support this argument, Defendants cite *Burke v. City of Charleston*, 139 F.3d 401 (4th

Cir. 1998), in which the United States Court of Appeals for the Fourth Circuit found that a mural

creator who sold his mural (and thus had no right to display it) lacked standing to bring a First

Amendment[10] challenge to a law preventing the mural's display. 139 F.3d at 403. *Burke* is

inapposite. In *Burke*, the plaintiff lacked standing because he no longer owned the mural, and

therefore could not control the display or claim injury from a law that prohibited its display. *Id.*

The case at bar arises from materially different circumstances; it is not a property interest case.

As will be elaborated upon later, in Section III.C, Plaintiffs' legally protected interest here is the

right protected by § 1985(3) to enjoy Battery Park, a place of public accommodation. (*See* ECF

No. 31 ¶¶ 88, 94.) Plaintiffs plausibly plead that this loss stemmed from racially motivated

vandalism. Their claims of emotional injuries stem from the racially motivated vandalism of the

---

[10] The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting
> the free exercise thereof; or abridging the freedom of speech, or of the press; or
> the right of the people peaceably to assemble, and to petition the Government for
> a redress of grievances.

U.S. CONST. amend. I.

mural and the message it sent to patrons of the Park. (ECF No. 31 ¶¶ 6, 80–82.) As such, they allege cognizable injury-in-fact.

ii.    **Plaintiffs Sufficiently Allege Injuries that Establish an Injury-in-Fact for Standing Purposes**

Plaintiffs well-plead their loss of a "legally protected interest" in the form of the vandalism to the mural in that they "and their children substantially curtailed or even eliminated their use of the Park, feeling compelled to avoid the Park's playground, paths, basketball and tennis courts, and other available amenities." (ECF No. 31 ¶ 6; *see also* ECF No. 31 ¶¶ 80–85.)

Plaintiffs also adequately plead emotional injuries. While Defendants argue that Plaintiffs merely raise a "subjective fear that was of indeterminate length and indefinite strength" and of "indeterminate effect", (ECF No. 103, at 9), which cannot support an injury-in-fact, the record at bar establishes otherwise. Defendants characterize Plaintiffs' injuries as "subjective, emotional responses to a public event" that Plaintiffs "do not . . . claim to have witnessed in person." (ECF No. 103, at 7.) Defendants further contend that Plaintiffs' "claims encompass such amorphous alleged injuries as 'racing thoughts,' finding access to the [P]ark 'more difficult,' and 'wonder[ing] if they or their neighbors would be targeted by Patriot Front.'" (ECF No. 107, at 8.) Notwithstanding the Defendants' characterizations of Plaintiffs' injuries, the Court concludes that Plaintiffs allege cognizable injuries where, as detailed above, they have both significantly curtailed or even eliminated their access to the Park and have experienced emotional harm as a result of Defendants' actions. (*See* ECF No. 31 ¶¶ 76, 78, 80–84); *see Sines*, 324 F. Supp. 3d at 774–75, 797 (emotional distress alone sufficient to show a concrete and particularized injury for §§ 1985 and 1986 claims); *Thompson*, 590 F. Supp. 3d at 72 (recognizing that § 1985 "permit[s] recovery for emotional distress for certain torts without a showing of physical injury"); *Nat'l Coal. on Black Civic Participation*, 512 F. Supp. 3d at 515–

16 (plaintiff demonstrated concrete and particularized injury due to intimidation, undermined confidence, and emotional trauma).

As a result of the vandalism, Sealed Plaintiff 1, a resident of Battery Park Neighborhood, "lost sleep, had racing thoughts, and felt anxious." (ECF No. 31 ¶¶ 6, 80.) Upon seeing the vandalized mural, Sealed Plaintiff 1 "immediately felt a sense of fear and apprehension at being in the Park" and "interpreted the vandalism as a warning from . . . Patriot Front" that their safety, and their community's safety, was at risk. (ECF No. 31 ¶ 76.) Sealed Plaintiff 1 wondered if "they or their neighbors would be targeted by Patriot Front and worried for the safety of their children." (ECF No. 31 ¶ 78.) Sealed Plaintiff 1's fear also stemmed from the fact "that their home, which is close to the Park, had signs showing their support of Black Lives Matter and the LGBTQ+ community." (ECF No. 31 ¶ 78.) Out of fear of "being targeted", Sealed Plaintiff 1 removed the signs around their home associated with Black Lives Matter. (ECF No. 31 ¶ 78.)

Sealed Plaintiff 2, a long-time resident of Battery Park Neighborhood, describes similar emotional harm resulting from the defacement of the mural. Sealed Plaintiff 2 "lost sleep and felt anxious, fatigued, and scared." (ECF No. 31 ¶ 83.) Additionally, "Sealed Plaintiff 2 further worried about the impact of the vandalism on their family", as their "child felt considerable stress and anxiety as a result of the vandalism." (ECF No. 31 ¶ 84.) Sealed Plaintiff 2 "regularly considered placing their oldest child in therapy as a result of the stress and anxiety the child felt because of the vandalism." (ECF No. 31 ¶ 84.)

But the harm alleged is not just emotional. As a result of the vandalism and their ensuing safety concerns, both Plaintiffs limited their access to the Park. Sealed Plaintiff 1 began avoiding the Park at night and did not let their children go to the Park alone as they did before. (ECF No. 31 ¶ 80.) Even after the City reopened the tunnel, Sealed Plaintiff 2 and their family

28

avoided going "through the tunnel" to use the Park's amenities as they had before.  (ECF No. 31 ¶ 82.)  Sealed Plaintiff 2 stopped allowing their minor family member to walk their dog near the park because after the vandalism they did not think it was safe for the family member to do so.  (ECF No. 31 ¶ 84.)  After the vandalism, friends and family of Sealed Plaintiff 2 refused to meet them at the Park.  (ECF No. 31 ¶ 85.)Plaintiffs clearly state that, for a period of time, they could not fully access the Park even had they wanted to.  (ECF No. 31 ¶ 81.)  Read favorably, such restricted access articulates "actual" harm, not anything "conjectural or hypothetical."  *See Spokeo Inc.*, 578 U.S. at 339; *Lujan*, 504 U.S. at 560, 564 (to establish Article III standing, plaintiff must demonstrate an "actual or imminent injury") (citation and internal quotation marks omitted).  For instance, after the vandalism, the City of Richmond "locked the tunnel [containing] the mural," depriving Plaintiffs of its use and making it more difficult for them to access park amenities. (ECF No. 31 ¶¶ 81, 82.)  And in "the immediate aftermath of the vandalism, the tunnel connecting the north and south sides of the Park was completely shuttered both day and night."  (ECF No. 31 ¶ 81.)  Sealed Plaintiff 1 and their neighbors experienced more difficulty accessing the southern area of the Park where the basketball courts and a playground are located.  (ECF No. 31 ¶ 81.)

Plaintiffs identify an injury that is "actual", rather than "conjectural or hypothetical."  *See Spokeo, Inc.*, 578 U.S. at 339.  These particularized harms are both personal and individual.  *Id.*, at 339.  Certainly, at this procedural juncture, Plaintiffs plausibly plead sufficient injury to undergird a finding of injury-in-fact.

### iii.    The Court Rejects Defendants' Argument that Plaintiffs Merely Present a Generalized Grievance

Finally, Defendants contend that it would be improper for this Court to adjudicate Plaintiffs' claims where Plaintiffs present merely a "'generalized grievance shared in

substantially equal measure by all or a large class of citizens.'"[11]  (ECF No. 107, at 7 (quoting

*Warth*, 422 U.S. at 499).)  But Plaintiffs allege that Defendants attacked the community by

ruining the mural in Battery Park.  Plaintiffs plead plausible injury to them.  That others can also

claim this injury, and might have standing, does not thwart their cause of action.  This argument

does not transform Plaintiffs claims into "'generalized grievance[s] shared in substantially equal

measure by all or a large class of citizens.'"  (*See* ECF No. 107, at 7 (quoting *Warth*, 422 U.S.

at 499).)

　　　In sum, the well-pleaded allegations before the Court state a concrete and particularized

injury experienced by each Plaintiff.  Considering these allegations as a whole and reading them

favorably, the Court concludes that Plaintiffs each allege an injury that is actual, concrete, and

particularized.  *See Spokeo, Inc.*, 578 U.S. at 339.

### 3.　Plaintiffs' Alleged Injuries Are Fairly Traceable to the Conspiracy

#### a.　Legal Standard:  Demonstrating Traceability

　　　To show a causal connection, "the injury has to be 'fairly . . . trace[able] to the

challenged action of the defendant, and not . . . th[e] result [of] the independent action of some

third party not before the court.'"  *Lujan*, 504 U.S. at 560 (alterations in original) (quoting *Simon*

*v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)).

　　　To determine whether an injury is traceable to a defendant's actions, the relevant inquiry

is simply whether the defendant's alleged actions are "at least in part responsible" for the

---

[11]  Defendants again caution the Court that if Plaintiffs "have a cause of action for [their] harms, so too must every other member of the public", which would create "an impossible burden on the courts."  (ECF No. 103, at 7.)  The Court rejects this argument.  "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance."  *Spokeo, Inc.*, 578 U.S. at 339 n.7.  Rather, the proper inquiry is whether "each individual suffers a particularized harm."  *Id.*  As discussed above, both Plaintiffs have made this showing.

plaintiff's injuries. *See Libertarian Party of Va. v. Judd*, 718 F.3d 308, 315–16 (4th Cir. 2013)

(traceability is not subject to "the stringent proximate cause standard[] derived from principles of

tort law"; instead, courts look to "whether the pleadings and proof demonstrate a sufficient

connection between the plaintiff's injury and the conduct of the defendant, such that a court

ought to assert jurisdiction over the dispute") (citing *Bennett v. Spear*, 520 U.S. 154, 168–69

(1997)). This can include an evaluation of concurrent causation. *Libertarian Party of Va.*, 718

F.3d at 316. Traceability "does not require the challenged action to be the sole or even

immediate cause of the injury." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th

Cir. 2018) (citing *Bennett*, 520 U.S. at 168–69).

> **b.    Plaintiffs' Alleged Injuries Are Traceable to Defendants' Vandalism**

Defendants argue that Plaintiffs fail to allege that their injuries are fairly traceable to

Defendants' conduct. First, Defendants contend that "[i]t may well be that [Plaintiffs] were

upset about events [surrounding the upcoming Charlottesville Unite the Right 2017 white

supremacist trial], but [D]efendants' alleged act of vandalism does not provide [P]laintiffs with

an opportunity to seek compensation for feelings brought on by unrelated events." (ECF No.

103, at 8.) Second, Defendants argue that there is no allegation that they "left any threatening

messages." (ECF No. 103, at 8.) Rather, "an unknown entity or person" provided Plaintiffs with

a "description or characterization of Patriot Front", and this in turn caused Plaintiffs' "anxiety

about Patriot Front." (ECF No. 103, at 9; *see also* ECF No. 107, at 7.) In essence, Defendants

contend that Plaintiffs fail to establish traceability because "an intermediary stands directly

between the plaintiffs and the challenged conduct in a way that breaks the causal chain." (ECF

No. 107, at 7.)

31

In response, Plaintiffs argue that "Defendants misstate [their] claim" and aver that their emotional injuries are a "direct and proximate result of Defendants' conspiracy and vandalization of the Arthur Ashe mural", not the Charlottesville Unite the Right rally. (ECF No. 106, at 17 (citing ECF No. 31 ¶¶ 88–95).) First, Plaintiffs plausibly explain that they reference the events surrounding the summer and fall placement of Patriot Front stickers in the community and the upcoming Charlottesville Unite the Right 2017 trial to provide context, but "[a]t no point" do Plaintiffs allege that these events "were themselves the source of [Plaintiffs'] injury." (ECF No. 106, at 17–18.) Plaintiffs, also rightly, reject Defendants' contention that Defendants "did not 'leave any threatening messages.'" (ECF No. 106, at 18.) The Court agrees that the "destruction of the Arthur Ashe mural was *itself* a threatening message, which Plaintiffs received loud and clear, and which caused their injuries." (ECF No. 106, at 18 (emphasis in original).)

The Court concludes that, as to traceability, Plaintiffs state that Patriot Front's actions sufficiently connect to Plaintiffs' injuries and are "at least in part responsible" for those injuries. *See Libertarian Party of Va.*, 718 F.3d at 315–16. At the very least, Defendants' actions constitute concurrent causation. *See id.* at 316. Plaintiffs allege that "Patriot Front's members have defaced murals honoring Black Americans . . . and destroyed public and private property as part of their campaign to promote their extreme" beliefs. (ECF No. 31 ¶ 2.) Plaintiffs state that the vandalism of the Arthur Ashe mural was "part of Patriot Fronts' . . . campaign of vandalism and property destruction" that began in the summer of 2021 with stickers appearing in the neighborhood and continued through the fall of 2021 as the Charlottesville United the Right trial was set to begin. (ECF No. 31 ¶ 3.)

Plaintiffs state that Patriot Front members are "require[d] . . . to publicly place a certain number of Patriot Front stickers and spray-painted stencils in order to remain members in good

standing." (ECF No. 31 ¶ 17.) Patriot Front's stickers and stencils are "intentionally branded" so that the messaging for any vandalism specifically identifies Patriot Front whether they are placed in Richmond or Norfolk Virginia, North Carolina, Indiana, or Minnesota. (ECF No. 31 ¶ 18.) All four of those states saw vandalism "of murals honoring Black lives" between August and October of 2021. (ECF No. 31 ¶ 20.) Patriot Front's own branding supports a finding that Plaintiffs' harm is traceable to Defendants' actions.

Sealed Plaintiff 1 learned that the stickers in Battery Park were attributable to "Patriot Front, a white supremacist group" after "research[ing]" them. (ECF No. 31 ¶ 74.) This discovery, however, does not constitute an intermediary fact that breaks a chain of causation for traceability purposes, as Defendants contend. That argument ignores the applicable law. Without Defendants' conspiracy and resulting vandalism, Sealed Plaintiff 1 would have had no reason to research Patriot Front's stickers, and Plaintiffs would have had no reason to believe that Patriot Front was targeting them or their community in any way. Thus, even if one or both Plaintiffs[12] learned about the meaning of Patriot Fronts' stickers or stencils from a third party, Defendants' actions are nonetheless, at a minimum, partially responsible for Plaintiffs' injuries. Read favorably, this is concurrent causation and more than sufficiently establishes traceability. *See Sierra Club*, 899 F.3d at 284 ("[T]he causation element of standing does not require the challenged action to be the sole or even immediate cause of the injury."); *see also Libertarian Party of Va.*, 718 F.3d at 315–16.

For the reasons stated above, the Court concludes that Plaintiffs have established the necessary Article III standing in this case.

---

[12] The Amended Complaint does not allege that Sealed Plaintiff 2 also researched Patriot Front's stickers and instead describes the emotional injuries that Sealed Plaintiff 2 experienced as a result of the vandalism to the mural. (ECF No. 31 ¶¶ 82–85.)

**B.     The Intracorporate Conspiracy Doctrine Does Not Apply to Plaintiffs'
§ 1985(3) or § 1986 Claims**

The Court rejects Defendants' argument that the intracorporate conspiracy doctrine bars

Plaintiffs § 1985(3)[13] and § 1986 claims.[14] (*See* ECF No. 103, at 21–22; *see also* ECF No. 107,

at 17–19.) First, Patriot Front is not a corporate entity, it is an unincorporated association.

---

[13] Section 1985(3) is titled "Conspiracy to interfere with civil rights", and provides:

**(3) Depriving persons of rights or privileges**

If two or more persons in any State or Territory conspire or go in disguise on the
highway or on the premises of another, for the purpose of depriving, either
directly or indirectly, any person or class of persons of the equal protection of the
laws, or of equal privileges and immunities under the laws; or for the purpose of
preventing or hindering the constituted authorities of any State or Territory from
giving or securing to all persons within such State or Territory the equal
protection of the laws; or if two or more persons conspire to prevent by force,
intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his
support or advocacy in a legal manner, toward or in favor of the election of any
lawfully qualified person as an elector for President or Vice President, or as a
Member of Congress of the United States; or to injure any citizen in person or
property on account of such support or advocacy; in any case of conspiracy set
forth in this section, if one or more persons engaged therein do, or cause to be
done, any act in furtherance of the object of such conspiracy, whereby another is
injured in his person or property, or deprived of having and exercising any right
or privilege of a citizen of the United States, the party so injured or deprived may
have an action for the recovery of damages occasioned by such injury or
deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

[14] 42 U.S.C. § 1986 provides in relevant part:

Every person who, having knowledge that any of the wrongs conspired to be done, and
mentioned in section 1985 of this title, are about to be committed, and having power to
prevent or aid in preventing the commission of the same, neglects or refuses so to do, if
such wrongful act be committed, shall be liable to the party injured . . . for all damages
caused by such wrongful act, which such person by reasonable diligence could have
prevented . . . .

42 U.S.C. § 1986.

Neither party suggests otherwise.  Second, it would defy logic to apply the intracorporate conspiracy doctrine to a group such as Patriot Front whose mission as alleged is to deprive other individuals of their civil rights.  And third, regardless of Patriot Front's incorporated status, the doctrine still would not apply here because Plaintiffs allege that certain participants of the conspiracy were not members of Patriot Front at any time relevant to the conspiracy.

### 1.   Legal Standard:  The Intracorporate Conspiracy Doctrine

The intracorporate conspiracy doctrine first arose in the antitrust context but has also "been applied in the civil rights area." *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985) (collecting cases).  Under the intracorporate conspiracy doctrine, "a corporation cannot conspire with its agents because the agents' acts are the corporation's own." *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 352 (4th Cir. 2013) (citing *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir.2002)).[15]  In other words, a corporation is no more capable of conspiring with its agents than an individual is capable of conspiring with him or herself. *Buschi*, 775 F.2d at 1251.

The Fourth Circuit has never addressed the question of whether the doctrine applies to unincorporated associations, such as Patriot Front, which do not have a separate legal existence as corporations do.  Federal courts outside the Fourth Circuit, however, have persuasively concluded that the intracorporate conspiracy doctrine does not apply to unincorporated associations. *See, e.g.*, *Nguyen v. Hoang*, 318 F. Supp. 3d 983, 1024 (S.D. Tex. 2018) ("The

---

[15] In their reply brief, Defendants contend that "that under Virginia law, agents of the same principal cannot conspire with each other or with the principal, and plaintiffs' complaint repeatedly alleges that the Defendants are agents of the same principal, i.e., Patriot Front." (ECF No. 107, at 2.)

Because 42 U.S.C. § 1985 and § 1986 are federal statutes, and because Plaintiffs do not allege that Patriot Front is a corporation, much less a Virginia corporation, the Court notes that Virginia agency law is not determinative of the viability of these federal claims arising under the Ku Klux Klan Act.

underlying reasoning behind the doctrine, that the corporation is a single entity, does not apply to an unincorporated association," and thus "it is not appropriate to apply the intracorporate conspiracy doctrine" to unincorporated associations); *Sirajullah v. Ill. State Med. Inter-Insurance Exchange*, No. 86 C 8668, 1988 WL 53210, at *4–5 (N.D. Ill. May 17, 1988) (the doctrine does not apply to associations because "[c]orporations have a legal existence, in contrast with voluntary unincorporated associations").

Federal courts also have stated the obvious: it would be improper to shield an unincorporated association from liability in a civil rights challenge by applying the intracorporate conspiracy doctrine where the group was created to deny the civil rights of others. *See, e.g.*, *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972) (noting the limitations of the scope of the intracorporate conspiracy doctrine, stating that agents of the Ku Klux Klan, for example, "certainly could not carry out acts of violence with impunity simply because they were acting under [the Klan's] orders"). In *Johnson v. Hill St. Dales Gen. Hosp.*, the Sixth Circuit emphasized that, when determining whether it is proper to hold corporate agents liable under § 1985(3), "[t]he corporation's mission is also a substantial factor to be considered." 40 F.3d 837, 840 (6th Cir. 1994). In *Johnson*, the Sixth Circuit concluded that "[a] corporation formed for the purpose of depriving citizens of their civil rights would not be shielded by the intracorporate conspiracy doctrine", and thus "members of the Ku Klux Klan could not avoid liability by incorporating." *Id.* (citing *Dombrowski*, 459 F.2d 190; *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108 (7th Cir.1990), and *Hartman v. Bd. of Trustees of Cmty. Coll. Dist. No. 508, Cook Cnty., Ill.*, 4 F.3d 465, 470 (7th Cir. 1993)).

Finally, participation in the conspiracy by non-members of a qualifying corporation destroys any defense of intercorporate conspiracy. *See, e.g., Phoenix Renovation Corp. v. Rodriguez*, 403 F. Supp. 2d 510, 517 (E.D. Va. 2005).

### 2.    The Intracorporate Conspiracy Doctrine Does Not Apply to Plaintiffs' § 1985(3) and § 1986 Claims

Defendants' invocation of the intracorporate conspiracy doctrine falters under all three evaluations that the Court must undertake.  Plaintiffs characterize the cases applying the doctrine as "inapplicable" because (1) "Patriot Front is not a corporation, and neither Plaintiffs nor Defendants allege otherwise"; (2) "the intracorporate conspiracy doctrine should not [ ] appl[y] to claims brought against unincorporated groups formed for the purpose of depriving persons of civil rights"; and (3) "Plaintiffs allege that Defendants conspired with persons who were not Patriot Front members, and therefore not agents of the same principal."  (ECF No. 106, at 30–31.)

As an initial matter, Plaintiffs do not dispute that the Fourth Circuit has applied the intracorporate conspiracy to § 1985 claims.  (ECF No. 106, at 30 (citing *Buschi*, 775 F.2d at 1257–59 and *Painter's Mill Grille, LLC*, 716 F.3d at 352–53).[16]

But Plaintiffs prevail when asserting that, as to the alleged conspiracy before the Court, Defendants cannot invoke the doctrine as a defense.  First, Defendants identify Patriot Front as an unincorporated association.  (ECF No. 107, at 2.)  This bars employing the intracorporate conspiracy doctrine here.  As an unincorporated association, Patriot Front has no separate legal

---

[16] Circuit courts are split regarding whether the intracorporate conspiracy doctrine applies to civil rights statutes. *See Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017).  Both the Fourth and the Seventh Circuits, among others, have applied the intracorporate conspiracy doctrine to § 1985 conspiracies. *See Dombrowski*, 459 F.2d at 196; *Wright v. Ill. Dep't of Child. & Fam. Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994) (intracorporate conspiracy doctrine barred § 1985(2) claim against individual government administrators).

existence distinct and apart from its members.  No allegation even suggests that Patriot Front members are employed by Patriot Front.  Thus, this case materially differs from other cases in which the Fourth Circuit has found the intracorporate conspiracy doctrine applicable to § 1985(3) against certain defendants:  those involving corporations, government entities, and limited liability companies.  *See, e.g., Buschi*, 775 F.2d at 1253 (correctly analyzing under the intracorporate conspiracy doctrine a § 1985(3) claim involving state officials and employees while noting personal motive exception may exist); *Locus v. Fayetteville State Univ.*, No. 88-2561, 1989 WL 21442, at *2 (4th Cir. Mar. 8, 1989) (state university); *Bank Realty v. Practical Mgmt. Tech.*, 935 F.2d 267 (4th Cir. 1991) (corporation where no exception applied); *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997) (corporation where no exception applied); *ePlus Tech.*, 313 F.3d at 179–80 (corporation where "personal stake exception" existed to allow suit against principal); *Painter's Mill Grille*, 716 F.3d at 352–53 (limited liability company where no exceptions were alleged).

A review of these cases readily allows this Court to conclude that, on these allegations, it would be inappropriate to apply the intracorporate conspiracy doctrine.  *See, e.g., Nguyen*, 318 F. Supp. 3d at 1024 (finding that "[t]he underlying reasoning behind the doctrine, that the corporation is a single entity, does not apply to an unincorporated association," and thus "it is not appropriate to apply the intracorporate conspiracy doctrine" to unincorporated associations); *see also Sirajullah*, 1988 WL 53210, at *4–5 (doctrine does not apply to associations because "[c]orporations have a legal existence, in contrast with voluntary unincorporated associations").

Second, common sense and the law make plain that applying the intracorporate conspiracy doctrine to shield Defendants from liability would be inconsistent with the purpose of § 1985(3).  As discussed in more detail below, the purpose of § 1985(3), entitled the *Ku Klux*

*Klan Act*, was to address "widespread violence and acts of terror", most notably from members of the Ku Klux Klan, "directed at [Black people] and their supporters in the postwar South." *Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 157 (citing Cong. Globe, 42nd Cong. 1st Sess. 245–48, 320–21, 369, 374, 428, 436 (1871)). Here, Plaintiffs allege that Patriot Front "is a white supremacist group that calls for the formation of a white ethnostate"[17] whose "members have defaced murals honoring Black Americans, targeted LGBTQ+ events, and destroyed public and private property as part of their campaign to promote their extreme" beliefs. (ECF No. 31 ¶¶ 1–2.) They add that Patriot Front "spreads its message of white supremacy and conquest through masked marches and vandalism", and Patriot Front's members "have intimidated communities based on race and sexual orientation across the country." (ECF No. 31 ¶¶ 2, 15.) Based on these allegations, it would be illogical and inappropriate to employ the intracorporate conspiracy doctrine to shield Defendants from liability, especially at the motion to dismiss stage. *See Dombrowski*, 459 F.2d at 196 ("Agents of the Klan certainly could not carry out acts of violence with impunity simply because they were acting under orders from the Grand Dragon.").

And third, the intracorporate conspiracy doctrine cannot bar Plaintiffs' § 1985 and § 1986 claims because Plaintiffs allege that two of the alleged conspirators were not Patriot Front members at the time of the conspiracy. (*See* ECF No. 31 ¶ 93 ("Patriot Front . . . conspired to vandalize the mural with Defendants John Doe 7 and John Doe 8, who were not members of [ ] Patriot Front at the time of the planning meeting on or about October 12, 2021.").)[18] While even

---

[17] "Patriot Front splintered from Vanguard America, one of the central white supremacists that marched at the United the Right rally." (ECF No. 31 ¶ 14.)

[18] In their reply brief, Counsel for Defendants state that they are not representing John Doe 7 and John Doe 8, but note that "as [P]laintiffs' argument has an impact on the Defendants represented [] in this motion to dismiss, Defendants note that . . . the conspiracy allegations

a single non-member of Patriot Front could destroy a claim of intracorporate conspiracy, Plaintiffs plausibly allege that at least two people not associated with Defendants contributed to a conspiracy, meaning the intracorporate conspiracy doctrine cannot apply. *See Phoenix Renovation Corp. v. Rodriguez*, 403 F. Supp. 2d 510, 517 (E.D. Va. 2005).

Having concluded that the intracorporate conspiracy doctrine does not bar Plaintiffs' claims under § 1985(3) or § 1986, the Court turns to whether Plaintiffs have successfully pled the elements of the three counts in the Amended Complaint.

### C.   Plaintiffs Sufficiently Plead Facts to Survive a Motion to Dismiss Count I:  Violation of 42 U.S.C. § 1985(3)

In Count I, Plaintiffs contend that all Defendants violated 42 U.S.C. § 1985(3) ("§ 1985(3)" or "Section 1985(3)"). This claim will survive against all moving Defendants.

"[T]he right to be free of the badges of slavery[] [is] protected by the Constitution against interference by private action." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 383 (1979) (Stevens, J. concurring) (discussing right to interstate travel). Section 1985(3) provides for a civil right of action against private conspiracies whose predominant purpose is to deprive individuals of the right to be free of the badges of slavery. *See id; see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993) (a conspiracy with the predominant purpose to impede or prevent the exercise of a right protected by § 1985(3) would trigger liability under the statute) (discussing right to interstate travel). The racially motivated

---

against John Does 7 and 8 do not meet the . . . standards for pleading § 1985 conspiracies." (ECF No. 107, at 18–19.) The Court disagrees. Plaintiffs allege that both John Doe 7 and John Doe 8 were "present for, and participated in, a meeting on or about October 12, 2021, planning the vandalism of the Arthur Ashe mural in Battery Park, Richmond, Virginia." (ECF No. 31 ¶¶ 37–38.) This is sufficient to allege, at this stage, that John Doe 7 and John Doe 8 were involved in the conspiracy. *See Section III.C.2.b, infra.*

deprivation of a person's use of public amenities, such as those provided by public parks,[19] cafés, or public waterways, constitutes a badge of slavery and thus qualifies as a right protected by § 1985(3).  *See Fisher v. Shamburg*, 624 F.2d 156, 159, 162 (10th Cir. 1980) (access to café); *Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan*, 518 F. Supp. 993, 1006 (S.D. Tex. 1981) (access to public waterway).  Thus, Plaintiffs state a claim for a violation of 42 U.S.C. § 1985(3).

### 1.   The History, Purpose, and Elements of 42 U.S.C. § 1985(3)

In the wake of the Civil War, Congress passed numerous civil rights laws to combat racial discrimination, violence, and organized terrorism directed against racial minorities and their supporters.[20]  The Civil Rights Act of 1871 served as one important piece of civil rights legislation passed during this time.  Section 2 of this Act contained the "Ku Klux Klan Act." The codified version of the Ku Klux Klan Act now appears at 42 U.S.C. § 1985(3).  *Great Am. Fed. Sav. & Loan Ass'n*, 442 U.S. at 368.

Congress passed the Ku Klux Klan Act "in response to widespread violence and acts of terror directed at [Black people] and their supporters in the postwar South."[21]  *Harrison*, 766

---

[19] The Court explains, to the extent necessary, why it concludes that public parks qualify for § 1985(3) protection in Section III.C.4, *infra*.

[20] *See* Act of May 31, 1870, ch. 114, 16 Stat. 140 (codified at 42 U.S.C. §§ 1981, 1982 (1982)) (protecting voting rights); Act of Mar. 1, 1875, ch. 114, 18 Stat. 335 (held unconstitutional in part in *The Civil Rights Cases*, 109 U.S. 3 (1883), codified in part at 42 U.S.C. § 1984 (1982)) (prohibiting racial discrimination in public accommodations); Act of Apr. 20, 1871, ch. 22, 17 Stat. 13 (codified as amended at 42 U.S.C. § 1985(3) (1982)) (the Ku Klux Klan Act); Act of Apr. 9, 1866, ch. 31, 14 Stat. 27 (codified as amended in scattered sections of 42 U.S.C.) (outlawing Black Codes in the former Confederate states); Act of Feb. 28, 1871, ch. 99, 16 Stat. 433, repealed by Act of Feb. 8, 1894, ch. 25, 28 Stat. 36 (protecting voting rights).

[21] It is worth noting that *The Civil Rights Cases*, 109 U.S. 3 (1883), codified in part at 42 U.S.C. § 1984 (1982), ruled that the "denial of admission to an inn or other place of public

F.2d at 157 (citing Cong. Globe, 42nd Cong. 1st Sess. 245–48, 320–21, 369, 374, 428, 436 (1871)).  Congress passed § 1985(3) pursuant to its powers under Section 2 of the Thirteenth Amendment,[22] which enables Congress "'rationally to determine what are the badges and incidents of slavery, and the authority to translate that determination into effective legislation.'" *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971) (citations omitted).

In passing § 1985(3), Congress provided "a remedy for the vindication of the civil rights of those being threatened and injured, notably blacks and advocates for their cause." *Harrison*, 766 F.2d at 157.  To state a § 1985(3) claim, Plaintiffs must plausibly allege the following elements:[23]

(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the

accommodation because of race did *not* constitute a badge or incident of slavery." *Fisher*, 624 F.2d at 159 (emphasis added). The *Fisher* court observed that "[a]lthough the Civil Rights cases have never been expressly overruled . . . [the Supreme Court in 1968] cast doubt on their present soundness." *Id.* at 160 (citing *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 441 n.78 (1968)); *see also Jones*, 392 U.S. at 441 n.78 (explaining that the question of the validity of the majority's position in the *Civil Rights Cases* has been "rendered largely academic by Title II of the Civil Rights Act of 1964").

[22] The Thirteenth Amendment provides:

SECTION 1.  Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

SECTION 2.  Congress shall have power to enforce this article by appropriate legislation.

U.S. CONST. amend. XIII.

[23] Section 1985(3) is not limited to state conspiracies; it can also be applied to certain private conspiracies involving "an intent to deprive persons of a right guaranteed against private impairment." *See Bray*, 506 U.S. at 274.  Defendants do not move to dismiss based on the allegations involving private, rather than state, action. (*See* ECF No. 103, at 11, 13 (acknowledging that § 1985(3) "does create a cause of action for certain kinds of private action" but arguing that the scope of § 1985(3) is limited to claims "involv[ing] involuntary servitude or [the] right of interstate travel").)

equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citing *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)).  The Court will address each element seriatim.

### 2.    Plaintiffs Allege a Conspiracy

The Court starts at element one—whether Plaintiffs have adequately pled a § 1985(3) conspiracy involving all moving Defendants.  They have.

### a.    Legal Standard:  Pleading Requirements for a § 1985(3) Conspiracy Claim

To adequately plead a § 1985(3) conspiracy, "the plaintiff 'must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights.'" *A Soc'y Without A Name*, 655 F.3d at 346 (citing *Simmons*, 47 F.3d at 1377).  To make this showing at the motion to dismiss stage, a plaintiff "need not produce direct evidence of a meeting of the minds." *Frazier v. Cooke*, No. 4:17-cv-54 (RAJ), 2017 WL 5560864, at *3 (E.D. Va. Nov. 17, 2017) (quoting *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 421 (4th Cir. 1996)).  A plaintiff need only allege sufficient facts for a court to conclude, drawing from "'its judicial experience and common sense'", that such an agreement or meeting of the minds plausibly occurred. *Frazier*, 2017 WL 5560864, at *3 (quoting *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009)).

"[A]lthough an express agreement is not necessary, the participants in the conspiracy must share [a] general conspiratorial objective. . . .  [I]t simply must be shown that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." *Simmons*, 47 F.3d at 1378 (third alteration in original) (citations and internal quotation marks omitted).  A meeting of the minds can be shown by

43

"'circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective,'" which "reasonably lead[s] to an inference that co-conspirators positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Frazier*, 2017 WL 5560864, at *3 (quoting *Hinkle*, 81 F.3d at 421). A court cannot infer a meeting of the minds based on "conclusory allegations unsupported by concrete facts." *A Soc'y Without A Name*, 655 F.3d at 347.

### b. Plaintiffs Sufficiently State a Claim of a § 1985(3) Conspiracy

Defendants argue that Plaintiffs fail to satisfy the pleading requirement for a § 1985(3) conspiracy because their allegations are too conclusory. (ECF No. 103, at 15–16.) First, Defendants assert, "[a]s to [D]efendants [Daniel] Turetchi and [Aeden] Tredinnick", Plaintiffs "merely repeat in cookie cutter fashion the conclusory phrase 'was present for, and participated in, a meeting on or about October 12, 2021, planning the vandalism of the Arthur Ashe mural in Battery Park, Richmond, Virginia.'" (ECF No. 103, at 15.) Defendants argue that "[t]his phrase fails to provide the required 'specific communications amongst the conspirators' or concrete detail about what the conspirators allegedly agreed to." (ECF No. 103, at 15.) Additionally, Defendants note that although "[t]he allegations regarding Paul Gancarz have a little more detail", they too fall short of "§ 1985 conspiracy pleading standards" because one cannot infer from the information alleged in the Amended Complaint "that, even assuming Mr. Gancarz was a Network Director, he had knowledge of or control over what could have been a rogue operation." (ECF No. 103, at 16.)

This Court finds otherwise. Plaintiffs allege numerous well-pleaded facts that, taken as true and read favorably, plausibly allege a conspiracy. Plaintiffs plainly state that Mr. Gancarz, Mr. Noyce, Mr. Dail, Mr. Turetchi, Mr. Tredinnick, and other Defendants who have not joined

44

the Motion to Dismiss, were "present for, and participated in, a meeting on or about October 12, 2021, planning the vandalism of the Arthur Ashe mural in Battery Park, Richmond, Virginia." (ECF No. 31 ¶¶ 24–38.)  Plaintiffs assert that during this meeting, Mr. Gancarz, Mr. Noyce, Mr. Dail, Mr. Turetchi, Mr. Tredinnick, and other Defendants who have not joined the Motion to Dismiss "discussed and planned the vandalization of the Arthur Ashe mural." (ECF No. 31 ¶ 50.)  Moreover, Patriot Front required Mr. Gancarz, as Network Director, to "to approve of any large scale mural cover-ups in his region before members initiate[] them." (ECF No. 31 ¶ 24.) Plaintiffs add that Defendant Gancarz, in his role as Network Director, was "directly involved in, consulted on, and approved" the vandalism of the Arthur Ashe mural.  (ECF No. 31 ¶ 24.)

Less than a week after the October 12, 2021 meeting, Mr. Noyce, Mr. Dail, and John Doe 1 vandalized the mural with Patriot Front insignia in a similar form used by Patriot Front members across the country.  (ECF No. 31 ¶¶ 51–71.)  Plaintiffs add that Patriot Front prominently featured "[f]ootage of the vandalism of the Arthur Ashe mural" in a video Patriot Front used "to recruit new members." (ECF No. 31 ¶ 71.)  Finally, pictures of the vandalism as it was occurring are included in the Amended Complaint.  (ECF No. 31 ¶¶ 58–62, 64, 66–69.) Considered together, Plaintiffs allege ample circumstantial, and some direct, facts to infer that the Defendants shared "a single plan" to deface the mural, and Defendants were aware of "the essential nature and general scope" of this plan. *See Simmons*, 47 F.3d at 1378; *see also Frazier*, 2017 WL 5560864, at *3.  Thus, Plaintiffs provide ample circumstantial, and some direct, evidence to reasonably infer the existence of a conspiracy that survives this Motion.

### 3.    Plaintiffs Plausibly Allege Discriminatory Animus

Turning to element two—discriminatory animus—the Court concludes that Plaintiffs clearly and plausibly allege the requisite racial animus.  To satisfy this element, Plaintiffs must

assert that Defendants were "motivated by a specific class-based, invidiously discriminatory animus." *A Soc'y Without A Name*, 655 F.3d at 346 (citations omitted). Section 1985(3) "was intended to reach any class-based animus" directed against Black people as well as "those who champion[] their cause." *United Broth. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 836 (1983).

Defendants argue that the alleged vandalism can be interpreted "as an ill-conceived protest against the defacement and removal of Confederate statutes" rather than "an attempt" to "deny African-American persons, or anyone else, use of the park." (ECF No. 103, at 14.) While this conjectural offering might suggest an alternative motive (or even a primary one) that animated Defendant's actions, the suggested motive does not preclude the favorable reading of Plaintiffs' allegations here. Discovery will result in a full factual record from which each party can test the other's contentions.

Viewed favorably, the Amended Complaint alleges numerous well-pled and plausible facts that support a reasonable inference that racial animus against Black individuals and their supporters animated Defendants' conduct. Among other things, Plaintiffs allege that "Patriot Front is a white supremacist group that calls for the formation of a white ethnostate." (ECF No. 31 ¶ 1.) The Amended Complaint reports Patriot Front's mission and white supremacist ideology, including that its "ideology, articulated in its online manifesto, is based on" the belief "that true Americans share a 'pan-European identity.'" (ECF No. 31 ¶ 12.) Plaintiffs plausibly allege that "Patriot Front's members . . . have intimidated communities based on race . . . across the country" by "defac[ing] murals honoring Black Americans, target[ing] LGBTQ+ events, and destroy[ing] public and private property as part of their campaign to promote their . . . credo." (ECF No. 31 ¶ 2.)

46

Patriot Front's leadership "require[s] members to publicly place a certain number of Patriot Front stickers and spray-painted stencils in order to remain members in good standing", and "requires members to purchase the Patriot Front stickers and stencils" from Patriot Front National Director Thomas Rousseau. (ECF No. 31 ¶ 17.) Patriot Front's stickers and stencils are "intentionally branded", (ECF No. 31 ¶ 18), so that the messaging of any vandalism specifically identifies Patriot Front whether they are placed in Richmond or Norfolk, Virginia, North Carolina, Indiana, or Minnesota. Indeed, all four of those states saw vandalism of "murals honoring Black lives" between August and October of 2021. (ECF No. 31 ¶ 20.) It is reasonable to infer that the use of branded signs was meant to reflect a show of strength regarding Patriot Front's white supremacist agenda.

Racial animus as a motivation from this group is amply stated in the Amended Complaint. Among other things, Plaintiffs plausibly allege that Defendants are members or associates of Patriot Front who conspired to deface a mural to intimidate an overwhelmingly and historically Black neighborhood. (ECF No. 31 ¶ 3.) Battery Park, post-segregation, served as a refuge for Black people in Richmond. (ECF No. 31 ¶¶ 6, 43–44.) It is reasonable to infer that the defacing of a mural depicting Arthur Ashe—a Black man who hailed from segregated Richmond but became a committed humanitarian activist and an international gamechanger— was driven by racial animus and was meant to intimidate. (ECF No. 31 ¶¶ 3–4.)

Specifically, Defendant John Doe 1 filmed Defendants Nathan Noyce and Thomas Dail while they vandalized the mural. (ECF No. 31 ¶ 65.) This video evidence directly shows that racial animus exists: after Mr. Noyce and Mr. Dail began vandalizing the mural's depiction of Arthur Ashe's face at John Doe 1's direction, John Doe 1 stated: "F[*****]g n*****'s face." (ECF No. 31 ¶ 65.) Pictures of the vandalism as it was occurring are included in the Amended

Complaint.  (ECF No. 31 ¶¶ 58–62, 64, 66–69.)  This direct evidence of racial animus certainly counsels against granting this Motion.

Also, Patriot Front leadership "has explicitly encouraged large scale, racially-motived vandalism by" its members and "requires Patriot Front leadership approval before its members engage in large scale mural coverups."  (ECF No. 31 ¶ 23.)  In addition, "Defendant Paul Gancarz" was "directly involved in, consulted on, and approved high-profile vandalism [in Virginia], including the vandalism of the Arthur Ashe mural."  (ECF No. 31 ¶ 24.)  Defendants Gancarz, Noyce, Dail, Turetchi, and Tredinnick "participated in a meeting on or about October 12, 2021" where they "discussed and planned the vandalization of the Arthur Ashe mural" just over a week before the vandalism occurred.  (ECF No. 31 ¶ 50.)  Considered together, Plaintiffs present ample circumstantial, and some direct, facts that Defendants conspired to vandalize the mural with a specific class-based animus against Black people and those who champion their cause.  *See Sines*, 324 F. Supp. 3d at 781.  These allegations amply satisfy element two as to Plaintiffs' claims.[24]

### 4.   Plaintiffs Allege Each Defendant's Intent to Deprive Plaintiffs of Equal Enjoyment of Rights Secured by Law

The parties dispute the scope of § 1985(3) in a manner that affects the Court's analysis of element three—whether Plaintiffs state a claim that Defendants conspired to "deprive the

---

[24] Defendants state the Court may not infer Defendants' racial animus by attributing to each Defendant "all of the actions or principles of [Patriot Front]."  (ECF No. 107, at 14 (citing *Keyishian v. Board of Regents*, 385 U.S. 589, 607 (1967)).)  In concluding that Plaintiffs allege the requisite racial animus, the Court does not blindly attribute to each Defendant "all of the actions or principles of" Patriot Front.  *See Keyishian*, 385 U.S. at 607.  Rather, in arriving at this conclusion, the Court conducted a context-specific analysis of Plaintiffs' allegations that "draw[s] on its judicial experience and common sense."  *See Francis*, 588 F.3d at 193 (citation omitted).  Pictures of individuals engaging in the challenged conduct, for instance, provide valuable context.

[Plaintiffs] of the equal enjoyment of rights secured by the law to all." *See A Soc'y Without A Name*, 655 F.3d at 346 (citing *Simmons*, 47 F.3d at 1376). Defendants contend that the Supreme Court and the Fourth Circuit have "narrowly circumscribed" § 1985(3) conspiracy claims, and Plaintiffs' "broad and novel use of § 1985(3)" directly conflicts with relevant precedent. (ECF No. 103, at 10.) Specifically, Defendants contend that § 1985(3) applies only to conspiracies involving "involuntary servitude or [the] right of interstate travel." (ECF No. 103, at 13 (citing *Bray*, 506 U.S. at 278).)

Plaintiffs disagree, arguing that § 1985(3) "serves as a vehicle to remedy violations of substantive rights guaranteed by federal law or the Constitution." (ECF No. 106, at 20 (citing *Doski v. M. Goldseker Co.*, 539 F.2d 1326, 1333 (4th Cir. 1976) (recognizing that § 1985(3) protects rights guaranteed by federal law and the Constitution, but finding that Title VII was not an available mechanism under that statute)).) Plaintiffs further note that "[c]ourts around the country have long recognized that enjoyment of a public accommodation is a predicate right of a § 1985 claim." (ECF No. 106, at 20 (citing *Fisher*, 624 F.2d at 162 and *Lowden v. William M. Mercer, Inc.*, 903 F. Supp. 212, 221 (D. Mass. 1995)).) These cases are persuasive.

For the reasons articulated below, this Court concludes that a racially motived conspiracy to deny Plaintiffs access to the public accommodations offered by Battery Park is actionable under § 1985(3).

Section 1985(3) "is a purely remedial statute" that provides "a civil cause of action when some otherwise defined federal right—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section." *Great Am. Fed. Sav. & Loan Ass'n*, 442 U.S. at 376. In other words, to successfully bring a § 1985(3) claim, a plaintiff must assert a predicate right found outside § 1985. *United Bd. of*

*Carpenters & Joiners of Am., Loc. 610, AFL-CIO*, 463 U.S. at 833.  Additionally, a predicate

right under a § 1985(3) claim against a private conspiracy, *i.e.*, a conspiracy not involving state

action, must be a right that is "guaranteed against private impairment." *Bray*, 506 U.S. at 274.

Although Defendants urge the Court to limit § 1985(3)'s scope to conspiracies involving

"involuntary servitude or right of interstate travel", the Court finds this argument flawed.

Instead, case law more properly, albeit broadly, states that § 1985(3) can be used to vindicate

federal substantive rights. *See, e.g.*, *Doski*, 539 F.2d at 1333 (Section 1985(3) "cover[s] rights

guaranteed by federal law[1] or the Constitution"); *Banks v. Gates Hudson & Assocs., Inc.*, No.

1:19-cv-1259 (TSE), 2020 WL 3441423, at *10 (E.D. Va. June 23, 2020) (stating same but

finding that plaintiffs did not plead sufficient facts that owners of emotional support dogs could

bring a § 1983 claim against their condominium group); *Sines*, 324 F. Supp. 3d at 782

(conspiracy to deprive plaintiffs of Thirteenth Amendment right to be free from racial violence in

context of Unite the Right rally was actionable under § 1985(3)).

The constitutional right to be free from the badges and incidents of slavery qualifies as a

right that can be vindicated via a 42 U.S.C. § 1985(3) claim against private actors. *See Griffin*,

403 U.S. at 104–05 (Section 1985(3) creates a statutory cause of action for "victims of

conspiratorial, racially discriminatory private action aimed at depriving [the victim] of the basic

rights that the law secures to all free [people]"); *Great Am. Fed. Sav. & Loan Ass'n*, 442 U.S. at

383 ("Some privileges and immunities of citizenship, such as the right to engage in interstate

travel and the right to be free of the badges of slavery, are protected by the Constitution against

interference by private action, as well as impairment by state action.  Private conspiracies to

deprive individuals of these rights are . . . actionable under § 1985(3).") (Stevens, J., concurring).

The Court must first address Defendants' assertion that post-*Bray*, a § 1985(3) claim can only be predicated on the right to interstate travel or the right to be free from involuntary servitude. (ECF No. 103, at 13; ECF No. 107, at 9.) In *Bray*, a women's health clinic argued that protestors violated § 1985(3) by conducting protests against the freedom to have an abortion at various clinics outside Washington, D.C. *Bray*, 506 U.S. at 311 n.10 (Stevens, J., dissenting) (citing district court findings of fact). Specifically, the anti-abortion protestors, on an almost weekly basis for five years, conducted demonstrations outside abortion clinics, at one point causing at least two clinics to shut down for large portions of the day. *Id.* The protestors also caused property damage at clinic sites, blocked entrance into and out of clinics, and placed nails on the ground outside clinic parking lots. *Id.*

In contending that *Bray* forecloses Plaintiffs' § 1985(3) claim, Defendants overstate its holding. First, the right to be free from "involuntary servitude" improperly constrains what courts consistently have identified as the right protected, which is the "right to be free from the badges of slavery." Second, *Bray* held that that § 1985(3) does not provide a federal cause of action against persons obstructing access to abortion clinics in part because "women seeking a [voluntary] abortion" could not be considered an "otherwise class-based" group protected under that statute. 506 U.S. at 266, 269–270 (quoting *Griffin*, 403 U.S. at 102). The *Bray* Court observed that § 1985(3) is not a "'general federal tort law.'" *Id.* at 268 (quoting *Griffin*, 403 U.S. at 102). It explained that for a conspiracy to trigger § 1985(3) liability, the impairment of the underlying right "must be a *conscious objective* of the enterprise."[25] *Id.* at 275 (emphasis added).

---

[25] *Bray* posits, for example, a conspiracy to rob an interstate traveler would not by itself violate § 1985(3), but a conspiracy with the "predominant purpose . . . to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his [or her] exercise of that right" would trigger liability under § 1985(3). *See* 506 U.S. at 268 (quoting *U.S. v. Guest*, 383 U.S. 745, 760 (1966)).

Here, even under *Bray*, the Amended Complaint identifies a conspiracy whose conscious objective was to intimidate, interfere with, and prevent the use of a public accommodation— Battery Park—by Black people because of their race. The mural chosen buttresses such a finding. This act falls firmly within the ambit of this statute.

This Court concludes that the racially motivated deprivation of the right to enjoy a public accommodation—such as that offered in Battery Park—constitutes a denial amounting to a "badge of slavery", and thus is actionable under § 1985(3). *See Fisher*, 624 F.2d at 159 (concluding that "Congress has declared its intention that a racially motivated interference with one's right to enjoy places of public accommodation constitutes [ ] a badge of slavery" and § 1985(3) can be used to enforce this right); *Vietnamese Fishermen's Ass'n*, 518 F. Supp. at 1006 (conspiracy to reduce presence of Vietnamese fishermen in public waterway actionable under § 1985(3)). The Court explains its rationale below.

As just stated, the Court concludes that § 1985(3) creates a federal cause of action stemming from a racially motivated conspiracy with the predominant purpose of interfering with Plaintiffs' access to a public accommodation, which constitutes a badge of slavery. That conclusion is wholly consistent with the guidance provided in *Bray*. More broadly, in circumstances outside of § 1985(3), courts have stated that denial of access to public parks, when driven by racial animus, violates a person's rights because such denial constitutes a "badge of slavery" that Congress has the power under the Thirteenth Amendment to eradicate. *See U.S. v. Bledsoe*, 728 F.2d 1094, 1097 (8th Cir. 1984) (holding that 18 U.S.C. § 245(b),[26] a criminal hate

---

[26] 18 U.S.C. § 245(b) provides, in relevant part:

52

_____

(b) *Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—*
    \*   \*   \*

(2) *any person because of his race, color,* religion or national origin and because he is or has been—

    (A) enrolling in or attending any public school or public college;

    (B) *participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof;*

    (C) applying for or enjoying employment, or any perquisite thereof, by any private employer or any agency of any State or subdivision thereof, or joining or using the services or advantages of any labor organization, hiring hall, or employment agency;

    (D) serving, or attending upon any court of any State in connection with possible service, as a grand or petit juror;

    (E) traveling in or using any facility of interstate commerce, or using any vehicle, terminal, or facility of any common carrier by motor, rail, water, or air;

    (F) enjoying the goods, services, facilities, privileges, advantages, or accommodations of any inn, hotel, motel, or other establishment which provides lodging to transient guests, or of any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility which serves the public and which is principally engaged in selling food or beverages for consumption on the premises, or of any gasoline station, or of any motion picture house, theater, concert hall, sports arena, stadium, or any other place of exhibition or entertainment which serves the public, or of any other establishment which serves the public and (i) which is located within the premises of any of the aforesaid establishments or within the premises of which is physically located any of the aforesaid establishments, and (ii) which holds itself out as serving patrons of such establishments . . .

shall be fined under this title, or imprisoned not more than one year, or both[.]

18 U.S.C. § 245(b) (emphasis added).

crime counterpart to § 1985, was a constitutional exercise of Congress's power to eradicate badges of slavery and finding no "doubt that interfering with a person's use of a public park because he is black is a badge of slavery"); *U.S. v. Allen*, 341 F.3d 870, 884–85 (9th Cir. 2003) (citing *Bledsoe* with approval and applying identical reasoning to uphold constitutionality of 18 U.S.C. § 245(b)).

Indeed, the *Bledsoe* court identifies earlier Supreme Court precedent reaching the same conclusion under the Thirteenth Amendment.[27] *Bledsoe* quotes Justice Douglas's concurrence in *Jones v. Mayer Co.*, 392 U.S. 409 (1968), which identifies the exclusion from "public parks" on the basis of race as a "badge[] of slavery" that "remain[ed] today." *Bledsoe*, 728 F.2d at 1097 (quoting *Jones*, 392 U.S. at 445 (Douglas, J., concurring)). The *Bledsoe* court also identifies a court in the United States Court of Appels for the Fifth Circuit that reached the same conclusion even earlier than *Jones* did. *Bledsoe*, 728 F.2d at 1097 (citing *New Orleans Park Improvement Ass'n. v. Detiege*, 354 U.S. 54 (1958)).

In sum, Plaintiffs plausibly allege a racially motived conspiracy whose predominant purpose was to deny them of their right to enjoy the public accommodations offered by Battery Park. Reading the allegations favorably, this constitutes a conspiracy to deprive Plaintiffs of equal privileges and immunities under § 1985(3). Although Defendants argue that Plaintiffs

---

[27] At oral argument, Defendants stridently argued that the criminal nature of § 245(b) renders it, and cases evaluating it, irrelevant to this civil action. This argument goes too far. It is certainly the case that many § 245(b) cases recite brutal and disturbing physical attacks while, in contrast, this case does not even involve physical presence in front of these victims. Perhaps that is why this comes to the Court as a civil and not a criminal matter.

More on point, while the Court acknowledges that factual difference regarding extreme conduct, it also sees that § 245(b) and § 1985(3) were both created to address, *inter alia*, badges of slavery. It is the legal analysis of what constitutes a badge of slavery that the Court evaluates here.

improperly and "repeatedly lump all Defendants together" in their allegations, (ECF No. 107, at 13), the Court concludes that Plaintiffs allege sufficient facts to conclude that each Defendant was involved in this conspiracy. Specifically, Plaintiffs identify Defendants Thomas Noyce, Thomas Dail, Paul Gancarz, Daniel Turetchi, and Aedan Tredinnick as attending and participating in a meeting to plan the vandalism of the mural. (ECF No. 31 ¶¶ 24–27, 30, 50.) Plaintiffs further allege that Paul Gancarz, in his role as a National Director for Patriot Front, consulted on and personally signed off on the vandalism to the mural, and that Nathan Noyce, Thomas Dail, and John Doe 1 ultimately carried out the vandalism. (ECF No. 31 ¶¶ 24, 51–71.) Thus, Plaintiffs provide ample well-pleaded facts to support the reasonable inference that each Defendant deprived Plaintiffs of the equal enjoyment of rights secured by the law.

### 5. Plaintiffs Allege Injury Caused by Defendants' Conspiracy

Defendants' argument that Plaintiffs fail to allege an injury caused by the alleged conspiracy—elements four and five—also does not succeed. In contending that Plaintiffs' allegations fail to satisfy the causation element, Defendants incorporate their arguments as to standing. (ECF No. 103, at 14.) As explained in detail above in Section III.A.2–3, Plaintiffs identify a cognizable injury-in-fact that is fairly traceable to the alleged conspiracy. For the same reasons, Plaintiffs' allegations plausibly satisfy the causation element of § 1985(3).

Having concluded that Plaintiffs stated a § 1985(3) claim against Defendants,[28] the Court now examines whether Plaintiffs plausibly allege a § 1986 claim.

---

[28] Defendants also challenge Plaintiffs' § 1985(3) claim by arguing that Plaintiffs fail to plead the requisite *mens rea* of recklessness. (ECF No. 103, at 16–20.) The Court analyzes this issue in Section III.E.

**D.    Plaintiffs Sufficiently Plead Facts to Survive a Motion to Dismiss Count II:  Violation of 42 U.S.C. § 1986**

Defendants argue that because Plaintiffs fail to plead an underlying § 1985(3) claim, their § 1986 claim must also falter.  (ECF No. 103, at 20.)  In the alternative, Defendants contend that Plaintiffs fail to plead the four elements of a § 1986 claim.  (ECF No. 103, at 21–23; ECF No. 107, at 16–17.)  Lastly, Defendants state that Plaintiffs' § 1986 claim is time-barred.  (ECF No. 103, at 23; ECF No. 107, at 17.)

The Court rejects Defendants' first argument because, for the reasons discussed above, Plaintiffs successfully plead an underlying § 1985(3) claim.[29]  Defendants' two remaining arguments fare no better.  Plaintiffs plausibly allege all four elements of a § 1986 claim, and they timely filed their Complaint within one year after the cause of action under this statute accrued.  Accordingly, Plaintiffs' § 1986 claim survives Defendants' Motion to Dismiss.[30]

**1.    Plaintiffs Allege Facts Supporting Each Element of 42 U.S.C. § 1986**

To bring a § 1986 claim, a Plaintiff must allege:  (1) a § 1985 conspiracy occurred; (2) the defendant had knowledge of the conspiracy; (3) the defendant had the power to prevent or aid in preventing the commission of acts pursuant to that conspiracy; and, (4) the defendant neglected or refused to act to prevent the conspiracy.  *See McHam v. N. Carolina Mut. Life Ins. Co.*, No. 105CV01168, 2007 WL 1695914, at *5 (M.D.N.C. June 11, 2007), *aff'd*, 250 F. App'x 545 (4th Cir. 2007) (citing *Clark v. Clabaugh*, 20 F.3d 1290, 1295–96 (3d Cir. 1994) (setting out

---

[29] The Court agrees, however, that "[a] cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985." *Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985).  Plaintiffs do not dispute this. (ECF No. 106, at 28.)

[30] Defendants also challenge Plaintiffs' § 1986 claim by arguing that Plaintiffs fail to plead the requisite *mens rea* of recklessness. (ECF No. 103, at 16–20.)  The Court analyzes this issue in Section III.E.

56

elements of § 1986 claim)); *see also Waller v. Butkovich,* 584 F. Supp. 909, 923, 932 (M.D.N.C. 1984) (rejecting motion to dismiss when plaintiffs alleged that defendants had "full advance knowledge" of conspiracy and the power to prevent it where the defendants "actively participated in the planning of [an] attack," "monitored" the attack, and "failed to take any action to stop [it]").

Here, Plaintiffs allege facts supporting each element of § 1986. As to the first requirement for a successful § 1986 claim, for the reasons discussed above, Plaintiffs plausibly allege that a § 1985(3) conspiracy occurred. As to the second element, Plaintiffs plausibly plead that Defendants knew of the conspiracy. Specifically, Plaintiffs allege that Defendants Mr. Noyce and Mr. Dail actively participated in destroying the mural. (ECF No. 31 ¶¶ 51–71.) Mr. Noyce, Mr. Dail, Mr. Gancarz, Mr. Turetchi, and Mr. Tredinnick also were "present for, and participated in, a meeting on or about October 12, 2021, planning the vandalism of the . . . mural." (ECF No. 31 ¶¶ 24–27, 30.) Plaintiffs plausibly add that all Defendants joining the Motion to Dismiss were members of Patriot Front during the time of the alleged conspiracy. (ECF No. 31 ¶¶ 24–27, 30.)

Defendants counter that Plaintiffs' allegations insufficiently establish their knowledge of the alleged conspiracy, and in so doing, appear to confuse Plaintiffs' burden at this stage of the litigation. (ECF No. 107, at 16.) Specifically, Defendants contend that "[P]laintiffs must allege and prove the Defendants' focused attention on the essential aspects and aims of the § 1985 conspiracy, not merely the Defendants' alleged presence in an environment where the conspiracy may (or may not) have been discussed." (ECF No. 107, at 16 (citing *Hampton v. City of Chicago,* 484 F.2d 602, 610 (7th Cir. 1973).) The Court reiterates that, at the motion to dismiss stage, Plaintiffs need only allege sufficient facts for the Court to reasonably infer, drawing from

57

"'its judicial experience and common sense'", that Defendants had knowledge of the alleged conspiracy. *Frazier*, 2017 WL 5560864, at *3 (quoting *Francis*, 588 F.3d at). Plaintiffs do so here.

Plaintiffs must state a § 1986 claim as to each Defendant. The Court finds that they do so for the reasons their § 1985(3) claims survive. Moreover, Defendants' argument that Plaintiffs must plead "actual knowledge" rather than just "knowledge" is flawed. Plaintiffs state well-pleaded facts that allow the Court to conclude that Defendants had knowledge of the conspiracy because they all attended and participated in a meeting on or about October 12, 2021 in which the vandalism of the mural was planned.[31] Among other things, Patriot Front requires its members to publicly place branded Patriot Front stickers and stencils, which began appearing in Battery Park in the summer of 2021. As members of Patriot Front, Mr. Dail, Mr. Noyce, and John Doe 1 vandalized the mural less than a week after this meeting and filmed themselves doing so. This all occurred just before the Charlottesville Unite the Right trial and around the same time Patriot Front had defaced murals honoring Black lives in other cities. Defendants raise primarily factual challenges to what undergirds the Court's findings. But this is premature. Discovery will result in a full factual record from which each party can challenge the opposing party's claims.

Finally, the Court speaks to the remaining elements—elements three and four—together. Plaintiffs must allege that Defendants had the power to prevent, or aid in preventing, the commission of acts pursuant to that conspiracy, but nonetheless neglected or refused to act to prevent the conspiracy. *See McHam*, 2007 WL 1695914, at *5. Defendants argue that Plaintiffs

---

[31] The conscious objective of the plan agreed to on October 12, 2021 was to deprive Plaintiffs of equal access to Battery Park, which implicates a badge of slavery under the Thirteenth Amendment.

fail to establish the third element as to Mr. Turetchi and Mr. Tredinnick only.  (ECF No. 107, at 17.)[32]  The Court finds otherwise.

The Amended Complaint states that Defendants Turetchi and Tredinnick were members of Patriot Front at the time of the conspiracy and were present for, and participated in, the meeting that occurred on or about October 12, 2021.  Patriot Front had engaged in similar conduct in other cities prior to October 2021.  The purpose of this meeting was to plan the vandalism of the Arthur Ashe mural in Richmond.  The destruction occurred less than a week later.  Viewing these well-pleaded allegations as true and in the light most favorable to Plaintiffs, Plaintiffs sufficiently establish that Mr. Turetchi and Mr. Tredinnick had the power to prevent or aid in preventing the commission of acts pursuant to that conspiracy, and that they nonetheless neglected or refused to do so.  *See Waller,* 584 F. Supp. at 923, 932.  In opposition, Defendants raise primarily factual challenges to what supports the Court's findings.[33]  But discovery will

---

[32] Although Defendants do not raise this argument, the Court nonetheless observes that elements three and four of § 1986 are also satisfied as to Mr. Noyce, Mr. Dail, and Mr. Gancarz. By alleging that Mr. Noyce and Mr. Dail vandalized the mural, Plaintiffs plausibly allege that both men had the power to prevent the vandalism and nonetheless failed to do so.  These elements are also easily satisfied as to Mr. Gancarz, who Plaintiffs state:  (1) was a member of Patriot Front's leadership who "required all Patriot Front members to get his personal approval before engaging in mural coverups in his network", which included Richmond, Virginia; and, (2) was present for and participated in the meeting that occurred on or about October 12, 2021. (ECF No. 31 ¶¶ 24, 101.)

[33] In a single sentence in their reply brief, Defendants, improperly, raise a new argument that § 1986 is also "unconstitutionally vague" if it subjects Defendants to liability by "merely attending—probably telephonically—a meeting with a sizable number of participants at which an alleged conspiracy was addressed in unspecified ways by unknown persons."  (ECF No. 107, at 17.)  The Court need not address this untimely argument.  *See Touchcom, Inc. v. Bereskin & Parr,* 790 F. Supp. 2d 435, 446 (E.D. Va. 2011) (explaining "[t]ypically, courts will not consider an argument raised for the first time in a reply brief" as the "opposing party is prejudiced in its ability to respond to the argument") (citation omitted).

59

result in a full record from which each party can challenge the opposing party's claims. The Court concludes that Plaintiffs have stated a claim as to element of a § 1986 claim against each Defendant.

### 2.    Plaintiffs' § 1986 Claim is Timely

The Court next evaluates Defendants' final challenge to Plaintiffs' § 1986 Claim— whether the applicable statute of limitations bars this claim. It does not.

The applicable statute of limitations period governing § 1986 is one year from the time the claim accrued. *See* 42 U.S.C. § 1986.[34] "A civil rights claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *A Soc'y Without A Name*, 655 F.3d at 348 (citation and quotation marks omitted). A cause of action accrues "'when the plaintiff possesses sufficient facts about the harm done to [them].'" *Doe v. Va. Polytechnic Inst. & State Univ.*, 617 F. Supp. 3d 412, 432 (W.D. Va. 2022) (quoting *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995)). After a Plaintiff knows these facts, they are on "'inquiry notice'" and have "'a duty to inquire about reasonably discoverable details.'" *Id.* (quoting *Slaey v. Adams*, No. 1:08cv354 (LO), 2008 WL 5377937, at *7 (E.D. Va. Dec. 23, 2008)). "A plaintiff must know that [they have] been hurt and who inflicted the injury." *Id.*

Defendants provide two arguments asserting that this claim is time-barred. First, Defendants contend that the allegation that "Patriot Front's scheme [to "target[] the Battery Park

---

Regardless, even if the Court were inclined to consider Defendants' as-applied vagueness challenge to § 1986, it likely would find, on this record, that it is not void for vagueness, as the text of § 1986 gives a person of ordinary intelligence adequate notice of what conduct is prohibited and also includes sufficient standards to prevent arbitrary and discriminatory enforcement. *See Sessions v. Dimaya*, 584 U.S. 148, 156 (2018).

[34] Section 1986 provides, in relevant part: "[N]o action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued." 42 U.S.C. § 1986.

community"] began in the summer of 2021 and culminated in the destruction of [the] mural . . . on or about October 18, 2021." (ECF No. 31 ¶ 3.) Thus, Defendants argue, Plaintiffs had a "duty to inquire" by the "[t]he summer of 2021", which occurred "approximately 16 or 17 months" before Plaintiffs filed their first Complaint on October 18, 2022. (ECF No. 103, at 23; ECF No. 107, at 15.) Second, in the alternative, Defendants suggest that the October 18, 2021 vandalism of the mural occurred "one year and one day before the filing of the Complaint" on October 18, 2022. (ECF No. 103, at 23.)

The Court rejects each argument because Plaintiffs filed their § 1986 action within one year of when their claim accrued.

Sealed Plaintiff 1 states that they "first became aware of Patriot Front's activity after seeing their stickers plastering the [Battery Park] neighborhood in the summer of 2021." (ECF No. 31 ¶ 74.) Sealed Plaintiff 1 then "researched the stickers" and learned "that the stickers belonged to Patriot Front, a white supremacist group", which caused Sealed Plaintiff 1 to feel "shocked, angry, and hurt that a white supremacist group was actively pushing propaganda in their neighborhood." (ECF No. 31 ¶ 74.) Plaintiffs' § 1985(3) claim, and in turn their § 1986 claim, however, are predicated on injuries stemming solely from the October 18, 2021 defacement of the mural[35]—which constitutes the racially motivated conspiracy to deny them access to the Park. (ECF No. 31, at 28–35.) Both Plaintiffs allege that as a result of the vandalism to the mural, they "and their children substantially curtailed or even eliminated their use of the Park, feeling compelled to avoid the Park's playground, paths, basketball and tennis courts, and other available amenities." (ECF No. 31 ¶¶ 6, 84.)

---

[35] The allegations of the Patriot Front stickers appearing in the community during the summer of 2021 and of the impending Unite the Right trial provide context to the injury Plaintiffs experienced upon seeing the act of vandalism.

Defendants' first argument regarding the summer of 2021 lead-up to the act of vandalism fails because Plaintiffs rest their § 1986 claim stem solely on the October 18, 2021 vandalism to the mural, which they did not discover until October 21, 2021. (ECF No. 31 ¶ 72.) Accordingly, Plaintiffs could not have been on "inquiry notice" during the summer of 2021, before their injuries occurred. *See Va. Polytechnic Inst. & State Univ.*, 617 F. Supp. 3d at 432.

Defendants' second argument falters because, taking Plaintiffs' allegations as true, their cause of action began to accrue on October 21, 2021—the day they discovered the vandalism—rendering Plaintiffs' October 18, 2022 Complaint timely. Moreover, the earliest Plaintiffs' cause of action could have accrued was October 18, 2021. Even if Plaintiffs discovered the vandalism to the mural on this date, the October 18, 2022 Complaint, filed exactly one calendar year later, would be timely.[36] *See* 42 U.S.C. § 1986. The statute of limitations does not bar Plaintiffs' § 1986 claim.

### E.   Plaintiffs Allege Recklessness

Defendants assert that pursuant to *Counterman v. Colorado*, 600 U.S. 66 (2023), Plaintiffs must plausibly allege a *mens rea* "of at least recklessness" for each of their three claims, and they have failed to do so. (ECF No. 103, at 19; ECF No. 107, at 2, 11.) In *Counterman*, the Supreme Court articulated a subjective standard of recklessness for *criminal* prosecutions of true threats. *See* 600 U.S. at 82. *Counterman*, Defendants say, applies to Plaintiffs' claims because they involve "'true threat' claims." (ECF No. 103, at 16, 18; ECF No. 107, at 2, 11.) In response, Plaintiffs correctly observe that "it is not clear that *Counterman*" applies given that the case "arose in the context of a criminal prosecution." (ECF No. 106,

---

[36] Defendants argue that "the stenciling of the mural" occurred "one year and one day before the filing the Complaint" on October 18, 2022. (ECF No. 103, at 23.) The Court notes that October 18, 2022 is one calendar year, or 365 days, after October 18, 2021.

at 25.)  Even so, Plaintiffs correctly contend that "even if *Counterman* does apply, Plaintiffs have more than sufficiently alleged facts supporting that Defendants had the requisite *mens rea*." (ECF No. 106, at 25.)

As a threshold matter, the Court finds *Counterman* inapplicable in this civil lawsuit with no criminal statute at issue.  *See* 600 U.S. at 69 (in a criminal prosecution for a true threat of violence, "[t]he State must show that the defendant consciously disregarded a substantial risk that his [or her] communications would be viewed as threatening violence"); *see also Boquist v. Courtney*, -- F. Supp. 3d --, No. 6:19-CV-01163-MC, 2023 WL 4563725, at *5 & n.10 (D. Or. July 17, 2023) (declining to apply *Counterman* to analysis of true threat claim in civil case).[37]

In any event, even if *Counterman*'s holding did extend to civil cases such as this one, the Court finds that Plaintiffs have plausibly alleged Defendants' *mens rea* of at least recklessness. Generally speaking, "[a] person acts recklessly . . . when he [or she] 'consciously disregard[s] a substantial [and unjustifiable] risk that the conduct will cause harm to another.'"  *Counterman*,

---

[37] To support their argument that *Counterman*'s holding applies to noncriminal cases, Defendants offer the following: (1) the *Counterman* decision relied on cases applying the First Amendment in civil cases as relevant precedent; (2) Justice Barrett stated in her *dissent* (joined by only Justice Thomas) that *Counterman*'s holding applies to both civil and criminal cases involving true threats; and (3) "the First Amendment applies in state tort cases."  (ECF No. 107, at 11 (citing *Counterman*, 600 U.S. at 118–19 and *Snyder v. Phelps*, 562 U.S. 443 (2011)).) Although *Counterman* does indeed evaluate First Amendment cases, the latter two arguments do not persuade the Court, nor does Justice Barrett's dissenting opinion (joined only by Justice Thomas) bind the Court.

First, despite the explicit invitation to rule otherwise, *Counterman*'s five-person majority opinion limits its holding to what a state must prove to successfully bring a *criminal* true threat charge.  *See* 600 U.S. at 69.  Second, although "[t]he Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits", *Snyder*, 562 U.S. at 451, it does not necessarily follow that the *mens rea* requirement articulated in *Counterman* for criminal cases also applies to those civil tort cases.  Based on the decision itself, it does not.  Finally, relative to civil cases, courts commonly apply heightened standards of proof in criminal cases whose consequences are qualitatively less severe.

600 U.S. at 79 (quoting *Voisine v. U.S.*, 579 U.S. 686, 691 (2016)) (third and fourth alteration in original).  "In the threats context," this means a person acts recklessly when the person "is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Id.* (quoting *Elonis v. U.S.*, 575 U.S. 723, 746 (2015) (Alito, J., concurring in part and dissenting in part)).

Moreover, the Court has articulated in detail why Plaintiffs state a claim that Defendants entered into a racially motivated conspiracy to interfere with Plaintiffs access to Battery Park. Patriot Front's public call for the formation of white ethnostate and its previous destruction of murals honoring Black Americans are only the beginning of the Court's rationale. *See* Section III.C., *supra*.  This Court need not repeat its earlier findings and declines to do so.

Still, Defendants argue that the Court cannot infer a *mens rea* of recklessness from the alleged conduct alone, arguing that *Counterman* "increased the burden needed to be surmounted before a 'true threat' would become actionable or punishable.'"  (ECF No. 103, at 19 (emphasis removed).)  *Counterman* examined the subjective standard of recklessness for criminal prosecutions of true threats.  With respect to the case at bar, the Court need only decide whether Plaintiffs plausibly state each claim in their Amended Complaint.

Having found denial of the Defendants' motion appropriate here, the Court adds that, based on the same allegations together, it is plausible to infer at least recklessness because Defendants were "aware", at a minimum, that "others *could* regard [the defacement of the mural] as" threatening violence, and they nonetheless directly or indirectly contributed to the defacement of the mural anyway.  *Counterman*, 600 U.S. at 79 (quoting *Elonis*, 575 U.S. at 746) (internal quotation marks and citations omitted) (emphasis added).   In sum, Defendants'

arguments as to the recklessness standard fails, but if the reckless standard did apply to the Plaintiffs' civil claim, their allegations would plausibly rise to that level of intent.

**F.    Plaintiffs Sufficiently Plead Facts to Survive a Motion to Dismiss Count III:  Violation of Va. Code § 8.01-42.1**

In the final claim in the Amended Complaint, Count III, Plaintiffs maintain that Defendants Patriot Front, Mr. Noyce, Mr. Dail, and John Doe 1 violated Virginia Code § 8.01-42.1, ("Va. Code § 8.01-42.1"), which is often referred to as Virginia's hate crime statute.[38]  Defendants seek dismissal of Count III because Plaintiffs fail to allege that Defendants harassed or intimidated Plaintiffs.  Defendants also argue that Va. Code § 8.01-42.1 is both facially unconstitutional and unconstitutional as-applied to them under the First Amendment and under the Due Process Clauses of the Fifth and Fourteenth Amendments.

The Court rejects each argument.  For the reasons articulated below, the Court concludes that (1) Plaintiffs state a claim under Va. Code § 8.01-42.1(A), and (2) Va. Code § 8.01-42.1 is constitutional as-applied to Defendants, and is not facially overbroad.  At this stage, Plaintiffs' Va. Code § 8.01-42.1 claim survives.

**1.    Plaintiffs Allege Facts Supporting Each Element of Va. Code § 8.01-42.1**

To state a claim under Va. Code § 8.01-42.1, Plaintiffs must plausibly allege the four following elements:  (1) Defendant subjected Plaintiffs to *either* "(i) intimidation or harassment,

---

[38] Virginia Code § 8.01-42.1 provides, in relevant part:

A.  An action for injunctive relief or civil damages, or both, shall lie for any person who is subjected to acts of (i) intimidation or harassment, (ii) violence directed against his person, or (iii) vandalism directed against his real or personal property, where such acts are motivated by racial, religious, gender, disability, gender identity, sexual orientation, or ethnic animosity.

Va. Code § 8.01-42.1(A).

(ii) violence directed against [their] person[s], *or* (iii) vandalism against [their] real or personal property", *and* (2) such acts were "motivated by racial, religious, gender, disability, gender identity, sexual orientation, or ethnic animosity." Va. Code § 8.01-42.1(A) (emphasis added). Here, Plaintiffs base their claim on racially motivated intimidation and harassment.

Defendants counter that they did not subject Plaintiffs to harassment or intimidation for four reasons: (1) Defendants never physically encountered Plaintiffs; (2) Defendants did not "use symbols with a 'long and pernicious history as a signal of impending violence'", citing *Virginia v. Black*, 538 U.S. 343, 363 (2003); (3) "a third party, undoubtedly hostile to the Defendants, interpreted the Patriot Front logos and values to the [P]laintiffs"; and, (4) "[P]laintiffs' core factual allegations involved damage to public property to which [P]laintiffs had no greater rights than the general public." (ECF No. 103, at 24.)

Once again, Defendants' arguments primarily raise questions of fact rather than law. As noted repeatedly, these questions cannot be raised at this procedural juncture. Against this backdrop, the Court concludes that Plaintiffs have stated a claim of racially motivated intimidation and harassment that is actionable under Va. Code § 8.01-42.1(A).

### a. Harassment or Intimidation Under Va. Code § 8.01-42.1 Does Not Require Direct Physical Contact

Defendants suggest that to state a cause of action under Va. Code § 8.01-42.1(A), a plaintiff must allege the "physical invasion" of their space or "confrontational use of verbal threats and insults." (ECF No. 103, at 24.) Defendants cite a series of cases in which the Virginia hate crime elements were satisfied during a physically or racially abusive interaction: *Berry v. Target Corp.*, 214 F. Supp. 3d 530, 535 (E.D. Va. 2016) (defendant's employee harassed plaintiff based on racial animus, used a racial slur, and implied that African Americans only entered the store to steal); *Salim v. Dahlberg*, 170 F. Supp. 3d 897, 913 (E.D. Va. 2016)

(passenger in plaintiff's taxi "engaged in an alcohol-fueled rant against Muslims and Arabs that culminated in [passenger] punching [plaintiff] multiple times"); *Law v. Hilton Domestic Operating Co.*, No. 3:20cv145 (DJN), 2020 WL 7130785, at *1–2, *11 (E.D. Va. Dec. 4, 2020) (hotel security "accosted" Black plaintiff, the sole Black person in the hotel lobby, and "repeatedly stated that [plaintiff] did not 'belong' there"); *Williams v. AM Lapomarda*, No. 3:19cv631 (DJN), 2020 WL 3643466 (E.D. Va. July 6, 2020) (7-Eleven manager told Black Muslim plaintiff dressed in a niqab and sunglasses to "uncover her face to purchase her items", refused to serve plaintiff even after she removed her sunglasses, told her she was a security risk, and called the police); *Frazier*, 2017 WL 5560864 (defendants physically attacked plaintiffs).

Based on a plain reading of the statute, however, this Court concludes that "[w]hile this statute clearly covers conduct such as physical violence and the use of racial slurs," as Defendants identify, "it also covers quieter acts of discrimination," including the ones alleged in this action. *See Law*, 2020 WL 7130785, at *11 (citing *Hugo's Skateway*, 974 F.2d at 1413); *see also Sines*, 324 F. Supp. 3d at 800 (noting that courts have found the statute satisfied when defendants used racial slurs, and when defendants have apprehended or called the police on plaintiffs). Despite the lack of face-to-face interaction here, the Court concludes that Plaintiffs' well-plead allegations, read favorably and presumed to be true, state a claim under the statute.

In doing so, the Court acknowledges the "limited judicial interpretation of this statute" and that "few courts have provided further elaboration of the statute or specific standards to follow." *Law*, 2020 WL 7130785, at *11 (citing *Sines*, 324 F. Supp. 3d at 800). But standard rules of statutory construction commend such a finding. When "interpreting a state law, [a federal court] appl[ies] the statutory construction rules applied by the state's highest court." *In*

*re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009) (citing *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007)).  The Supreme Court of Virginia has explained that the "'primary objective'" of statutory construction "is 'to ascertain and give effect to legislative intent' from the words of the statute." *Turner v. Commonwealth*, 295 Va. 104, 108 (2018) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 236 (2013)).  "In determining that intent," courts "are to give those words their ordinary meaning, unless it is apparent that the legislative intent is otherwise, and we presume that the General Assembly chose, with care, the words that appear in a statute." *Id.* at 108–09 (cleaned up for readability).  "Furthermore, the 'plain, obvious, and rational meaning of a statute is to be preferred over any curious, narrow, or strained construction.'" *Id.* at 109 (quoting *Meeks v. Commonwealth*, 274 Va. 798, 802 (2007)).

Contrary to Defendants' assertions, a plain reading of the statute provides that acts can constitute "intimidation or harassment" giving rise to liability under Va. Code § 8.01-42.1 even in the absence of physical contact between Plaintiffs and Defendants.  The plain language of the statute simply references "intimidation or harassment." Va. Code § 8.01-42.1(A).  When determining whether Plaintiffs have plausibly alleged that Defendants' actions constitute intimidation or harassment, the Court will "give [these] words their ordinary meaning", *Turner*, 295 Va. at 108 (citation omitted), and will "draw on its experience and common sense." *Iqbal*, 556 U.S. at 663–64.  Although Va. Code § 8.01-42.1(A) claims more commonly arise after plaintiffs and defendants have directly interacted, Defendants have cited no case that suggests physical contact between a plaintiff and defendant is *required* to plausibly allege intimidation or harassment for the purpose of establishing a claim under Va. Code § 8.01-42.1.  Nor does a plain reading of the statute suggest such a requirement.

68

**b.    The Fact that Plaintiffs Do Not Allege that Defendants Used Any Symbol with a Long and Pernicious History as a Signal of Impending Violence is Not Fatal to Their Claim**

Defendants' argument that harassment or intimidation under Va. Code § 8.01-42.1 requires the "use of symbols with a 'long and pernicious history as a signal of impending violence'" fares no better.  (ECF No. 103, at 24 (citing *Black*, 538 U.S. at 343 (syllabus)).)  As an initial matter, the Supreme Court's reference to symbols with a "long and pernicious history as a signal of impending violence" in *Virginia v. Black*, a First Amendment case, does not fully control the decision as to whether Plaintiffs have plausibly stated a claim under Va. Code § 8.01-42.1.  *See* 538 U.S. at 363.  In *Black*, the Supreme Court held that under the First Amendment, Virginia may "outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation." *Id.*  *Black* did not establish that for an act to constitute intimidation or harassment, it *must* involve the use of a symbol with a long and pernicious history as a signal of impending violence.  Rather, it reaffirmed that states are constitutionally permitted to ban speech and expressive conduct that rises to the level of a "true threat" engendered by such symbols. *Id.* at 359.

First, it is a question of fact as to whether the history of Patriot Front's stickers and stencils qualifies them as symbols that signal impending violence.  Certainly, Defendants did not burn a cross, and Patriot Front is a nascent organization.  But when a group systematically brands stickers and stencils for use in vandalism and other disruptive conduct to support the creation of a white ethnostate, the question becomes a closer one.  This Court cannot and will not disallow the content of what Patriot Front advocates.  But the record cannot yet support a finding whether intimidation flows from their placing these items in public areas without suppressing the speech Patriot Front may have a right to use.

The Court so finds in part because conduct has been deemed intimidating or harassing for the purposes of Va. Code § 8.01-42.1 even where it does not involve a symbol with a long and pernicious history as a signal of impending violence. *See, e.g., Hugo's Skateway*, 974 F.2d at 1412–15 (sole black patron of roller-skating rink established violation of Va. Code § 8.01-42.1 for racial harassment and intimidation after manager of rink told patron to go to the rink's back office without explanation, the patron refused, and the manager called the police to remove plaintiff); *Law*, 2020 WL 7130785, at *1–2, *11 (hotel security "accosted" Black plaintiff, the sole Black person in the hotel lobby, and "repeatedly stated that [plaintiff] did not 'belong' there"). Defendants' argument to the contrary does not persuade.

In sum, this Court will determine only on a more fulsome record whether the interaction here rises to the level of violating Virginia's hate crime statute, even without personal interaction and without the use of a symbol that may be found to *not* constitute a longstanding symbol of hate. As such, Plaintiffs plausibly allege sufficient facts that could give rise to liability under Va. Code § 8.01-42.1.[39] But Defendants have raised other constitutional challenges, which the Court speaks to briefly next.

---

[39] The Court rejects Defendants' two remaining arguments contending that Plaintiffs do not plausibly state a claim under Va. Code § 8.01-42.1. Defendants contend that: (1) "a third party, undoubtedly hostile to the Defendants, interpreted the Patriot Front logos and values to the plaintiffs"; and, (2) "the [P]laintiffs' core factual allegations involved damage to public property to which [P]laintiffs had no greater rights than the general public." (ECF No. 103, at 24.)

First, for reasons articulated more fully in Sections III.A.2–3, the first argument founders. The suggestion that an "intermediary" breaks the chain of causation cannot be sustained because Defendants' actions could be viewed as harassment or intimidation in violation of this statute, even if one or both Plaintiffs had to learn about Patriot Front and its symbols from a third party. The Court adds that the sources identified in Plaintiffs' Amended Complaint come from Patriot Front itself: their website and their manifesto. Second, the Court also has determined that allegations need not involve private property to be actionable under Va. Code § 8.01-42.1, because the plain language of the statute does not so specify.

**G.    Defendants' Remaining Constitutional Challenges Entirely Founder**

The Court ends its analysis speaking to what Defendants characterize as several constitutional challenges to Virginia's hate crime statute, Va. Code § 8.01-42.1(A).  The Court is chagrined to see that Defendants bring a plethora of purported constitutional infirmities amidst a dearth of thoughtful legal analysis.  And they purport to do so only if—without knowing the Court's reasoning—Count III of Plaintiffs' Amended Complaint is allowed to proceed beyond the pleading stage.  This Court cannot, and will not, determine an issue of such grave legal consequence—the potential unconstitutionality of a well-established Virginia statute—on these bare legal assertions of vagueness, overbreadth, and absence of viewpoint neutrality.

Indeed, Defendants rest their constitutional arguments on a one-paragraph parade of what they call "constitutional quandaries" but which are, in fact, conclusory suppositions devoid of thoughtful legal analysis.  Defendants attempt to describe the supposed unending metes and bounds of § 8.01-42.1(A)'s unconstitutional applications, but they do so without any reliable survey.  While Plaintiffs attempt to unearth what could be the full legal and factual grounding for Defendants' constitutional arguments, this Court will not engage with such cursory suppositions.

Defendants' constitutional challenges to the constitutionality of Va. Code § 8.01-42.1(A) are denied without prejudice.

### IV.  Conclusion

For the foregoing reasons, the Court will deny Defendants Nathan Noyce, Thomas Dail, Paul Gancarz, Daniel Turetchi, and Aedan Tredinnick's Motion to Dismiss.  (ECF No. 102.)

An appropriate Order shall issue.

Date: **3/31/24**
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge

71