IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SEALED PLAINTIFF 1,

and

SEALED PLAINTIFF 2,

        Plaintiffs,

        v.

PATRIOT FRONT, *et al.*,

        Defendants.

Civil Action No. 3:22-cv-00670

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiffs' Motions for Default Judgment (the "Motions") against Defendants Patriot Front, Thomas Rousseau, William Ring, and Jacob Brown (collectively, the "Defaulting Defendants").   (ECF Nos. 187, 188, 189).   For the reasons articulated below, the Court will grant the Motions.

# I.  Factual and Procedural Background

## A.    Factual Background[1]

### 1.    Patriot Front's Ideology and Connection to Vandalism

Patriot Front, a white supremacist group, "calls for the formation of a white ethnostate."
(ECF No. 31 ¶ 1.)  The group formed in 2017 after "splinter[ing] from Vanguard America, one
of the central white supremacist groups that marched at the Unite the Right rally in
Charlottesville, Virginia in August 2017."  (ECF No. 31 ¶ 14.)  At the time Plaintiffs filed their
Amended Complaint, Patriot Front's website promoted a "hard reset on the nation we see
today—a return to the traditions of our [European] forefathers" who "left their European homes
. . . [and who] found a common cause and a common identity as Americans."  (ECF No. 31 ¶ 1
(alterations in original).)

Patriot Front published an online manifesto to articulate its ideology.  (ECF No. 31
¶ 12.)  This manifesto provides that "'the varied nations and cultures of Europe forged [the
United States] in the flames of conquest,' and that true Americans share a 'pan-European
identity.'"  (ECF No. 31 ¶ 12.)  According to Patriot Front, "'[t]o be an American is to be a
descendant of conquerors . . . . This unique identity was given to us by our [European] ancestors,
and this national spirit remains firmly rooted in our blood.'"  (ECF No. 31 ¶ 12.)  Patriot Front

---

[1] The following facts are drawn from Plaintiffs' Amended Complaint, (ECF No. 31),
their Motions, and all attached documents submitted with those filings, as the Defaulting
Defendants have not responded to the Amended Complaint.  *See Ryan v. Homecomings Fin.
Network*, 253 F.3d 778, 780 (4th Cir. 2001) (requiring a court considering a default motion to
determine whether a plaintiff's well-pleaded allegations support the relief sought); *Barbeau v.
Siege Techs., LLC*, No. 1:24-cv-682 (WEF), 2025 WL 1905584, at *7 n.11 (E.D. Va. July 1,
2025) ("The Federal Rules of Civil Procedure expressly permit a court, in granting a default
judgment, to consider extrinsic evidence to, among other reasons, establish the truth of any
allegation.") (quotation omitted), *report and recommendation adopted*, 2025 WL 2155793 (E.D.
Va. July 29, 2025).

2

advertises its ideology "through masked marches and vandalism, which it calls 'activism.'"
(ECF No. 31 ¶ 15.)  "Responding to directives from the group's leaders, Patriot Front's
members have defaced murals honoring Black Americans, targeted LGBTQ+ events, and
destroyed public and private property as part of their campaign to promote their extreme" beliefs.
(ECF No. 31 ¶ 2.)

Through its marches and acts of vandalism, Patriot Front has "intimidated communities
based on race and sexual orientation across the country and deterred community members from
accessing public amenities."  (ECF No. 31 ¶ 2.)  Patriot Front has been connected to "dozens of
acts of property damage and defacement of public art that supports racial justice and LGTBQ+
inclusion all over the country."  (ECF No. 31 ¶ 16.)  For example, "[f]rom August through
October, 2021, Patriot Front members vandalized murals honoring Black lives in Norfolk, VA,
Raleigh, NC, Lafayette, IN, St. Paul, MN and elsewhere," including Richmond.  (ECF No. 31
¶¶ 3, 20.)

Patriot Front, through its members and affiliates, also damages and defaces property by
placing Patriot Front stickers and spray-painting Patriot Front logos and insignia, using stencils,
on the property.  (ECF No. 31 ¶¶ 16–18.)  "Patriot Front's leadership . . . require[s] members to
publicly place a certain number of Patriot Front stickers and spray-painted stencils" in a
community in order to be deemed a member "in good standing."  (ECF No. 31 ¶ 17.)  Patriot
Front's stickers and stencils are "intentionally branded," (ECF No. 31 ¶ 18), so that the
messaging for any vandalism specifically identifies Patriot Front whether it appears in Richmond
or Norfolk Virginia, North Carolina, Indiana, or Minnesota.

Members must receive approval from Patriot Front regional and national leadership
before committing "any high-profile acts of vandalism."  (ECF No. 31 ¶ 17.)  Members must

also purchase Patriot Front's stickers and stencils from National Director and Founder Thomas

Rousseau, who in turn "distributes every stencil."   (ECF No. 31 ¶¶ 17, 21, 23.)   To ensure the

uniformity of Patriot Front's spray-painted logos and insignia, Patriot Front's leadership provides

"detailed instructions . . . on what color paints to use" as well as instructions "on sharing

stencils."   (ECF No. 31 ¶ 18.)

### 2.   Patriot Front's Structure

"Patriot Front is well-organized and follows a defined hierarchical structure."   (ECF No.

31 ¶ 21.)   The organization has geographical chapters, referred to as "networks," throughout the

country.   (ECF No. 31 ¶ 22.)   The highest-ranking members in each network serve as Network

Directors.   (ECF No. 31 ¶ 22.)   Network Directors report regularly to Thomas Rousseau, the

National Director, and bear "responsib[ility] for organizing and executing" Patriot Front events,

including its marches and acts of vandalism.   (ECF No. 31 ¶ 22.)

Plaintiffs' Amended Complaint named several individuals as defendants, several of

whom have since been dismissed from Plaintiffs' suit.   The defendants who have since been

dismissed from the suit include John Does 1 through 19, Nathan Noyce, Thomas Dail, Paul

Gancarz, Daniel Turetchi, and Aedan Tredinnick (collectively, the "Settling Defendants").

(ECF Nos. 162, 171, 173.)   The parties stipulated to dismissing Settling Defendants John Doe 1,

Nathan Noyce, Thomas Dail, Paul Gancarz, Daniel Turetchi, and Aedan Tredinnick with

prejudice.   (ECF Nos. 162, 171.)   Plaintiffs dismissed Settling Defendants John Does 2 through

19 without prejudice.   (ECF No. 173.)   As is the norm, the dismissals were silent as to the terms

of settlement, including damages or attorney's fees.   Of the Settling Defendants, six are relevant

to Plaintiffs' Motions.   Settling Defendant Paul Gancarz (also known as "Samuel VA"), at all

times relevant to this case, served as "Patriot Front's Network Director for the region covering

4

Virginia, the District of Columbia, Maryland, and Delaware." (ECF No. 31 ¶ 24.) In this role, Mr. Gancarz supervised Patriot Front activities in this region. (ECF No. 31 ¶ 24.) Patriot Front required him, as Network Director, to approve any large-scale mural cover-ups in his region before members initiated them. (ECF No. 31 ¶ 24.) Settling Defendants John Doe 1 (also known as "Christopher VA"), Nathan Noyce (also known as "Roger VA"), Thomas Dail (also known as "Kenneth VA"), Daniel Turetchi (also known as "Grant MD"), and Aedan Tredinnick (also known as "Vincent VA") served as members of Patriot Front at all times relevant to this case. (ECF No. 31 ¶¶ 25, 26, 27, 30, 31.)

Plaintiffs' Motions seek default judgments against the four Defaulting Defendants who have not been dismissed from the suit: Patriot Front itself, Thomas Rousseau, William Ring, and Jacob Brown. (ECF Nos. 187, 188, 189.) As described above, Mr. Rousseau "is the founder and is now, and was during the time of the conspiracy alleged herein, National Director of Defendant Patriot Front." (ECF No. 31 ¶ 23.) Mr. Ring (also known as "Tyler MD") and Mr. Brown (also known as "John VA") served as members of Patriot Front at all times relevant to this case. (ECF No. 31 ¶¶ 28, 29.)

### 3.    Battery Park and the Arthur Ashe Mural

The City of Richmond owns and manages Battery Park ("Battery Park" or the "Park"), a public park located in Richmond, Virginia and near "Jackson Ward, the historically Black center of Richmond." (ECF No. 31 ¶¶ 42, 43.) The Park's public amenities include walking paths, "two playgrounds, basketball courts, restrooms, horseshoe pits, a community center that houses a free computer lab, and a swimming pool." (ECF No. 31 ¶¶ 3, 42.)

A neighborhood, also named "Battery Park" (the "Battery Park Neighborhood" or the "Neighborhood"), surrounds the Park. (ECF No. 31 ¶ 43.) United Census Bureau data lists the

racial composition of zip code 23222, which encompasses the Battery Park Neighborhood, as "77.7% Black and 17.5% White." (ECF No. 31 ¶¶ 6, 43.) For many years, Battery Park had "the only public swimming pool [Black residents] felt comfortable using as children" after government-imposed segregation ended and racial tensions in Richmond (and the country) were fraught. (ECF No. 31 ¶ 44.)

Plaintiffs, both long-term residents of the Battery Park Neighborhood, live near the Park. (ECF No. 31, at ¶¶ 10, 11.) Plaintiffs and their families "regularly used the Park and its amenities, including the basketball and tennis courts, playgrounds, and paths, on a near daily basis." (ECF No. 31 ¶¶ 10, 11.) They also frequently used the Park's tunnel, which connects the north and south sides of the Park, to access various amenities throughout the Park, including playgrounds and basketball courts. (ECF No. 31 ¶¶ 81, 82.)

In July 2017, the Park unveiled "a mural honoring Black tennis star Arthur Ashe" who grew up in segregated Richmond, Virginia. (ECF No. 31 ¶¶ 4, 40, 41, 44.) "In addition to being the first Black man to win the U.S. Open in 1968, Mr. Ashe was a committed humanitarian whose work included establishing the African American Athletic Association and raising money for the United Negro College Fund. (ECF No. 31 ¶ 4.) A group of Black-led local artists completed the mural over approximately three weeks. (ECF No. 31 ¶ 40.)



(ECF No. 31 ¶ 41.)

Located "at the entrances and inside of a pedestrian tunnel joining south and north ends of the Park," the mural "depicted images of Mr. Ashe's face and of him holding the trophy after winning Wimbledon in 1975." (ECF No. 31 ¶ 41.) The mural also "listed several of Mr. Ashe's tennis achievements" inside the tunnel. (ECF No. 31 ¶ 41.) "Generations of Black Americans and others have looked up to Mr. Ashe as a role model." (ECF No. 31 ¶ 4.) The mural served as "a symbol" of Battery Park Neighborhood's "support for and pride in Black lives and Black accomplishments." (ECF No. 31 ¶ 49.)

### 4.   Events Predating the Vandalism of the Arthur Ashe Mural

In August 2017, about a month after the mural's unveiling, several white supremacist groups marched at the Unite the Right rally in Charlottesville, Virginia. (ECF No. 31 ¶ 14.) At the rally, which occurred approximately an hour's drive away from Richmond, a white supremacist attendee drove a car "into a group of peaceful counter[-]protesters, murdering Heather Heyer and injuring dozens of others." (ECF No. 31 ¶ 45.) A group of counter-protestors who attended the rally later sued the organizers and participants of the rally in the

United States District Court for the Western District of Virginia.   (ECF No. 31 ¶ 46.)   The media covered the lawsuit and resulting trial extensively.   (ECF No. 31 ¶ 47.)   Jury selection for the trial began on October 25, 2021.   (ECF No. 31 ¶ 47.)

Beginning in the summer of 2021, Patriot Front began targeting the Battery Park community.   (ECF No. 31 ¶ 3.)   That summer, residents of the Battery Park Neighborhood, including Sealed Plaintiff 1, began to notice "that Patriot Front stickers were being placed on lampposts, stop signs, and elsewhere throughout the [N]eighborhood."   (ECF No. 31 ¶¶ 48, 74.)   Other residents of the Battery Park Neighborhood also noticed that Patriot Front stickers had been placed in the Park itself.   (ECF No. 31 ¶ 48.)   "The stickers continued to appear into the fall of 2021."   (ECF No. 31 ¶ 48.)

After discovering the Patriot Front stickers, Sealed Plaintiff 1 researched what they signified and discovered their connection to Patriot Front.   (ECF No. 31 ¶ 74.)   Through this research, Sealed Plaintiff 1 learned that Patriot Front identifies as "a white supremacist group." (ECF No. 31 ¶ 74.)   Sealed Plaintiff 1 felt "shocked, angry, and hurt that a white supremacist group was actively pushing propaganda in their neighborhood."   (ECF No. 31 ¶ 74.)

Patriot Front's scheme to target the Battery Park community culminated in the vandalism to and destruction of the Arthur Ashe mural on or about October 18, 2021, seven days before jury selection in the Charlottesville Unite the Right trial was to begin.   (ECF No. 31 ¶ 3.)

5.    **Patriot Front Members and Non-Members Attend a Meeting and Plan to Vandalize the Arthur Ashe Mural**

According to the Amended Complaint, on or about October 12, 2021, Patriot Front members, including the Settling Defendants and Defaulting Defendants Brown and Ring, attended and participated in a meeting to plan the vandalism of the Park's Arthur Ashe mural. (ECF No. 31 ¶¶ 24–38, 50.)   Settling Defendant Gancarz, in his role as Network Director, was

8

"directly involved in, consulted on, and approved" the vandalism of the Arthur Ashe mural. (ECF No. 31 ¶ 24.)   Defaulting Defendant Rousseau was made aware of the events of this meeting.   (ECF No. 190-3, at 35:2–17.)

Exhibits attached to Plaintiffs' Motions include additional detail on what occurred during the October 12, 2021 meeting.   During depositions taken by Plaintiffs of the Settling Defendants after the filing of the Amended Complaint, Settling Defendant Gancarz denied that any of the parties present at the October 12, 2021 meeting discussed spray painting the Arthur Ashe mural. (ECF No. 190-3, at 29:16–30:15.)   Settling Defendant Gancarz explained that, "[a]t that meeting [the parties present] discussed activism as we usually do. . . . People kind of said what they were going to do that weekend. . . . [T]he three guys that happened to be in central, around Richmond . . . said they were going to do [] some stencils in the Richmond area.   No reference to specific surfaces [or] specific locations.   (ECF No. 190-3, at 31:12–23.)   Settling Defendant Gancarz did not discourage these individuals from placing Patriot Front stencils in Richmond. (ECF No. 190-3, at 34:14–25.)   Settling Defendant Dail, in a separate deposition, also asserted that during the October 12, 2021 meeting, "the Arthur Ashe Exhibit—the Arthur Ashe situation was not discussed.   It was kind of an off-the-wind-type thing.   We [] had discussed during that meeting doing activism, but it wasn't clarified that it was going to be the Arthur Ashe mural." (ECF No. 190-5, at 25:15–24.)   Settling Defendant Dail then noted that the parties at the October 12, 2021 meeting discussed engaging in activism in Richmond specifically.   (ECF No. 190-5, at 26:22–27:3.)[2]

---

[2] As discussed *infra*, Section III.B.1, to the extent the Court credits the contents of these exhibits, they could be read contrary to the plain language of the Amended Complaint.   But even if that were true, these exhibits do not change the Court's analysis of Plaintiffs' Motions below; regardless of whether the Court adheres to the description of the October 12, 2021 meeting in the Amended Complaint or that in these exhibits, the Court will grant the Motions.

9

This meeting occurred approximately two weeks before jury selection began in the trial connected with the Charlottesville Unite the Right rally.   (ECF No. 31 ¶ 49.)   Patriot Front members had "decided to escalate their tactics targeting Battery Park.   Beyond putting up stickers as Patriot Front members had previously done," Settling Defendants Gancarz, Noyce, Dail, and Turetchi, as well as Defaulting Defendants Brown and Ring, "prepared to destroy a symbol of the [N]eighborhood's support for and pride in Black lives and Black accomplishments:   the Arthur Ashe mural."   (ECF No. 31 ¶ 49.)

**6.      Settling Defendants Nathan Noyce, Thomas Dail, and John Doe 1 Vandalize the Arthur Ashe Mural**

During "the early morning hours on or about October 18, 2021," just days after the October 12 meeting, Settling Defendants Nathan Noyce, Thomas Dail, and John Doe 1 arrived at the mural.   (ECF No. 31 ¶ 51.)   Mr. Noyce and Mr. Dail were wearing baseball hats identical to hats worn by other Patriot Front members "around the country, as shown in the following picture from the Patriot Front website:"   (ECF No. 31 ¶ 53.)

10



**Patriot Front**

(ECF No. 31 ¶ 53.)

Mr. Noyce and Mr. Dail obscured their faces with masks. (*See* ECF No. 31 ¶ 53.) As John Doe 1 filmed and illuminated the tunnel with a flashlight, Mr. Dail "removed a can of spray paint" from his backpack and raised it over a sign commemorating Arthur Ashe's induction into the International Tennis Hall of Fame. (ECF No. 31 ¶¶ 54, 57.)



(ECF No. 31 ¶ 56.)   Before Mr. Dail sprayed over the sign, Mr. Noyce, who was wearing a

headlamp for additional lighting, advised:   "'[S]hake it, it's not going to spray well if you don't

shake it.'"   (ECF No. 31 ¶¶ 55, 57.)   Mr. Dail then shook the spray paint, and spray-painted

over the sign in white.   (ECF No. 31 ¶¶ 57–58.)



(ECF No. 31 ¶ 58.)

Mr. Noyce then removed another can of spray paint from Mr. Dail's backpack and spray-

painted over another sign touting Arthur Ashe's victory at Wimbledon and stating, "[T]he first

African-American male to be ranked #1 in the world."   (ECF No. 31 ¶ 59.)



(ECF No. 31 ¶ 59.)   As John Doe 1 continued to film, Mr. Dail and Mr. Noyce continued

spraying white paint over several more signs celebrating Arthur Ashe's historic achievements.

(ECF No. 31 ¶ 60, images at 18.)

Next, Mr. Dail and Mr. Noyce "removed Patriot Front stencils and cans of spray paint of

different colors from the backpack that [Mr.] Dail had been carrying."   (ECF No. 31 ¶ 61.)

Working together, Mr. Dail and Mr. Noyce spray-painted in red and blue paint Patriot Front

stencils over the now-painted over signs that had celebrated Mr. Ashe's achievements.   (ECF

No. 31 ¶ 62.)



(ECF No. 31 ¶ 62.)



(ECF No. 31 ¶ 62.)   As Mr. Noyce and Mr. Dail covered the signs with Patriot Front stencils, John Doe 1, who continued to film, provided suggestions and encouragement, stating, for example, "[F]or the next one, y'all can switch colors for the different stencils . . . try to mix it up a little bit."   (ECF No. 31 ¶ 63.)

After Mr. Dail and Mr. Noyce finished adding Patriot Front stencils to the white-washed signs touting Arthur Ashe's achievements, John Doe 1 asked:   "[Y]ou want to get his face or something?"   (ECF No. 31 ¶ 65.)   Mr. Dail and Mr. Noyce then approached the mural's depiction of Arthur Ashe's face, and John Doe 1 stated:   "F[*****]g n*****'s face."   (ECF No. 31 ¶ 65.)   Mr. Noyce and Mr. Dail then sprayed white paint over two depictions of Arthur Ashe's face, and sprayed Patriot Front stencils in red and blue paint on top.   (ECF No. 31 ¶¶ 67–70.)

Patriot Front kept John Doe 1's footage of the vandalism for recruitment purposes, prominently featuring it in a video highlighting Patriot Front's "nationwide acts of vandalism occurring in October 2021."   (ECF No. 31 ¶ 71.)   "Patriot Front Network Directors then used this video as part of their efforts to recruit new members."   (ECF No. 31 ¶ 71.)

14

### 7.   Battery Park Neighborhood Residents Discover the Vandalism

On October 21, 2021, four days before jury selection in the Charlottesville Unite the Right trial began, Battery Park Neighborhood residents, including Sealed Plaintiff 1, discovered that the Arthur Ashe mural had been vandalized.   (ECF No. 31 ¶¶ 5, 72, 76.)   Sealed Plaintiff 1 discovered the vandalized mural during their regular morning walk on October 21, 2021.   (ECF No. 31 ¶ 76.)   Upon "seeing the spray-painted Patriot Front logos" on the mural, "Sealed Plaintiff 1 immediately felt a sense of fear and apprehension at being in the Park."   (ECF No. 31 ¶ 76.)   This feeling stemmed in part from the timing of the vandalism in relation to the upcoming Unite the Right-related civil trial in Charlottesville, Virginia.   (ECF No. 31 ¶¶ 47, 76.)   Given the close timing, "Sealed Plaintiff 1 interpreted the vandalism as a warning from . . . Patriot Front that Black residents of the [N]eighborhood and those who opposed white supremacy were not safe."   (ECF No. 31 ¶ 76.)   Moreover, "Sealed Plaintiff 1 was especially unnerved because of . . . [the] presence in Virginia of the defendants in [the Charlottesville Unite the Right case]."   (ECF No. 31 ¶ 79.)

In addition to feeling personally threatened by Patriot Front, Sealed Plaintiff 1 wondered if "they or their neighbors would be targeted by Patriot Front and worried for the safety of their children."   (ECF No. 31 ¶ 78.)   One resident who grew up near Battery Park described the vandalism as "a violation of . . . a sacred space."   (ECF No. 31 ¶ 75.)   Sealed Plaintiff 1 "spent most of the rest of the day speaking with neighbors" who "shared a sense of fear and a sense that the [P]ark was no longer safe."   (ECF No. 31 ¶ 77.)   Sealed Plaintiff 1's fear also stemmed from the fact "that their home, which is close to the Park, had signs showing their support of Black Lives Matter and the LGBTQ+ community."   (ECF No. 31 ¶ 78.)   Out of fear of "being targeted," Sealed Plaintiff 1 removed their signs associated with Black Lives Matter.   (ECF No.

15

31 ¶ 78.)  As a result of the vandalism to the mural, Sealed Plaintiff 1 "lost sleep, had racing

thoughts, and felt anxious."  (ECF No. 31 ¶ 80.)

Sealed Plaintiff 2, a long-time resident of Battery Park Neighborhood, also felt fear and

concern as a result of the vandalism to the mural.  (ECF No. 31 ¶¶ 82–84.)  Specifically,

"Sealed Plaintiff 2 lost sleep and felt anxious, fatigued, and scared as a result of the vandalism."

(ECF No. 31 ¶ 83.)  Sealed Plaintiff 2 also worried about the vandalism's impact on their

family.  (ECF No. 31 ¶ 84.)  "Sealed Plaintiff 2 regularly considered placing their oldest child

in therapy as a result of the stress and anxiety [their] child felt because of the vandalism."  (ECF

No. 31 ¶ 84.)

By the evening of October 21, 2021, "Park officials had painted over . . . Patriot Front's

insignia with black paint."  (ECF No. 31 ¶ 72.)



(ECF No. 31 ¶ 72.)  "[T]he mural, which had taken months of planning and work to create, was

effectively ruined and the Black man it celebrated erased." (ECF No. 31 ¶ 72.) It took many months before full restoration of the mural occurred. (ECF No. 31 ¶ 73.)

     As a result of the mural's defacement, both Plaintiffs "and their children substantially curtailed or even eliminated their use of the Park, feeling compelled to avoid the Park's playground, paths, basketball and tennis courts, and other available amenities." (ECF No. 31 ¶ 6.) After the vandalism, Sealed Plaintiff 1 no longer allowed their children to go to the park alone. (ECF No. 31 ¶ 80.) "Sealed Plaintiff 1 also started avoiding the Park at dusk." (ECF No. 31 ¶ 80.) Sealed Plaintiff 1 also interpreted the vandalism as a warning that Battery Park residents, and those who opposed white supremacy, were not safe. (ECF No. 31 ¶ 76.) Similarly, Sealed Plaintiff 2 no longer allowed "a minor family member to walk their dog near the Park . . . or meet friends [there]." (ECF No. 31 ¶ 84.) Sealed Plaintiff 2's family friends also began to "refuse[] to meet Sealed Plaintiff 2 or their family members at the Park, because of the vandalism." (ECF No. 31 ¶ 85.)

     After the vandalism, the City of Richmond "locked the tunnel [containing] the mural," depriving Plaintiffs of its use and making it more difficult for them to access Park amenities. (ECF No. 31 ¶¶ 81, 82.) "[F]or a period of time in the immediate aftermath of the vandalism, the tunnel connecting the north and south sides of the Park was completely shuttered both day and night." (ECF No. 31 ¶ 81.) This made it more difficult for Sealed Plaintiff 1 and their neighbors to access the southern area of the Park, where basketball courts and a playground are located. (ECF No. 31 ¶ 81.) Even after the City reopened the tunnel, Sealed Plaintiff 2 and their family continued to avoid going "through the tunnel to make use of [the Park's] various amenities"—something Sealed Plaintiff 2 and their family had done prior to the vandalism. (ECF No. 31 ¶ 82.)

## B.    Procedural Background

On December 5, 2022, Plaintiffs filed their Amended Complaint.   (ECF No. 31.)   The

Amended Complaint contains three Counts against the Defaulting Defendants:[3]

> (1) **Count I, 42 U.S.C. § 1985(3),** against Defaulting Defendants Patriot Front, Brown, and Ring;
>
> **Conspiracy to Violate Civil Rights Under the Ku Klux Klan Act of 1871**;
>
> (2) **Count II, 42 U.S.C. § 1986**, against Defaulting Defendants Patriot Front, Rousseau, Brown, and Ring;
>
> **Action for Neglect to Prevent Interference with Civil Rights Under the Ku Klux Klan of 1871**; and,
>
> (3) **Count III, Virginia Code § 8.01-42.1** against Defaulting Defendant Patriot Front;
>
> **Civil Action for Racial, Religious, or Ethnic Harassment**.

(ECF No. 31 at 28, 30, 33.)   In the Amended Complaint, Plaintiffs seek a declaratory judgment

that the Defaulting Defendants' actions deprived Plaintiffs of their rights under state and federal

law; injunctive relief enjoining the Defaulting Defendants from future violations of rights

guaranteed by state and federal law; compensatory and punitive damages; and interest, attorney's

fees, and costs.   (ECF No. 31, at 35.)

On January 12, 2023, Plaintiffs returned Mr. Ring's executed summons to the Court

reflecting a service date of January 9, 2023.   (ECF No. 54.)   On May 30, 2023, Plaintiffs

returned Mr. Rousseau's and Patriot Front's executed summonses to the Court reflecting a

service date of January 5, 2023.   (ECF Nos. 89, 90.)   On September 11, 2023, Plaintiffs

returned Mr. Brown's executed summons to the Court reflecting a service date of September 5,

---

[3] The Amended Complaint also sought relief against the Settling Defendants.   Because Plaintiffs' Motions do not concern the Settling Defendants, the Court details only the claims asserted against the Defaulting Defendants.

18

2023.  (ECF No. 109.)   None of the Defaulting Defendant made an appearance or filed a responsive pleading within the time required by the Federal Rules of Civil Procedure.   The time to do so has expired.   *See* Fed. R. Civ. P. 12(a).[4]

On July 24, 2023, Plaintiffs requested that the Clerk of Court enter default as to Patriot Front, Mr. Rousseau, and Mr. Ring.  (ECF Nos. 100, 101.)   On July 26, 2023, the Clerk entered default as to those Defaulting Defendants.  (ECF Nos. 104, 105.)   On October 12, 2023, Plaintiffs requested that the Clerk of Court enter default as to Mr. Brown.  (ECF No. 114.)   On October 26, 2023, the Clerk entered default as to Mr. Brown.  (ECF No. 118.)   On March 13, 2025, Mr. Ring filed a motion to retract the entry of default against him.  (ECF No. 167.)   On August 27, 2025, the Court denied Mr. Ring's motion to retract the entry of default.  (ECF No. 181.)

On September 24, 2025, Plaintiffs filed their Motions for Default Judgment against the

---

[4] Federal Rule of Civil Procedure 12(a) provides in relevant part:

(a) Time to Serve a Responsive Pleading.

Unless another time is specified by this rule or a federal statute, the time for serving a responsive pleading is as follows:

(1) *In General.*

(A) A defendant must serve an answer:

(i) within 21 days after being served with the summons and complaint; or

(ii) if it has timely waived service under Rule 4(d), within 60 days after the request for a waiver was sent, or within 90 days after it was sent to the defendant outside any judicial district of the United States.

Fed. R. Civ. P. 12(a)(1).

19

Defaulting Defendants.   (ECF Nos. 187, 188, 189.)   In their Motions, Plaintiffs seek

compensatory damages, punitive damages, and attorney's fees.   (ECF No. 190, at 23–25; ECF

No. 191, at 27–30; ECF No. 192, at 23–26.)

## II.   Standard of Review

### A.   Default and Default Judgment

Federal Rule of Civil Procedure 55 governs default judgment.   Rule 55(a) provides that

"[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or

otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the

party's default."   Fed. R. Civ. P. 55(a).   The party seeking entry of default judgment must then

"apply to the court for a default judgment."   Fed. R. Civ. P. 55(b)(2).

A defendant in default "admits the plaintiff's well-pleaded allegations of fact, is

concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus

established."   *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (quoting

*Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).

The Clerk's entry of default does not itself warrant the Court's entry of default judgment.

*See Colleton Preparatory Acad, Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 419 n.6 (4th Cir.

2010) (noting that "[e]ntry of default raises no protectable expectation that a default judgment

will follow") (quoting *Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 785 (8th Cir. 1998)

(citation omitted)).   Rather, entry of default judgment is left to the discretion of the trial

court.   *Payne ex rel. Estate of Calzada v. Brake*, 439 F.3d 198, 203–04 (4th Cir. 2006).

Prior to entering a default judgment, the Court must ensure that:   (1) it possesses

personal jurisdiction over the defaulting party; (2) it possesses subject-matter jurisdiction over

each of the claims; (3) the action is in the proper venue; and, (4) the defaulting party received

proper service of process.  *See Am. Auto. Ass'n v. AAA Auto Glass, LLC*, No. 1:14-cv-1072 (CMH/TCB), 2015 WL 3545927, at *1–2 (E.D. Va. June 3, 2015).

Before entry of default judgment, the Court must determine whether the allegations in the complaint support the relief sought.  *Ryan*, 253 F.3d at 780.  This is so because "[d]efault is a harsh measure because it ignores the merits," *Bogopa Serv. Corp. v. Shulga*, No. 3:08-cv-365, 2009 WL 1628881, at *3 (W.D.N.C. June 10, 2009), and "the Fourth Circuit has a 'strong policy that cases be decided on the merits,'" *State Employees' Credit Union v. Nat'l Auto Leasing, Inc.*, No. 2:06-cv-663 (JBF), 2007 WL 1459301, at *1 (E.D. Va. May 14, 2007) (quoting *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993)).  Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Thus, "'naked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'"  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557).

## B.  Jurisdiction and Venue

A federal district court has subject matter jurisdiction over claims that arise under federal law.  28 U.S.C. § 1331.[5]  Federal courts likewise have subject matter jurisdiction over claims arising under federal law where the plaintiff claims a deprivation of their civil rights.  28 U.S.C.

---

[5] Section 1331 provides:

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

28 U.S.C. § 1331.

§ 1343.[6]  And federal courts may also exercise supplemental subject matter jurisdiction over state-law claims when those state-law claims are sufficiently related to federal claims before the Court.   28 U.S.C. § 1367.[7]

---

[6] Section 1343 provides, in relevant part:

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

28 U.S.C. § 1343(a)(1)–(4).

[7] Section 1367 provides, in relevant part:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

* * *

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

22

A court possesses personal jurisdiction over a defendant who has sufficient minimum contacts with the forum state and who has received effective service of process. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945); Fed. R. Civ. P. 4(k)(1)(A).[8] Venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2).[9]

---

> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(a), (c)(1)–(4).

[8] Rule 4(k) states, in pertinent part:

> (k) Territorial Limits of Effective Service.
>
> > (1) *In General.*  Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant:
> >
> > > (A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district is located.

Fed. R. Civ. P. 4(k)(1)(A).

[9] 28 U.S.C. § 1391(b)(1) provides, in relevant part:

> (b) Venue in General.—A civil action may be brought in—
> > * * *
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

28 U.S.C. §1391(b)(2).

23

Pursuant to Federal Rule of Civil Procedure 4(e), a plaintiff may properly serve an individual by, *inter alia*, following service procedures outlined by state law, by delivering a copy of the summons and complaint to the individual personally, or by delivering a copy of the summons and complaint to an agent authorized by appointment or law to receive service of process. Fed. R. Civ. P. 4(e)(1), (2)(A)–(C). Rule 4(h)(1)(A), meanwhile, provides that service upon an association may be effected "in the manner prescribed by Rule 4(e)(1)" permitting service through state-law means "for serving an individual[.]" Fed. R. Civ. P. 4(h)(1)(A). Finally, Virginia law provides that service upon an individual, association, or legal or commercial entity may be made upon the Secretary of the Commonwealth of Virginia. Va. Code § 8.01-329.[10]

### III.  Analysis

Plaintiffs assert that Defaulting Defendants Patriot Front, Brown, and Ring conspired to deprive them of their civil rights in violation of 42 U.S.C. § 1985(3), (ECF No. 31, at 28); that Defaulting Defendants Patriot Front, Rousseau, Brown, and Ring neglected to prevent

---

[10] Va. Code § 8.01-329 provides in relevant part:

A. When the exercise of personal jurisdiction is authorized by this chapter . . . process or notice may be served on any agent of such person in the county or city in the Commonwealth in which that agent resides or on the Secretary of the Commonwealth of Virginia, hereinafter referred to in this section as the "Secretary," who, for this purpose, shall be deemed to be the statutory agent of such person.

B. When service is to be made on the Secretary, the party or his agent or attorney seeking service shall file an affidavit with the court, stating either (i) that the person to be served is a nonresident or (ii) that, after exercising due diligence, the party seeking service has been unable to locate the person to be served. In either case, such affidavit shall set forth the last known address of the person to be served.

Va. Code § 8.01-329.

24

interference with their civil rights in violation of 42 U.S.C. § 1986, (ECF No. 31, at 30); and that Defaulting Defendant Patriot Front subjected Plaintiffs to intimidation and harassment motivated by racial animosity in violation of Va. Code § 8.01-42.1, (ECF No. 31, at 33).   The well-pleaded allegations in Plaintiffs' Amended Complaint, deemed admitted as a result of default by the Defaulting Defendants, satisfy the requirements for each of these claims.   Therefore, the Court will grant Plaintiffs' Motions against the Defaulting Defendants.

## A.    The Court Has Jurisdictional and Statutory Authority to Render Default Judgment Against Defendants

Each of the requirements for entering default judgment against Defendants has been satisfied.  *See Am. Auto. Assoc.*, 2015 WL 3545927, at *1–2 (stating that prior to entering a default judgment, a court must ensure that it has subject matter jurisdiction, personal jurisdiction over the defaulting party, the action is in the proper venue, and the defaulting party received proper service of process).

### 1.    The Court has Subject Matter Jurisdiction Over Plaintiffs' Claims

The Amended Complaint asserts under Count I that the Defaulting Defendants, through their meeting on October 12, 2021 and the subsequent defacement of the Arthur Ashe mural, conspired to deprive Plaintiffs "of the equal protection of the laws" in violation of 42 U.S.C. § 1985(3).  (ECF No. 31 ¶¶ 86–95.)   The Amended Complaint further asserts under Count II that the Defaulting Defendants, "ha[d] knowledge . . . [of] the wrongs [the Defaulting Defendants] conspired to be done" contemplated by § 1985(3); that the Defaulting Defendants "ha[d] power to prevent" the commission of those wrongs; and that the Defaulting Defendants "neglect[ed] or refuse[d]" to prevent those wrongs, all in violation of 42 U.S.C. § 1986.  (ECF No. 31 ¶¶ 96–109.)   Because Counts I and II arise under federal law, the Court has federal question jurisdiction over these Counts.   *See* 28 U.S.C. §§ 1331, 1343.

25

Count III of the Amended Complaint arises under Virginia Code § 8.01-42.1,[11] which creates a civil cause of action for any person who is subjected to acts of intimidation or harassment motivated by racial, religious, or ethnic animosity.   The Amended Complaint asserts that through their conspiracy to deface the Arthur Ashe mural, Defaulting Defendant Patriot Front subjected Plaintiffs to intimidation and harassment motivated by racial animosity.   (ECF No. 31 ¶¶ 110–16.)   This state-law claim and Plaintiffs' two federal-law claims arise from a "common nucleus of operative fact," namely the Defaulting Defendants' conspiracy to deface the Arthur Ashe mural.   *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). As a result, Plaintiffs' state-law claims and federal-law claims are "so related . . . that they form part of the same case or controversy," meaning the Court has supplemental jurisdiction over Count III.   28 U.S.C. § 1367.   The Court does not exercise its discretion to decline supplemental jurisdiction over the state-law claim.   § 1367(c)(1)–(4).

2.    **The Court has Personal Jurisdiction Over the Defaulting Defendants**

The Court has personal jurisdiction over all four Defaulting Defendants.   "Pursuant to [Federal Rule of Civil Procedure] 4(k)(1)(A), a federal court assessing such a jurisdictional issue

---

[11] Virginia Code § 8.01-42.1 provides in relevant part:

A. An action for injunctive relief or civil damages, or both, shall lie for any person who is subjected to acts of (i) intimidation or harassment, (ii) violence directed against his person, or (iii) vandalism directed against his real or personal property, where such acts are motivated by racial, religious, gender, disability, gender identity, sexual orientation, or ethnic animosity.

B. Any aggrieved party who initiates and prevails in an action authorized by this section shall be entitled to damages, including punitive damages, and in the discretion of the court to an award of the cost of the litigation and reasonable attorney fees in an amount to be fixed by the court.

Va. Code. § 8.01-42.1(A)–(B).

borrows and applies the applicable long-arm statute and governing principles from the forum

state." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 (4th Cir. 2009).

"In order for a district court to exercise personal jurisdiction over a defendant pursuant to a state

long-arm statute, two requirements must be satisfied." *Id.* "First, the forum state's long-arm

statute must authorize the exercise of such personal jurisdiction." *Id.* "Second, if that

authorization exists, the Due Process Clause of the Fourteenth Amendment requires that the

defendants have sufficient minimum contacts with the forum state." *Id.*

      **a.**    <u>**Standard of Review**</u>

      Virginia's long-arm statute provides that "[a] court may exercise personal jurisdiction

over a person, who acts directly or by an agent, as to a cause of action arising from the

person's . . . [t]ransacting any business in th[e] Commonwealth [of Virginia][.]" Va. Code

§ 8.01-328.1(A)(1). Virginia law defines a "person" as any "individual, his [or her] executor,

administrator, or other personal representative, or a corporation, partnership, association or any

other legal or commercial entity, whether or not a citizen or domiciliary of th[e] Commonwealth

and whether or not organized under the laws of th[e] Commonwealth." Va. Code § 8.01-328.

The Virginia long-arm statute is a "single act" statute, meaning "even a single act of business can

confer jurisdiction provided that it is 'significant' and demonstrates 'purposeful activity' in

Virginia." *Prod. Grp. Intern., Inc. v. Goldman*, 337 F. Supp. 2d 788, 793 (E.D. Va. 2004)

(citing *John G. Kolbe, Inc. v. Chromodern Chair Co., Inc.,* 211 Va. 736, 740 (1971)).

      "In defining the term transacting business," the United States Court of Appeals for the

Fourth Circuit has noted that "the purpose of the Virginia long-arm statute is to extend

jurisdiction to the extent permissible under the due process clause" of the Fourteenth

Amendment. *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990). "Because

Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002) (quotations omitted).   Accordingly, the inquiry becomes whether the Defaulting Defendants maintain sufficient minimum contacts with the forum state so as not to offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316 (quotation omitted).

"The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003).   "If the defendant's contacts with the State are also the basis for the suit, those contacts may establish specific jurisdiction. . . .[I]f the defendant's contacts with the State are not also the basis for suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the State." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 & nn.8–9 (1984)).

The United States Court of Appeals for the Fourth Circuit has adopted a three-part test to determine whether specific personal jurisdiction exists. *Reynolds Foil, Inc. v. Pai*, No. 3:09-cv-657 (HEH), 2010 WL 1225620, at *2 (E.D. Va. Mar. 25, 2010) (citing *ALS Scan, Inc.*, 293 F.3d at 712).   The Court must consider:   "(1) the extent to which the defendant purposefully avail[ed] itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and[,] (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *ALS Scan, Inc.*, 293 F.3d at 712

28

(first alteration in original).

With respect to the first factor, "no clear formula [exists] for determining what constitutes 'purposeful availment.'" *Reynolds Foil, Inc.*, 2010 WL 1225620, at *2. The Court, however, may consider whether the defendant maintains offices or agents in the forum state; whether the defendant owns property in the forum state; whether the defendant reached into the forum state to solicit or initiate business; whether the defendant deliberately engaged in significant or long-term business activities in the forum state; whether the parties contractually agreed that the law of the forum state would govern disputes; whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; the nature, quality, and extent of the parties' communications about the business transactions; and, whether the performance of contractual duties was to occur within the forum. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (internal citations omitted). "If, and only if . . . the plaintiff has satisfied this first prong of the test for specific jurisdiction need [the Court] move on to a consideration of prongs two and three." *Id.*

"The second prong of the test for specific jurisdiction . . . requires that the defendant's contacts with the forum state form the basis of the suit." *Id.* at 278–79 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros Nacionales de Columbia, S.A.*, 466 U.S. at 414). The third prong of the specific jurisdiction test "permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there." *Id.* at 279. Specifically, the Court may consider: "(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining

29

efficient resolution of disputes; and, (5) the interests of the states in furthering substantive social policies." *Id.* (citing *Burger King*, 471 U.S. at 477).

### b. __Analysis__

The Court may exercise personal jurisdiction over all four Defaulting Defendants. First, the Court has personal jurisdiction over Patriot Front.[12] Applying Virginia's long-arm statute, the Court finds that Patriot Front is covered by that statute. Patriot Front has "transact[ed] . . . business" in Virginia, such that the long-arm statute provides the Court with personal jurisdiction over Patriot Front. Va. Code § 8.01-328.1(A)(1).[13] Patriot Front, through Mr. Rousseau, Mr.

---

[12] In neither their Amended Complaint nor their Motions for Default Judgment do Plaintiffs explain what Patriot Front's legal status is. Plaintiffs *suggest* that Patriot Front is an unincorporated association, as they argue that they properly served Patriot Front under Federal Rule of Civil Procedure 4(h)'s provisions for service on associations, (ECF No. 191, at 20), though they do not expressly characterize Patriot Front as an incorporated entity or as an unincorporated association.

In either case, the Court may exercise personal jurisdiction over Patriot Front. Federal Rule of Civil Procedure 17(b)(3) provides that an unincorporated association's "[c]apacity to . . . be sued" is determined "by the law of the state where the court is located." Fed. R. Civ. P. 17(b)(3). Assuming Patriot Front is an unincorporated association, Virginia law provides that a court may exercise personal jurisdiction over a "person," Va. Code § 8.01-328.1, which includes "a corporation, partnership, association or any other legal or commercial entity," § 8.01-328. Virginia's definition of "person" "is all inclusive, sufficient to bring within the ambit of the statute every natural or fictitious entity capable of performing the acts, such as transacting business, which are made the basis for the exercise of personal jurisdiction over a nonresident." *Combs v. Dickenson-Wise Med. Grp.*, 233 Va. 177, 180 (1987).

Moreover, courts in this District apply the same personal jurisdiction analysis to unincorporated associations as they do to incorporated entities. *See, e.g., Parizer v. AJP Educ. Found., Inc.*, No. 1:24-cv-724 (RDA), 2025 WL 2382933, at *12 (E.D. Va. Aug. 15, 2025) (applying minimum contacts test to unincorporated association). Accordingly, the Court's personal jurisdiction analysis does not hinge on Patriot Front's legal status.

[13] Some federal courts in Virginia analyze only whether due process supports the exercise of personal jurisdiction. *See, e.g., Eat Good Do Good, LLC v. Pellegrino Food Prods. Co., Inc.*, No. 1:14-cv-863 (LO), 2014 WL 12527288, at *1 (E.D. Va. Oct. 28, 2014) ("Because the Supreme Court of Virginia has held that the 'transacting business' provision of Virginia's long-arm statute extends to the limits of due process, the Court addresses only the due process

Brown, Mr. Ring, and the Settling Defendants, conspired to deface the Arthur Ashe mural in

Richmond.   As part of that conspiracy, Patriot Front sold materials to its members for use in the

defacement of the mural.   As Settling Defendant Noyce, who took part in the physical

defacement of the mural, explained, the stencils used to deface the Arthur Ashe mural "were

*purchased through the organization*," that is, through Patriot Front.   (ECF No. 190-4, at 24:3–18

(emphasis added).)   This single act of business is enough to satisfy Virginia's long-arm statute.

*Goldman*, 337 F. Supp. 2d at 793 ("[E]ven a single act of business can confer jurisdiction

provided that it is 'significant' and demonstrates 'purposeful activity' in Virginia."); *see also*

*Doe v. Mast*, 741 F. Supp. 3d 409, 456–60 (W.D. Va. 2025) (finding personal jurisdiction under

the Virginia long-arm statute because the defendant "transacted business" in the state through a

"sustained course of conduct" to assist others through a conspiracy).   The Court may properly

exercise personal jurisdiction over Patriot Front under Virginia's long-arm statute.

Constitutional considerations of due process do not alter the Court's exercise of personal

jurisdiction over Patriot Front.   As to the first factor in the due process analysis, Patriot Front

purposefully availed itself of the privilege of conducting activities in Virginia.   Patriot Front

maintains "geographical chapters, which it calls 'networks.'"   (ECF No. 31 ¶ 22.)   At the time

relevant to the suit, Settling Defendant Gancarz was the "Network Director for the region

covering Virginia."   (ECF No. 31 ¶ 24.)   Mr. Gancarz and the Defaulting Defendants

participated in the October 12, 2021 meeting during which Patriot Front members conspired to

---

prong of the inquiry.").   Other courts examine whether a defendant has truly engaged in a
business transaction, such that the Virginia long-arm statute applies.   *See Ferguson v. Blackwell*,
No. 1:23-cv-32 (JPJ), 2024 WL 3179175, at *3 (W.D. Va. June 26, 2024) ("Blackwell has not
made payments, solicited buyers, or negotiated as part of a business transaction.").   The Court
engages in both inquiries here.

deface the Arthur Ashe mural.[14]   (ECF No. 31 ¶¶ 23–29.)   Patriot Front ultimately used footage

taken of the defacement of the mural "as part of [its] efforts to recruit new members."   (ECF No.

31 ¶ 71.)

As to the second factor, Patriot Front's contacts with Virginia form the basis of the suit.

Patriot Front's conspiracy to deface the Arthur Ashe mural constitutes both its contacts with

Virginia and the basis of the suit.

As to the third factor, Virginia is an appropriate forum.   The burden on Patriot Front of

litigating in Virginia is low because it maintains a "network" covering Virginia, in which it

operates and plans its "activism."   Virginia has an interest in adjudicating the dispute because

Virginia residents have suffered harm through the deprivation of their civil rights.   As Virginia

residents, Plaintiffs' interest in obtaining convenient and effective relief supports the propriety of

the forum.

Thus, the Court finds that Plaintiffs have established a prima facie case that this Court has

personal jurisdiction over Patriot Front.   *See Patel v. Patel*, No. 1:15cv598 (TSE), 2017 WL

---

[14] As discussed *infra*, Section III.B.1, Plaintiffs attached exhibits to their Motions that
add additional detail concerning what happened during the October 12, 2021 meeting.   In
depositions attached to Plaintiffs' Motions, two of the Settling Defendants asserted that during
the October 12, 2021 meeting, the Defaulting and Settling Defendants discussed plans to engage
in Patriot Front's "activism" in Richmond, but that they did not discuss defacing the Arthur Ashe
mural specifically.   (ECF No. 190-3, at 29:16–30:15, 31:12–23, 34:14–25; ECF No. 190-5, at
25:15–24, 26:22–27:3.)   The Amended Complaint, in contrast, states that Defaulting Defendants
Brown and Ring were "present for, and participated in, a meeting on or about October 12, 2021,
planning the vandalism *of the Arthur Ashe mural* in Battery Park, Richmond, Virginia."   (ECF
No. 31 ¶¶ 28–29 (emphasis added).)

Even if the Court accepts the characterization of the October 12, 2021 meeting in the
attached depositions, its personal jurisdiction analysis would not change.   In either scenario,
Patriot Front purposefully availed itself of the privilege of conducting activities in Virginia, in
that its members conspired to deface *something* in Virginia.   There is no evidence that Patriot
Front's members withdrew from that conspiracy or took steps to prevent it.

5198151, at *3 (E.D. Va. July 31, 2017) (in the context of a motion for default judgment, a plaintiff has the burden to establish a prima facie case that the court has personal jurisdiction over the defaulting parties) (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993)). For all of the same reasons articulated above, the Court may exercise personal jurisdiction over the other three Defaulting Defendants. Mr. Brown and Mr. Ring participated in the October 12, 2021 meeting, during which Patriot Front members conspired to deface the Arthur Ashe mural. Mr. Rousseau was made aware of this meeting and, despite holding the power to instruct Patriot Front members not to engage in "activism," he took no steps to prevent it. (ECF No. 190-3, at 35:2–17; ECF No. 190-5, at 13:3–18).)

In doing so, Mr. Rousseau, Mr. Brown, and Mr. Ring "transacted business" in Virginia, such that Virginia's long-arm statute permits the Court's exercise of personal jurisdiction over each. And the same constitutional considerations that applied to Patriot Front apply to the other three Defaulting Defendants. By participating in this conspiracy, the other three Defaulting Defendants purposefully availed themselves of the privilege of conducting activities in Virginia; their contacts with Virginia form the basis of the suit; and Virginia is an appropriate forum into which the Defaulting Defendants have reached through their conspiracy and in which Plaintiffs have an interest in obtaining full relief.

The Court may properly exercise personal jurisdiction over Patriot Front, Mr. Rousseau, Mr. Ring, and Mr. Brown.

### 3. <u>Venue is Proper in this District</u>

Venue is proper in this Court over all of Plaintiffs' claims because "a substantial part of the events or omissions giving rise to" Plaintiffs claims occurred in Richmond, namely the

defacement of the Arthur Ashe mural.   28 U.S.C. § 1391(b)(2).

**4.      Plaintiffs Effectuated Proper Service of Process on All Defaulting Defendants**

Each Defaulting Defendant was properly served.   Federal Rule of Civil Procedure 4(h)(1) provides that service on an association is proper when conducted "in the manner prescribed by Rule 4(e)(1) for serving an individual."   Fed. R. Civ. P. 4(h)(1).   Rule 4(e)(1), meanwhile, provides that service on an individual is proper when conducted by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located."   Fed. R. Civ. P. 4(e)(1).   The relevant state law provides that "process or notice may be served on any agent of [a party] . . . or on the Secretary of the Commonwealth of Virginia."   Va. Code § 8.01-329(A).   If a party serves process on the Secretary of the Commonwealth of Virginia, "the party or his [or her] agent or attorney seeking service shall file an affidavit with the court, stating either (i) that the person to be served is a nonresident or (ii) that, after exercising due diligence, the party seeking service has been unable to locate the person to be served."   Va. Code § 8.01-329(B).

On January 5, 2023, Plaintiffs served the Amended Complaint and a summons on the Secretary of the Commonwealth of Virginia along with a proper affidavit.   (ECF Nos. 52, 53.) In doing so, Plaintiffs properly served both Patriot Front and its agent, Defaulting Defendant Rousseau.   Plaintiffs also served Mr. Rousseau with a copy of the Amended Complaint and a summons by posting both on Mr. Rousseau's front door.   (ECF No. 89.)

Plaintiffs also served a copy of the Amended Complaint and a summons on Mr. Brown personally pursuant to Federal Rule of Civil Procedure 4(e)(2)(A).   (ECF No. 109.)   And Plaintiffs served a copy of the Amended Complaint and a summons on a Lt. Mattie, an officer at Fayette County Prison, where Mr. Ring was incarcerated at the time of service.   (ECF No. 54.)

In doing so, Plaintiffs properly served Mr. Ring pursuant to Federal Rule of Civil Procedure 4(e)(2)(C), as Lt. Mattie was "authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(e)(2)(C).

Accordingly, Plaintiffs properly served all four Defaulting Defendants.

**B.    Plaintiffs' Allegations, Deemed Admitted, Establish that Plaintiffs Have Stated a Claim Under Counts I through III**

This Court previously determined that Plaintiffs stated a claim with respect to Counts I through III as applied to the Settling Defendants. (*See* ECF No. 127.) The Court now examines whether Plaintiffs have properly stated a claim with respect to the Defaulting Defendants. They have.

**1.    Plaintiffs Have Properly Stated a Claim Under 42 U.S.C. § 1985 Against Defaulting Defendants Patriot Front, Brown, and Ring in Count One**

Plaintiffs demonstrate entitlement to relief under 42 U.S.C. § 1985(3) based on the well-pleaded facts in the Amended Complaint. To state a § 1985(3) claim, Plaintiffs must plausibly allege the following elements:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

*A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995)). Regarding element one, to adequately plead a § 1985(3) conspiracy, "the plaintiff 'must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights.'" *Id.* (alterations in original) (quoting *Simmons*, 47 F.3d at 1377). "[I]t simply must be shown that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its

consequences." *Simmons*, 47 F.3d at 1378 (citations and internal quotation marks omitted).

Plaintiffs allege numerous well-pleaded facts that, taken as true, plausibly allege a conspiracy. Plaintiffs plainly state that Defaulting Defendants Brown and Ring, members of Defaulting Defendant Patriot Front, were "present for, and participated in, a meeting on or about October 12, 2021, planning the vandalism of the Arthur Ashe mural in Battery Park, Richmond, Virginia." (ECF No. 31 ¶¶ 28–29.) During this meeting, these Defaulting Defendants "discussed and planned the vandalization of the Arthur Ashe mural." (ECF No. 31 ¶ 50.) Moreover, Patriot Front required Settling Defendant Gancarz, as Network Director, to approve of any large scale mural cover-ups in his region before members initiate them. (ECF No. 31 ¶ 24.) Settling Defendant Gancarz, in his role as Network Director, was "directly involved in, consulted on, and approved" the vandalism of the Arthur Ashe mural. (ECF No. 31 ¶ 24.)

Less than a week after the October 12, 2021 meeting, Settling Defendants Noyce, Dail, and John Doe 1 vandalized the mural with Patriot Front insignia in a similar form used by Patriot Front members across the country. (ECF No. 31 ¶¶ 51–71.) Patriot Front prominently featured "[f]ootage of the vandalism of the Arthur Ashe mural" in a video Patriot Front used "to recruit new members." (ECF No. 31 ¶ 71.) Finally, pictures of the vandalism as it was occurring are included in the Amended Complaint. (ECF No. 31 ¶¶ 58–62, 64, 66–67, 69.) Considered together, Plaintiffs have alleged, and the Court assumes as true, ample facts to infer that Defaulting Defendants Patriot Front, Brown, and Ring shared "a single plan" to deface the mural, and these Defaulting Defendants were aware of "the essential nature and general scope" of this plan. *See Simmons*, 47 F.3d at 1378.

In depositions attached to Plaintiffs' Motions, two of the Settling Defendants asserted that during the October 12, 2021 meeting, the Defaulting and Settling Defendants discussed

plans to engage in Patriot Front's "activism" in Richmond, but that they did not discuss defacing the Arthur Ashe mural specifically.   (ECF No. 190-3, at 29:16–30:15, 31:12–23, at 34:14–25; ECF No. 190-5, at 25:15–24, 26:22–27:3.)   The Amended Complaint, in contrast, states that Defaulting Defendants Brown and Ring were "present for, and participated in, a meeting on or about October 12, 2021, planning the vandalism *of the Arthur Ashe mural* in Battery Park, Richmond, Virginia."   (ECF No. 31 ¶¶ 28–29 (emphasis added).)

On a motion for default judgment, the Court ordinarily treats the facts of the operative complaint as true.   To the extent the Court can credit this evidence in the context of a motion for default judgment, the depositions attached to Plaintiffs' Motions could be read to undermine the facts as alleged in the Amended Complaint.[15]   But even if the Court were to credit the events as described in these depositions, Plaintiffs still plausibly allege a conspiracy.   "Plaintiffs may hold each Defendant liable for the reasonably foreseeable acts of their co-conspirators."   *Sines v. Kessler*, 324 F. Supp. 3d 765, 795 (W.D. Va. 2018).   In their depositions, Settling Defendants Gancarz and Dail made clear that even if the parties at the October 12, 2021 meeting did not discuss defacing the Arthur Ashe mural, they did discuss defacing *something* in Richmond in line with Patriot Front's mission.   (ECF No. 190-3, at 29:16–30:15, 31:12–23, at 34:14–25; ECF No. 190-5, at 25:15–24, 26:22–27:3.)   The defacement of the Arthur Ashe mural was a reasonably foreseeable act ultimately undertaken by the Defaulting Defendants' co-conspirators.

Turning to element two—discriminatory animus—the Court concludes that Plaintiffs clearly and plausibly allege the requisite racial animus.   To satisfy this element, Plaintiffs must assert that Defendants were "motivated by a specific class-based, invidiously discriminatory

---

[15] The Court commends Plaintiffs for including potentially conflicting information in their Motions so that the Court has a full and complete record.

animus." *A Soc'y Without A Name*, 655 F.3d at 346 (citations omitted). The Amended Complaint alleges numerous well-pleaded and plausible facts that support a reasonable inference that racial animus against Black individuals and their supporters animated Defendants' conduct. Indeed, "Patriot Front is a white supremacist group that calls for the formation of a white ethnostate." (ECF No. 31 ¶ 1.) The Amended Complaint reports Patriot Front's mission and white supremacist ideology, including that its "ideology, articulated in its online manifesto, is based on" the belief "that true Americans share a 'pan-European identity.'" (ECF No. 31 ¶ 12.) "Patriot Front's members . . . have intimidated communities based on race and sexual orientation. . . across the country" by "defac[ing] murals honoring Black Americans, target[ing] LGBTQ+ events, and destroy[ing] public and private property as part of their campaign to promote their . . . credo." (ECF No. 31 ¶ 2.)

Regarding the third element, § 1985(3) "is a purely remedial statute" that provides "a civil cause of action when some otherwise defined federal right—to equal protection of the laws or equal privileges and immunities under the laws—is breached by a conspiracy in the manner defined by the section." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979). The Constitutional right to be free from the badges and incidents of slavery qualifies as a right that can be vindicated via a 42 U.S.C. § 1985(3) claim against private actors. *See Griffin v. Breckenridge*, 403 U.S. 88, 104–05 (1971) (explaining that Section 1985(3) creates a statutory cause of action for "victims of conspiratorial, racially discriminatory private action aimed at depriving [the victim] of the basic rights that the law secures to all free [people]"). The racially motivated deprivation of the right to enjoy a public accommodation—such as that offered in Battery Park—constitutes a denial amounting to a "badge of slavery," and thus is actionable under § 1985(3). *See Fisher v. Shamburg*, 624 F.2d 156, 159 (10th Cir. 1980) (concluding that

38

"Congress has declared its intention that a racially motivated interference with one's right to enjoy places of public accommodation constitutes [ ] a badge of slavery" and § 1985(3) can be used to enforce this right). Plaintiffs have plausibly alleged a racially-motived conspiracy whose predominant purpose was to deny them of their right to enjoy the public accommodations offered by Battery Park.

Finally, Plaintiffs well plead damages connected to the conspiracy. Plaintiffs plead that the loss of their "legally protected interest" in the form of the vandalism to the mural, they "and their children substantially curtailed or even eliminated their use of the Park, feeling compelled to avoid the Park's playground, paths, basketball and tennis courts, and other available amenities." (ECF No. 31 ¶¶ 6, 80–82.)

They also allege emotional injuries. Plaintiffs have alleged cognizable injuries where they have both significantly curtailed or even eliminated their access to the Park and have experienced emotional harm as a result of Defendants' actions. (*See* ECF No. 31 ¶¶ 76, 78, 80–84.) As a result of the vandalism and their resulting safety concerns, both Plaintiffs limited their access to Battery Park. These injuries are directly traceable to Defaulting Defendants' Patriot Front, Brown, and Ring's involvement in the conspiracy. Plaintiffs have established the elements necessary to state a claim under Count One.

### 2. Plaintiffs Have Properly Stated a Claim Under 42 U.S.C. § 1986 Against Defaulting Defendants Patriot Front, Rousseau, Brown, and Ring in Count Two

Plaintiffs demonstrate entitlement to relief under 42 U.S.C. § 1986 based on the well-pleaded facts in the Amended Complaint. To state a § 1986 claim, Plaintiffs must plausibly allege: (1) a § 1985 conspiracy occurred; (2) the defendants had knowledge of the conspiracy; (3) the defendants had the power to prevent or aid in preventing the commission of acts pursuant

to that conspiracy; and (4) the defendants neglected or refused to act to prevent the conspiracy. *See McHam v. N. Carolina Mut. Life Ins. Co.*, No. 1:05-cv-01168, 2007 WL 1695914, at *5 (M.D.N.C. June 11, 2007), *aff'd*, 250 F. App'x 545 (4th Cir. 2007) (citing *Clark v. Clabaugh*, 20 F.3d 1290, 1295–96 (3d Cir.1994) (setting out elements of § 1986 claim)).

As discussed above, Plaintiffs have established a conspiracy under § 1985.    And all four Defaulting Defendants had knowledge of the conspiracy.    Defaulting Defendants Brown and Ring, members of Defaulting Defendant Patriot Front, attended and participated in the October 12, 2021 meeting at which Patriot Front members discussed engaging in "activism."    Defaulting Defendant Rousseau was made aware of the events of this meeting.    All of the Defaulting Defendants had the power to prevent or aid in the prevention of the defacement of the Arthur Ashe mural and neglected or refused to do so.    Plaintiffs have established the elements necessary to state a claim under Count Two.

### 3.    Plaintiffs Have Properly Stated a Claim Under Virginia Code § 8.01-42.1 Against Defaulting Defendant Patriot Front in Count Three

Plaintiffs demonstrate entitlement to relief against Patriot Front under Virginia Code § 8.01-42.1 based on the well-pleaded facts in the Amended Complaint.    To state a Virginia Code § 8.01-42.1 claim, Plaintiffs must plausibly allege the following elements:    (1) the defendant subjected Plaintiffs to *either* "(i) intimidation or harassment, (ii) violence directed against [their] person[s], *or* (iii) vandalism against [their] real or personal property", *and* (2) such acts were "motivated by racial, religious, gender, disability, gender identity, sexual orientation, or ethnic animosity."    Va. Code § 8.01-42.1(A) (emphasis added).    Plaintiffs have demonstrated that Patriot Front, through its members' defacement of the Arthur Ashe mural, subjected them to intimidation and harassment and that these acts were motivated by racial animosity.    Plaintiffs have established the elements necessary to state a claim under Count Three.

40

**C.      Plaintiffs are Entitled to Damages and Attorney's Fees**

Plaintiffs seek compensatory damages, punitive damages, and attorney's fees.   42 U.S.C.

§§ 1985(3) and 1986 expressly authorize damages awards.   42 U.S.C. § 1988 expressly

authorizes the Court to grant attorney's fees in actions under §§ 1985(3) and 1986.   Virginia

Code § 8.01-42.1 likewise expressly permits damages awards.   The Court will order Plaintiffs to

file supplemental briefing concerning the damages and attorney's fees to which they are entitled

and will reserve ruling on each.

In their Amended Complaint, Plaintiffs also seek a declaratory judgment that the

Defaulting Defendants' actions deprived Plaintiffs of their rights under state and federal law and

injunctive relief enjoining the Defaulting Defendants from future violations of rights guaranteed

by state and federal law.   (ECF No. 31, at 35.)   Plaintiffs' memoranda discuss only their

entitlement to damages and attorney's fees.   As a result, the Court will order Plaintiffs to include

in their supplemental briefing argument concerning their entitlement to declaratory and

injunctive relief.

### IV.   Conclusion

For the foregoing reasons, the Court will grant the Motions.   (ECF Nos. 190, 191, 192.)

The Court will order that default judgment be entered against the Defaulting Defendants.   The

Court will further order Plaintiffs to file a motion outlining the damages they believe appropriate

and the fees to which they believe they are entitled.

An appropriate Order shall issue.

Date: 2/27/26
Richmond, Virginia

_____
/s/
M. Hannah Lauck
Chief United States District Judge