## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**SEALED PLAINTIFF 1,**

    **and**

**SEALED PLAINTIFF 2,**

    **Plaintiffs,**

        **v.**

**PATRIOT FRONT,** *et al.,*

    **Defendants.**

              **Civil Action No. 3:22-cv-00670**

### <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Plaintiffs' Supplemental Brief Regarding Plaintiffs' Entitlement to Damages, Equitable Relief, and Attorney's Fees (the "Supplemental Brief"). (ECF No. 213.)   For the reasons articulated below, the Court will award Plaintiffs compensatory damages and punitive damages, award declaratory relief, and deny injunctive relief.   The Court will address Plaintiffs' request for attorney's fees in a separate order.

## I.   Factual and Procedural Background

### A.       Findings of Fact[1]

### 1.       The Defaulting Defendants Defaced the Arthur Ashe Mural

The Court described the facts relevant to this case in its opinion entering default judgments against Defendants Patriot Front, Thomas Rousseau, Jacob Brown, and William Ring (the "Defaulting Defendants"). *Sealed Plaintiff 1 v. Patriot Front*, No. 3:22-cv-670 (MHL), 2026 WL 561098, at *1–7 (E.D. Va. Feb. 27, 2026).

To summarize, Patriot Front is a white supremacist organization that "calls for the formation of a white ethnostate." *Id.* at *1 (quotation omitted). "Patriot Front's members have defaced murals honoring Black Americans, targeted LGBTQ+ events, and destroyed public and private property as part of their campaign to promote their extreme beliefs." *Id.* (quotation omitted).

"The City of Richmond owns and manages Battery Park, . . . a public park located in Richmond, Virginia." *Id.* at *3. "In July 2017, the Park unveiled a mural honoring Black tennis star Arthur Ashe who grew up in segregated Richmond, Virginia." *Id.* (quotation omitted). The mural was "[l]ocated at the entrances and inside of a pedestrian tunnel joining south and north ends of [Battery] Park." *Id.* (quotation omitted).

---

[1] To assess the extent of a plaintiff's damages, a district court *may* conduct a formal evidentiary hearing under Federal Rule of Civil Procedure 55(b)(2), or may determine damages based on affidavits or documents attached to the plaintiff's motion. *See Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 507 (4th Cir. 1998) (citation omitted) (noting that "in some circumstances a district court entering a default judgment may award damages ascertainable from the pleadings without holding a hearing"). The Court's findings of fact with respect to Plaintiffs' damages rely on affidavits Plaintiffs filed in connection with their Supplemental Brief. (ECF Nos. 213-1, 213-2.) Setting a formal hearing against defaulting parties would waste litigative and judicial resources.

According to Plaintiffs' Amended Complaint, on or about October 12, 2021, Patriot Front members, including Defaulting Defendants Brown and Ring, attended and participated in a meeting to plan the vandalism of the Arthur Ashe mural. *Id.* at *4. Defaulting Defendant Rousseau was made aware of the events of this meeting. *Id.* This meeting occurred approximately two weeks before jury selection began in the trial connected with the white supremacist-led Charlottesville Unite the Right rally during which one counterprotester was killed, and others injured, when run down by a car that sped into a peaceful protest against white supremacy. *Id.* at *5.

On or about October 18, 2021, just days after the October 12 meeting, Defendants Nathan Noyce, Thomas Dail, and John Doe 1 (the "Settling Defendants") met at the Arthur Ashe mural and spray-painted over it. *Id.* at *5. Settling Defendant John Doe 1 filmed the vandalism "for recruitment purposes," which Patriot Front "prominently feature[ed] in a video highlighting Patriot Front's nationwide acts of vandalism occurring in October 2021." *Id.* at *6 (quotation omitted). Patriot Front Network "then used this video as part of their efforts to recruit new members." *Id.* (quotation omitted).

### 2.    Destruction of the Arthur Ashe Mural Had an Especially Devastating Effect in Richmond and in the Battery Park Neighborhood

In their Supplemental Brief, Plaintiffs offer evidence of the enhanced harm caused by the Defaulting Defendants' targeting the Arthur Ashe mural for destruction. (ECF Nos. 213-3, 213-4.) Plaintiffs provide the declaration of State Delegate Rae E. Cousins, a fourth generation Richmonder who has lived in the Battery Park neighborhood for eight years. (ECF No. 213-3.) Delegate Cousins highlights the impact Arthur Ashe had as an "activis[t] fighting for the equality of Black people in the United States and across the world, and his humanitarian work to help the global community. (ECF No. 213-3 ¶ 3.) Delegate Cousins describes Arthur Ashe as a person

3

who fought against Jim Crow policies and Apartheid.  (ECF No. 213-3 ¶ 3.)  She avers that "[t]hrough [her] work as an elected representative and throughout [her] life in Richmond," she has known many other Richmonders who feel the same way about Arthur Ashe, adding that his significance to the Black community and in Richmond "cannot be understated."  (ECF No. 213-3 ¶ 4.)  Delegate Cousins recalls Arthur Ashe's refusal to abandon Richmond, remembering that Arthur Ashe returned to Richmond to host a tennis clinic at Byrd Park in which he coached her brother and her cousin. (ECF No. 213-3 ¶¶ 5–6.)  Despite progress Richmond had recently made by removing Confederate statues on Monument Avenue and renaming the Boulevard after Arthur Ashe, she found it unsettling to think that white supremacists were still among her community and could engage in such "hateful behavior."  (ECF No. 213-3 ¶¶ 8–10.)  Delegate Cousins states that she "could not help but think about the increase over the years in the hateful and violent rhetoric from white supremacist groups that was happening nationwide, including at the Unite the Right rally in Charlottesville, only an hour from Richmond."  (ECF No. 213-3 ¶ 11.)  She describes the defacement as feeling particularly personal because it focused on Arthur Ashe, a Richmond hero, and because Battery Park is tucked away from the more trafficked streets in the city, making the incident "deliberate and targeted."  (ECF No. 213-3 ¶¶ 12–13.)

Plaintiffs also attach the declaration of Ali Faruk, who has lived in Battery Park for 15 years "just a few blocks from the park."  (ECF No. 213-4 ¶ 1.)  Mr. Faruk describes a similar reaction to the defacement.  Mr. Faruk has been a longtime member and former Vice President of the Battery Park Civic Association ("BCPA"), which "works to create a sense of community among neighbors from different backgrounds."  (ECF No. 213-4 ¶¶ 2–3.)  Mr. Faruk states that the "defacement of the mural felt like a targeted attack on the diverse people who live here."  (ECF No. 213-4 ¶ 10.)  He states that in "the aftermath of the vandalism of the mural, [he] and

4

other members of the BCPA feared that Patriot Front would continue to terrorize our community with more racist vandalism." (ECF No. 213-4 ¶ 13.) He and other BCPA members considered implementing neighborhood patrols and the use of cameras to keep the community safe. (ECF No. 213-4 ¶ 13.)

### 3.    Plaintiffs Suffered Emotional Distress as a Result of the Vandalism

In their Supplemental Brief, Plaintiffs seek compensatory damages resulting from the Defaulting Defendants' involvement in the defacement of the Arthur Ashe mural. Plaintiffs establish their damages through affidavits attached to the Supplemental Brief. (ECF Nos. 213-1, 213-2.) Both Plaintiffs describe their loss of the use of the park, their fears for their own safety, and their fears for the safety of their children.

Sealed Plaintiff 1 has "lived in the Battery Park neighborhood . . . for more than twenty years" and "live[s] near Battery Park itself." (ECF No. 213-1 ¶ 1.) "Until the Defendants' actions, [Sealed Plaintiff 1 and their family] regularly used the Park and its amenities . . . on a near daily basis. [They] often used the tunnel [containing the mural] to visit the southern part of the Park." (ECF No. 213-1 ¶ 6.) Prior to the vandalism, Sealed Plaintiff 1 found what they learned to be white supremacist Patriot Front stickers in their neighborhood, and as a result, "felt shocked, angry, and hurt that a white supremacist group was actively pushing propaganda in [their] neighborhood." (ECF No. 213-1 ¶ 8.) On October 21, 2021, Sealed Plaintiff 1 discovered the vandalized mural while walking through Battery Park. They "immediately felt a sense of fear and apprehension about being in the Park." (ECF No. 213-1 ¶ 9.) Sealed Plaintiff 1 avers that, "[i]n light of the upcoming Charlottesville trial, [they] interpreted the vandalism as a warning from the Patriot Front that Black residents of the neighborhood and others who oppose white supremacy were not safe." (ECF No. 213-1 ¶ 10.) They became "worried about being

5

targeted, given that [their] home, which is close to the Park, had signs showing [their] family's support of Black Lives Matter and the LGBTQ+ community." (ECF No. 213-1 ¶ 13.) Sealed Plaintiff 1 "removed [their] Black Lives Matter signs out of a concern for safety" and "worried about the safety of [their] children." (ECF No. 213-1 ¶ 13.) "As a result of Patriot Front's vandalism in Battery Park, [Sealed Plaintiff 1] lost sleep, had racing thoughts, and felt anxious." (ECF No. 213-1 ¶ 15.) Sealed Plaintiff 1 has "seen more Patriot Front stickers" in nearby neighborhoods since the vandalism of the mural. (ECF No. 213-1 ¶ 21.) To counteract their fear, Sealed Plaintiff 1 purchased a knife and pepper spray for self-defense, took self-defense training, and obtained a first responder medic certification. (ECF No. 213-1 ¶ 18.)

Sealed Plaintiff 2 is "a long-term resident of the Battery Park neighborhood and [] live[s] near Battery Park." (ECF No. 213-2 ¶ 1.) Sealed Plaintiff 2

> first learned of the existence of Patriot Front as an organization in the immediate wake of the killing of Heather Heyer in the Unite the Right rally. The upset around her death directly affected people [Sealed Plaintiff 2] knew in the Charlottesville area. [Sealed Plaintiff 2] had colleagues who were present when Heather was hit or who knew people personally affected by her death. The images of torches and yelling from the original Unite the Right March were all over the news and it was deeply troubling. When [Sealed Plaintiff 2] discovered that Patriot Front folks weren't just coming to the state capital area of the city but were now within [their] own neighborhood, [they] became very worried. [Their] worry stemmed from [their] knowledge that [Patriot Front was] willing to incite and enact violence to spread their hateful ideology.

(ECF No. 213-2 ¶¶ 9–10.)

"Until Defendants vandalized the Arthur Ashe mural in the Park, [Sealed Plaintiff 2 and their family] regularly used the Park and its amenities . . . on a near daily basis." (ECF No. 213-2 ¶ 6.) "In the aftermath of the vandalism, [Sealed Plaintiff 2 and their family] limited and in some cases stopped using the Park as [they] once did." (ECF No. 213-2 ¶ 7.) Sealed Plaintiff 2 "felt anxious, fatigued, and scared as a result of the vandalism and the white supremacist

6

message it represent[ed].   It caused [Sealed Plaintiff 2] to lose sleep for some time."   (ECF No. 213-2 ¶ 12.)   Sealed Plaintiff 2 "greatly feared that Patriot Front would escalate their acts of violence in [their] neighborhood."   (ECF No. 213-2 ¶ 12.)

B.    **Procedural Background**

On December 5, 2022, Plaintiffs filed their Amended Complaint.   (ECF No. 31.)   The Amended Complaint contains three Counts against the Defaulting Defendants.   Plaintiffs allege:

(1) **Count I, 42 U.S.C. § 1985(3),** against Defaulting Defendants Patriot Front, Brown, and Ring;
**Conspiracy to Violate Civil Rights Under the Ku Klux Klan Act of 1871**;

(2) **Count II, 42 U.S.C. § 1986**, against Defaulting Defendants Patriot Front, Rousseau, Brown, and Ring;
**Action for Neglect to Prevent Interference with Civil Rights Under the Ku Klux Klan of 1871**; and,

(3) **Count III, Virginia Code § 8.01-42.1** against Defaulting Defendant Patriot Front.
**Civil Action for Racial, Religious, or Ethnic Harassment**.

(ECF No. 31 at 28, 30, 33.)   Plaintiffs seek a declaratory judgment that the Defaulting Defendants' actions deprived Plaintiffs of their rights under state and federal law; injunctive relief enjoining the Defaulting Defendants from future violations of rights guaranteed by state and federal law; compensatory and punitive damages; and attorney's fees, costs, and interest. (ECF No. 31, at 35.)

On September 24, 2025, after the Clerk entered default as to each of the Defaulting Defendants, Plaintiffs filed Motions for Default Judgment against the Defaulting Defendants. (ECF Nos. 187, 188, 189.)   In their Motions for Default Judgment, Plaintiffs again sought a declaratory judgment; injunctive relief; compensatory and punitive damages; and attorney's fees, costs, and interest.   (ECF No. 187, at 1–2; ECF No. 188, at 1–2; ECF No. 189, at 1–2; ECF No. 190, at 23–25; ECF No. 191, at 27–30; ECF No. 192, at 23–26.)

7

On February 27, 2026, the Court granted Plaintiffs' Motions for Default Judgment. (ECF Nos. 206, 207.)   The Court entered (1) a default judgment against Defaulting Defendants Patriot Front, Brown, and Ring for violations of 42 U.S.C. § 1985(3); (2) a default judgment against Defaulting Defendants Patriot Front, Rousseau, Brown, and Ring for violations of 42 U.S.C. § 1986; and, (3) a default judgment against Defaulting Defendant Patriot Front for its violation of Virginia Code § 8.01-42.1.

The Court also found that Plaintiffs are entitled to damages and attorney's fees.   (ECF No. 206, at 41.)   But the Court reserved ruling on the amount of damages to which Plaintiffs were entitled, and on Plaintiff's entitlement to declaratory and injunctive relief.   (ECF No. 206, at 41.)   The Court ordered Plaintiffs to file supplemental briefing explaining the relief to which they are entitled.   (ECF No. 207, at 1.)   On March 16, 2026, Plaintiffs filed their Supplemental Brief.   (ECF No. 213.)   Plaintiffs request an award of damages as the Court "deems just and appropriate."   (ECF No. 213, at 10.)

## II.   Standard of Review

"Although well-pled factual allegations are accepted as true for default judgment purposes, a party who defaults does not admit the allegations in the claim as to the amount of damages." *STL Emirates Logistics, LLC v. Tamerlane Global Servs., Inc.*, No. 2:14-cv-51 (MSD), 2014 WL 12660119, at *2 (E.D. Va. Dec. 11, 2014) (citing Fed. R. Civ. P. 8(b)(6)). For that reason, after a district court concludes that liability is established, it must then independently calculate the appropriate amount of damages.   *Ryan v. Homecomings Fin, Network*, 253 F.3d 778, 780–81 (4th Cir. 2001).

8

After entering a default judgment, a district court may assess the extent of a plaintiff's damages by conducting a formal evidentiary hearing under Federal Rule of Civil Procedure 55(b)(2), or may determine damages based on affidavits or documents attached to the plaintiff's motion. *Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 507 (4th Cir. 1998) (citation omitted) (noting that "in some circumstances a district court entering a default judgment may award damages ascertainable from the pleadings without holding a hearing"); *cf. Pentech Fin. Servs., Inc. v. Old Dominion Saw Works, Inc.*, No. 6:09-cv-4, 2009 WL 1872535, at *2 (W.D. Va. June 30, 2009) (citation omitted) (finding "no need to convene a formal evidentiary hearing on the issue of damages" where the plaintiff submitted affidavits establishing the amount of damages); *DirecTV, Inc. v. Yancey*, No. 4:04-cv-11, 2005 WL 3435030, at *2 (W.D. Va. Dec. 12, 2005) (citation omitted) (deeming a hearing unnecessary because the plaintiff had "presented sufficient evidence to support its claim for damages, costs and fees by way of uncontradicted affidavits").

### III.   Analysis

**A.    The Court Will Award Each Plaintiff Compensatory Damages of $ 5,000 Per Count**

#### 1.    Legal Standard:   Compensatory Damages

42 U.S.C. §§ 1985(3) and 1986, as well as Virginia Code § 8.01-42.1, expressly permit awards of compensatory damages.   42 U.S.C. § 1985(3) (providing that plaintiffs "may have an action for the recovery of damages"); 42 U.S.C. § 1986 (providing that individuals who violate the statute "shall be liable to the party injured . . . for all damages caused by [the] wrongful act"); Va. Code § 8.01-42.1(A) (providing that "[a]n action for . . . civil damages . . . shall lie" for violations of the statute).   Plaintiffs proceeding under these statutes may seek compensatory damages for emotional distress caused by the defendants' actions.   *See, e.g., Murell v. Patriot*

9

*Front*, 762 F. Supp. 3d 65, 82–83 (D. Mass. 2025) (awarding compensatory damages for plaintiff's emotional distress against Patriot Front in action under § 1985(3)); *Libertad v. Sanchez*, 134 F. Supp. 2d 218, 226–27 (D.P.R. 2001) (awarding emotional distress damages in action under § 1985(3)); *Perez v. Cucci*, 725 F. Supp. 209, 255–58 (D.N.J. 1989) ("While congress did not specifically address the type of damages recoverable for violations of the civil rights statutes, . . . a plaintiff who has proven a violation of [42 U.S.C.] §§ 1983, 1985(3), and 1986 is entitled to recover nominal, compensatory and punitive damages as well as damages for any emotional distress."); *N. Va. Kitchen, Bath & Basement, Inc. v. Ellis*, 856 S.E.2d 593, 598 (Va. 2021) (holding that plaintiffs may obtain compensatory damages for emotional distress under Va. Code § 8.01-42.1(A) "supported by evidence of non-pecuniary or emotional damages alone").

"[A]n award of substantial compensatory damages . . . must be proportional to the actual injury occurred. . . . The award must focus on the real injury sustained." *Hetzel v. Cnty. of Prince William*, 89 F.3d 169, 173 (4th Cir. 1996) (quotation omitted). The United States Court of Appeals for the Fourth Circuit has held "that a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress." *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 546 (4th Cir. 2003) (citing *Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir. 1996)). But if a plaintiff seeks to establish their entitlement to damages for emotional distress based on their statements alone, those statements "must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated." *Id.* at 546–47 (quotation omitted). The plaintiff "cannot rely on conclusory statements that the plaintiff suffered emotional distress or the mere fact that the plaintiff was wronged. Rather, [a plaintiff] must indicate with specificity how [the plaintiff's] alleged distress manifested itself.

10

The plaintiff must also show a causal connection between the violation and her emotional distress." *Id.* at 547.   A plaintiff seeking damages for emotional distress "need not prove the exact measurement of damages for the harm suffered." *Matarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402, 446 (E.D. Va. 2011), *vacated on other grounds by, Matarese v. Archstone Cmtys., LLC*, 468 F. App'x. 283 (4th Cir. 2012).

Virginia law provides a similar formulation:   compensatory damages for emotional distress are limited "'to the actual damages proved to have been sustained.'" *Davis v. Christy*, —S.E.2d—, 2026 WL 662501, at *9 (Va. Ct. App. 2026) (quoting *Fleming v. Moore*, 275 S.E.2d 632, 638–39 (Va. 1981)).   A plaintiff seeking damages for emotional distress may do so without demonstrating corresponding monetary loss. *N. Va. Kitchen, Bath & Basement*, 856 S.E.2d at 599 ("[T]estimony describing how [defendant's] conduct made [plaintiff] feel intimidated, harassed, threatened, and humiliated was sufficient to support" award of compensatory damages for emotional distress).

### 2.    The Court Will Award Plaintiffs $5,000 in Compensatory Damages for the Defaulting Defendants' Violations of 42 U.S.C. § 1985(3)

Both Plaintiffs have demonstrated their entitlement to compensatory damages based on the emotional distress they experienced as a result of Defaulting Defendants Patriot Front, Brown, and Ring's involvement in their conspiracy to vandalize the Arthur Ashe mural.   As the Court determined in its opinion entering default judgments, the Defaulting Defendants engaged in a conspiracy to deprive Plaintiffs of their civil rights in violation of 42 U.S.C. § 1985(3). *Patriot Front*, 2026 WL 561098, at *15 (citing elements of § 1985).   Plaintiffs' affidavits sufficiently articulate that they suffered cognizable injuries through the emotional distress they experienced as a result of the Defaulting Defendants' involvement in that conspiracy.

11

After the vandalism of the Arthur Ashe mural, Sealed Plaintiff 1 felt "a sense of fear and apprehension about being in [Battery] Park"; became "worried about being targeted"; "worried about the safety of [their] children"; and "lost sleep, had racing thoughts, and felt anxious." (ECF No. 213-1 ¶¶ 9, 13, 15.) Sealed Plaintiff 1 took self-protective measures which showed the fear they felt: buying a knife, taking a self-defense class, and earning a first responder status. (ECF No. 213-1 ¶ 18.) Similarly, Sealed Plaintiff 2 experienced "great[] fear that Patriot Front would escalate their acts of violence"; "los[t] sleep for some time"; "worried about [their] neighbors"; "agonized over the impact of the vandalism on [their] family"; and "felt anxious, fatigued, and scared as a result of the vandalism and the white supremacist message it represent[ed]." (ECF No. 213-2 ¶¶ 12, 13.)

Both plaintiffs felt especially targeted given that, just two weeks after the act of vandalism, jury selection for the Unite the Right trial in Charlottesville began. (ECF No. 213-1 ¶ 10; ECF No. 213-2 ¶ 9.) That trial affected both Plaintiffs and grounded their fear and anxiety. Sealed Plaintiff 1 avers that, "[i]n light of the upcoming Charlottesville trial, [they] interpreted the vandalism as a warning from the Patriot Front that Black residents of the neighborhood and others who oppose white supremacy were not safe." (ECF No. 213-1 ¶ 10.) Sealed Plaintiff 2 explains that the "upset" in the community "in the immediate wake of the killing of [counterprotester] Heather Heyer at the Unite the Right rally" directly affected people she knew, including "colleagues who were present when Heather was hit." Sealed Plaintiff 2 stated that "[t]he images of torches and yelling from the original Unite the Right March were all over the news and it was deeply troubling. . . . When [Sealed Plaintiff 2] discovered that Patriot Front folks weren't just coming to the state capital area of the city but were now within [their] own neighborhood, [they] became very worried. [Their] worry stemmed from [their]

12

knowledge that [Patriot Front was] willing to incite and enact violence to spread their hateful ideology." (ECF No. 213-1 ¶¶ 9–10.)

Plaintiffs' showing is well in line with that of other plaintiffs who have obtained compensatory damages for emotional distress in this District. *See, e.g., Nolasco v. Solaris Paper*, No. 1:23-cv-1631 (PTG), 2025 WL 2656045, at *10 (E.D. Va. Sept. 15, 2025) (awarding emotional distress damages where plaintiff "felt humiliated," "didn't feel valued," "did not spend time with her family and grandchildren," and experienced physical symptoms such as insomnia and headaches); *Bryant*, 333 F.3d at 547 (awarding emotional distress damages where plaintiff expressed feeling "embarrassed, frustrated, and angry" and "very disgusted"); *Saleh v. Upadhyay*, 11 F. App'x 241, 262–63 (4th Cir. 2001) (affirming award of emotional distress damages where plaintiff testified to feeling "very sad," feeling "betrayed," and experiencing insomnia).

Plaintiffs have thus "establish[ed] that the[y] . . . suffered demonstrable emotional distress" with "sufficient[] articulat[ion]" and specificity. *Bryant*, 333 F.3d at 546–47 (quotation omitted). Moreover, Plaintiffs' damages do not "rely on conclusory statements that the[y] . . . suffered emotional distress or the mere fact that the[y] [were] wronged." *Id.* (quotation omitted).

The Court concludes that an award of $5,000 in compensatory damages to each Plaintiff is sufficient to compensate Plaintiffs for their emotional injuries resulting from the Defaulting Defendants' violation of § 1985(3). This award of damages is well within the range of emotional distress damages awards within this District and the Fourth Circuit. *See Diaz v. RM Contractor, LLC*, No. 1:21-cv-1192 (JFA/LO), 2022 WL 2980892 at *7 (E.D. Va. June 17, 2022) (awarding $5,000 in emotional distress damages), *report and recommendation adopted*,

13

2022 WL 2975301 (E.D. Va. July 27, 2022); *Bryant*, 333 F.3d at 547 (upholding award of $50,000 in emotional distress damages); *Nolasco*, 2025 WL 2656045, at *10 (awarding $300,000 in emotional distress damages).

### 3. The Court Will Award Each Plaintiff $5,000 in Compensatory Damages for the Defaulting Defendants' Violations of 42 U.S.C. § 1986

For the same reasons, Plaintiffs have established their entitlement to compensatory damages for Defaulting Defendants Patriot Front, Rousseau, Brown, and Ring's violations of 42 U.S.C. § 1986. As the Court previously determined in its opinion entering default judgments, the Defaulting Defendants had the power to prevent or aid in preventing the commission of acts pursuant to their conspiracy, but the Defaulting Defendants neglected or refused to act to prevent that conspiracy. *Patriot Front*, 2026 WL 561098, at *17 (citing elements of § 1986). Plaintiffs' affidavits again establish with sufficient particularity and without reference to merely conclusory statements that they suffered cognizable injuries through the emotional distress they experienced as a result of the Defaulting Defendants' failure to act to prevent their conspiracy. The Court concludes that an award of $5,000 in compensatory damages to each Plaintiff is sufficient to compensate Plaintiffs for their emotional injuries resulting from the Defaulting Defendants' violation of § 1986 and is again in line with comparable awards in this District.

### 4. The Court Will Award Each Plaintiff $5,000 in Compensatory Damages for the Defaulting Defendants' Violation of Va. Code § 8.01-42.1

For the same reasons, Plaintiffs have established their entitlement to compensatory damages for Defaulting Defendant Patriot Front's violation of Va. Code § 8.01-42.1. As the Court previously determined in its opinion entering default judgments, "Patriot Front, through its members' defacement of the Arthur Ashe mural, subjected [Plaintiffs] to intimidation and

14

harassment and that these acts were motivated by racial animosity." *Patriot Front*, 2026 WL 561098, at *17 (citing elements of Va. Code § 8.01-42.1(A)).   Plaintiffs' affidavits again establish with sufficient particularity that they suffered cognizable injuries through the emotional distress they experienced as a result of the Defaulting Defendants' intimidation and harassment. The Court concludes that an award of $5,000 in compensatory damages to each Plaintiff is sufficient to compensate Plaintiffs for their emotional injuries resulting from Patriot Front's violation of Va. Code § 8.01-42.1 and is in line with comparable awards in this District.

### B.   The Court Will Award Each Plaintiff Punitive Damages of $ 7,500 Per Count

#### 1.   Legal Standard:   Punitive Damages

Plaintiffs proceeding under 42 U.S.C. §§ 1985(3) and 1986 may seek awards of punitive damages.   *See, e.g., Murell*, 762 F. Supp. 3d at 82–83 (awarding punitive damages against Patriot Front in action under § 1985(3)); *Libertad*, 134 F. Supp. 2d at 230 (awarding punitive damages in action under § 1985(3)); *Perez*, 725 F. Supp. at 255 ("While congress did not specifically address the type of damages recoverable for violations of the civil rights statutes, . . . a plaintiff who has proven a violation of [42 U.S.C.] §§ 1983, 1985(3), and 1986 is entitled to recover nominal, compensatory and punitive damages as well as damages for any emotional distress.").

Under federal law, punitive damages are available for "conduct that involves 'reckless or callous indifference to the federally protected rights of others,' as well as for conduct motivated by evil intent." *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir. 1987) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).[2]   "Unlike compensatory damages, which compensate a plaintiff for harm

---

[2] In *Cooper*, the Fourth Circuit summarized the standard that plaintiffs must satisfy in order to obtain punitive damages in an action under 42. U.S.C. § 1983.   814 F.2d at 948.   But other courts apply the same punitive damages standard to actions under §§ 1985 and 1986.   *See,*

suffered, punitive damages serve the dual purposes of deterrence and retribution." *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246, 258 (4th Cir. 2017) (citation omitted). "The purpose of retribution is served by setting punitive damages proportionally to the outrageousness of the conduct or the magnitude of the harm. Deterrence principles support the imposition of higher penalties for misconduct that is difficult to detect or injury that is difficult to quantify." *Id.* (internal citation omitted).

Virginia Code § 8.01-42.1 also expressly provides for awards of punitive damages. Va. Code § 8.01-42.1(B) ("Any aggrieved party who initiates and prevails in an action authorized by this section shall be entitled to damages, including punitive damages."). Virginia law limits prevailing parties seeking punitive damages to an award of no more than $350,000. Va. Code § 8.01-38.1. Under Virginia law, "punitive damages are appropriate where the defendant engaged in conduct that 'either approaches actual malice or exhibits extreme recklessness resulting in clearly foreseeable and immediate injury.'" *Adkins v. HBL, LLC*, No. 1:17-cv-774 (TSE), 2017 WL 4484246, at *2 (E.D. Va. July 18, 2017) (quoting *Cummings v. Fisher-Price, Inc.*, 857 F. Supp. 502, 505 (W.D. Va. 1994)). To be entitled to punitive damages, a plaintiff must allege that a defendant "'acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to civil obligations.'" *Id.* (quoting *Wallen v. Allen*, 343 S.E.2d 73, 78 (Va. 1986)).

Punitive damages awards under federal or state law are subject to constitutional constraints. "'The Due Process Clause of the Fourteenth Amendment [to the United States Constitution] prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor' in the form of punitive damages." *In re C.R. Bard, Inc.*, 810 F.3d 913, 931–32 (4th

_____

*e.g., Perez*, 725 F. Supp. at 255–57.

16

Cir. 2016) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003)). The United States Supreme Court has articulated three "guideposts" for reviewing the constitutionality of a punitive damages award:   "(1) the degree or reprehensibility of the defendant's misconduct, (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 440 (2001) (citation omitted).   The Supreme Court has "noted that the first of these factors, reprehensibility, is the most important." *In re C.R. Bard*, 810 F.3d at 931 (citing *State Farm*, 538 U.S. at 419).

### 2.    The Court Will Award Each Plaintiff $7,500 in Punitive Damages for the Defaulting Defendants' Violations of 42 U.S.C. § 1985(3)

Both Plaintiffs have demonstrated their entitlement to punitive damages based on Defaulting Defendants Patriot Front, Brown, and Ring's involvement in the conspiracy to vandalize the Arthur Ashe mural.   The Court previously determined that the Defaulting Defendants engaged in a conspiracy to deprive Plaintiffs of their civil rights in violation of 42 U.S.C. § 1985(3).   *Patriot Front*, 2026 WL 561098, at *15 (citing elements of § 1985).   The Court will award Plaintiffs with $7,500 in punitive damages for Patriot Front, Brown, and Ring's violation of § 1985 for four reasons.

#### a.    The Defaulting Defendants Engaged in Conduct Involving Reckless Indifference to the Rights of Others Motivated by Evil Intent

First, the record supports a finding that Patriot Front, Brown, and Ring engaged in conduct involving "reckless or callous indifference to the federally protected rights of others, as well as for conduct motivated by evil intent." *Cooper*, 814 F.2d at 948 (quotation omitted).   As the Court previously determined, "Patriot Front's members have defaced murals honoring Black

17

Americans, targeted LGBTQ+ events, and destroyed public and private property as part of their campaign to promote their extreme beliefs." *Patriot Front*, 2026 WL 561098, at *1 (quotation omitted). Brown, Ring, and other Patriot Front members conspired to deface the Arthur Ashe mural in line with that history of vandalism, and ultimately used footage of the defacement to recruit new members. *Id.* at *6. The Court previously determined that "racial animus against Black individuals and their supporters animated [Patriot Front, Brown, and Ring's] conduct." *Id.* at *16. The harm Plaintiffs suffered "was the result of intentional malice," *id.*, in the form of Patriot Front, Brown, and Ring's conduct, which was informed by discriminatory animus.

> **b.     The Defaulting Defendants' Conspiracy to Deface the Arthur Ashe Mural was Sufficiently Reprehensible to Support an Award of Punitive Damages**

Second, an award of punitive damages readily satisfies the reprehensibility "guidepost" announced by the Supreme Court in reviewing punitive damages awards. *Cooper*, 532 U.S. at 440. In examining an act's "reprehensibility," courts consider whether (1) "the harm caused was physical as opposed to economic"; (2) "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others"; (3) "the target of the conduct had financial vulnerability"; (4) "the conduct involved repeated actions or was an isolated incident"; and (5) "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419.

While Plaintiffs' Amended Complaint concerns a single act of vandalism, the record demonstrates that Patriot Front members have engaged in similar vandalism in the past and the video here was used to recruit for future destructive events. *Patriot Front*, 2026 WL 561098, at *1. Moreover, the target of the Defaulting Defendants' conspiracy demonstrates a heighted level of reprehensibility, as the Defaulting Defendants' conspiracy constituted intentional malice

18

and a display of reckless indifference to the rights of others.    For example, Delegate Cousins identified Arthur Ashe as an "activis[t] fighting for equality of Black people in the United States and across the world."   (ECF No. 213-3 ¶ 3.)   Delegate Cousins emphasized that Arthur Ashe is from Richmond and that the effect of targeting a piece of art depicting him "cannot be understated."   (ECF No. 213-3 ¶ 4.)   And as Delegate Cousins asserts, because Battery Park is "tucked away from the more trafficked streets in the city," the incident was "deliberate and targeted."   (ECF No. 213-3 ¶¶ 12–13.)   Ali Faruk, who has lived in Battery Park for 15 years, also felt the attack countered the Battery Park neighborhood's "work[] to create a sense of community among neighbors from different backgrounds.   (ECF No. 213-4 ¶¶ 2–3.)   Mr. Faruk states that the "defacement of the mural felt like a targeted attack on the diverse people who live here."   (ECF No. 213-4 ¶ 10.)   Accordingly, Patriot Front,[3] Brown, and Ring's conspiracy to deprive Plaintiffs of their civil rights was sufficiently reprehensible to merit an award of punitive damages.

### c.    The Court's Award of Punitive Damages is Not Excessive Relative to its Award of Compensatory Damages

Third, an award of $7,500 in punitive damages satisfies the compensatory-punitive ratio "guidepost" announced by the Supreme Court in reviewing punitive damages awards.   *Cooper*, 532 U.S. at 440.   This guidepost requires the Court to consider the ratio between the Court's award of compensatory damages and its award of punitive damages.   *See Doe v. Nationwide Testing Assoc., Inc.*, —F. Supp. 3d—, 2026 WL 540387, at *4 (E.D. Va. 2026) ("[T]he Fourth Circuit has upheld ratios as high as 80 (punitive) to 1 (compensatory).   Additionally, the

---

[3] As Plaintiffs correctly argue, Patriot Front's members acted as agents in vandalizing the mural.   Accordingly, the Court may impute its members' malice to Patriot Front.   (ECF No. 213, at 11–12 (citing *Yates v. 11 Hagerstown Lodge No. 212 Loyal Ord. of Moose*, 878 F. Supp. 788, 798 (D. Md. 1995) (imputing malice in 42 U.S.C. § 1981 action)).)

19

Supreme Court instructs that a punitive to compensatory damages ratio may be higher where compensatory damages are less substantial.") (citations omitted). Here, the Court's award of $7,500 in punitive damages per count results in a 1-to-1.5 ratio with its award of $5,000 in compensatory damages per count. This ratio does not offend the Fourteenth Amendment's guarantee of due process or run afoul of relevant Fourth Circuit precedent. *See In re C.R. Bard*, 810 F.3d at 931 (affirming punitive damages award resulting in seven-to-one ratio between punitive and compensatory damages); *cf. Daugherty v. Ocwen Loan Serv., LLC*, 701 F. App'x 246, 260–61 (4th Cir. 2017) (finding $2.5 million punitive damages award unconstitutionally excessive compared to award of $6,128.39 award of compensatory damages); *see also State Farm*, 538 U.S. at 425 ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process.").

### d.    The Court's Award of Punitive Damages Comports with Punitive Damages Awards in Comparable Cases

Fourth, an award of $7,500 in punitive damages satisfies the comparative "guidepost" considered by the Supreme Court in reviewing punitive damages awards. *Cooper*, 532 U.S. at 440. The Court's award of punitive damages is far less than that of courts in similar circumstances. *See Murell*, 762 F. Supp. 3d at 84 (awarding punitive damages of $2 million against Patriot Front when Black plaintiff was randomly surrounded on the street and beaten by a group, resulting in physical injuries that included damage to a finger the hindered plaintiff's ability to earn money as a saxophone player); *Metro. Afr. Methodist Episcopal Church v. Proud Boys Int'l, L.L.C*, No. 2021-CA-000004-B, 2023 WL 4680104, at *15 (D.C. Super. Ct. Jan. 1, 2023) (awarding punitive damages of $1 million where defendants were found liable for conspiracy to vandalize under §§ 1985(3) and 1986 after destruction of a Black Lives Matter banner and continued harassment of members of an African American church); *Perez*, 725 F.

20

Supp. at 257 (awarding punitive damages of $25,000 for violations of §§ 1985(3) and 1986).

The Court concludes that (1) the record establishes Defaulting Defendants Patriot Front, Brown, and Ring acted with sufficient malice to warrant punitive damages; (2) an award of $7,500 comports with due process; and, (3) an award of $7,500 serves the dual ends of deterrence and retribution.

### 3. The Court Will Award Each Plaintiff $7,500 in Punitive Damages for the Defaulting Defendants' Violations of 42 U.S.C. § 1986

For the same reasons, the Court will award Plaintiffs $7,500 in punitive damages for Defaulting Defendants Patriot Front, Rousseau,[4] Brown, and Ring's violation of 42 U.S.C. § 1986. An award of $7,500 reflects (1) the clear record evidence that the Defaulting Defendants acted with malice; (2) that the Defaulting Defendants' conduct was sufficiently reprehensible; (3) that the resultant ratio between the Court's compensatory damages award for the § 1986 violation remains at one-to-one; and, (4) that the Court's damages award is well in line with awards in comparable cases.

The Court adds that an award of punitive damages is especially warranted under § 1986 given Defaulting Defendant Rousseau's involvement. As the Court explained in its opinion granting Plaintiffs' motions for default judgments, Defaulting Defendant Rousseau is the National Director and founder of Patriot Front. *Patriot Front*, 2026 WL 561098, at *2. Rousseau distributes every stencil used by Patriot Front members in their vandalism, coordinates Patriot Front's nationwide "Network Directors," and otherwise coordinates Patriot Front's marches and acts of vandalism. *Id.* Indeed, Patriot Front members reported on their meeting at

---

[4] The Court may likewise impute Patriot Front's members' malice to Rousseau who, as Patriot Front's Founder and National Director, was aware of the other Defaulting Defendants' conspiracy to deface the mural. *Patriot Front*, 2026 WL 561098, at *4.

21

which they planned to vandalize the Arthur Ashe mural to Rousseau. *Id.* at *4. The Defaulting Defendants' conduct is made even more reprehensible given Rousseau's involvement and coordination of the vandalism of the mural within Patriot Front's larger goal to "deface[] murals honoring Black Americans, target[] LGBTQ+ events, and destroy[] public and private property as part of their campaign to promote their extreme beliefs." *Id.* at *1 (quotation omitted).

### 4. The Court Will Award Each Plaintiff $7,500 in Punitive Damages for Patriot Front's Violation of Va. Code § 8.01-42.1

For the same reasons, the Court will award Plaintiffs $7,500 in punitive damages for Defaulting Defendant Patriot Front's violation of Va. Code § 8.01-42.1. The Court's award again reflects that Patriot Front, through its members, acted with sufficient malice as required by Virginia law and that the award satisfies the Supreme Court's three guideposts for due process purposes. This award is also well below Virginia's statutory cap on punitive damages of $350,000. Va. Code § 8.01-38.1.

### C. The Court Will Award Plaintiffs Declaratory Relief

### 1. Legal Standard: Declaratory Relief

Plaintiffs may obtain equitable relief under §§ 1985 and 1986. *See McAlister v. Alaska*, No. 3:23-cv-0029, 2023 WL 3480001, at *8 (D. Alaska May 16, 2023) ("[T]he majority of courts which have considered the issue have held that injunctive relief is available under Section 1985(3)."); *Perez*, 725 F. Supp at 257–58 (granting equitable relief §§ 1985 and 1986). Virginia Code § 8.01-42.1(A) also expressly provides for injunctive relief. Va. Code § 8.01-42.1(A) ("An action for injunctive relief or civil damages, or both, shall lie for any person who is subjected to [violations of the statute].")

"A district court may grant a request for declaratory judgment when three elements are met: 1) the complaint alleges an actual controversy between the parties of sufficient immediacy

22

to warrant a declaratory judgment; 2) the court possesses jurisdiction over the parties; and 3) the court does not abuse its discretion in issuing such judgment." *Human Rts. Def. Ctr. v. Ishee*, 726 F. Supp. 3d 482, 504 (E.D.N.C. 2024) (citing *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004)).   In exercising its discretion, the court should consider whether the declaratory judgment sought "1) will serve a useful purpose in clarifying and settling the legal relations at issue; 2) will terminate and afford relief from the controversy giving rise to the proceeding; 3) is being sought as a procedural maneuver to sidestep procedural obstacles such as *res judicata*, as well as 4) concerns of federalism and comity." *Id.* (citing *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998)).

### 2.    Declaratory Relief is Appropriate

Plaintiffs seek a declaratory judgment that the Defaulting Defendants' "participation in the vandalism of the Arthur Ashe mural violated Plaintiffs' rights under Sections 1985 and 1986 and Virginia Code [§] 8.01-42.1."  (ECF No. 213, at 18.)   The Court has discretion to award declaratory relief in this case.   Plaintiffs' Amended Complaint alleges an actual controversy between the parties and the Court possesses jurisdiction over the parties.   *Patriot Front*, 2026 WL 561098, at *10–14, *16–17 (finding that the Court has jurisdiction over the parties and that Plaintiffs stated a claim with respect to each of their causes of action).   A declaratory judgment in Plaintiffs' favor will serve a useful purpose in clarifying and settling the legal relations between Plaintiffs and the Defaulting Defendants, will terminate and afford relief from the controversy giving rise to this proceeding, and is not being sought as a procedural maneuver to sidestep procedural obstacles such as *res judicata*.   The Court will therefore grant Plaintiffs declaratory relief.

23

### D.    The Court Will Deny the Award of Injunctive Relief

#### 1.    Legal Standard:    Injunctive Relief

A plaintiff seeking a permanent injunction must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

#### 2.    Injunctive Relief is Not Appropriate on this Record

Plaintiffs seek a permanent injunction "enjoining Defendants and their agents from coming within 150 yards of Battery Park without prior permission of the Court." (ECF No. 213, at 18.)   As described above, injunctive relief is available under each of Plaintiffs' causes of action.

The permanent injunction requested by Plaintiffs would be overbroad.   Plaintiffs seek a *permanent* injunction preventing the Defaulting Defendants from congregating in a public space without the Court's approval.   Plaintiffs provide no argument with respect to whether enjoining the Defaulting Defendants from accessing such a public space would violate the Defaulting Defendants' rights under the First Amendment to the United States Constitution, or indeed any other constitutional rights.   To be sure, other courts have awarded injunctive relief under § 1985(3) barring defendants from entering certain spaces.   For example, in *Metropolitan African Methodist African Church*, the Superior Court of the District of Columbia enjoined §§ 1985(3) and 1986 defendants "to stay away from" the church whose property they had previously vandalized.   2023 WL 4680104, at *16.   But the *Metropolitan* court noted similar

24

constitutional concerns and added "minor modifications necessary to keep the injunction firmly within constitutional bounds." *Id.* This Court is unwilling to enjoin the Defaulting Defendants here because Plaintiffs' proposed injunction raises heightened constitutional concerns. Where the plaintiffs in *Metropolitan* sought an injunction barring the defendants from coming within proximity of their *own property* after months of harassment, Plaintiffs here seek an injunction barring the Defaulting Defendants from entering *public property*.

In the interest of creating a full record, the Court will nonetheless analyze the request for an injunction under the applicable test in the interest of creating a full record. Under the-four part *eBay* test, Plaintiffs would likewise not prevail in their request for a permanent injunction. First and second, the Court acknowledges that Plaintiffs have demonstrated an irreparable injury and some inadequacy of legal remedies: "Plaintiff[s] ha[ve] . . . pleaded emotional distress injuries which cannot be calculated with mathematical precision, and therefore, the remedy at law for such an injury is inadequate." *Mayrant v. Norfolk Redevelopment & Housing Aut.*, 801 F. Supp. 3d 601, 622 (E.D. Va. 2025) (citations omitted). But the Court explained its damages finding above and awarded both compensatory and punitive damages to both Plaintiffs. Thus, the Court has addressed any past injury through adequate legal remedies and the second factor favors the Defaulting Defendants.

Third, when addressing future conduct, the balance of hardships falls slightly in favor of the Defaulting Defendants. To be sure, the implicit threat of violence, the use of the video for recruitment purposes, and the targeting of a neighborhood with a rich history of exhibiting racial inclusiveness by honoring a Richmond icon known for his activism all favor an extra measure of protection for Battery Park. And Sealed Plaintiff 1 has seen Patriot Front stickers in nearby neighborhoods after the defacement of the mural. (ECF No. 213-1 ¶ 21.) Monetary damages

25

alone may not protect Battery Park residents from future targeting of Battery Park, even where the Court's award of punitive of damages may have some deterrent effect. *See Daugherty*, 701 F. App'x at 258 (describing punitive damages' twin purposes of "deterrence and retribution").

That said, Plaintiffs have not made a sufficient showing of potential future harm. *See Mayrant*, 801 F. Supp. 3d at 622–23 (granting a permanent injunction where plaintiff engaged in monthslong dispute with landlord over Fair Housing Act violations and where plaintiff's disability warranted additional protections against future harm); *Metro. African Methodist African Church*, 2023 WL 488014, at *6 (granting constitutionally limited injunctive relief due to *ongoing* harassment against a targeted church and its pastor). Full and permanent restriction of access to a large public park is far too broad and could infringe upon the Defaulting Defendants' First Amendment rights. The Court must apply *all* provisions of the Constitution when weighing the hardship any party experiences when evaluating the propriety of a permanent injunction. This factor does not favor Plaintiffs.

Finally, consideration of the public interest cuts both ways and is therefore neutral. The public would benefit from restricting white supremacist Patriot Front members from accessing Battery Park, but the public also has an interest in assuring that all constitutional protections apply to all persons equally. The Court makes this finding without prejudice in the event the basis for the request expands at a later date.

### IV.   Conclusion

For the reasons articulated above, the Court will award each Plaintiff $5,000 in compensatory damages per Count and $7,500 in punitive damages per Count from the Defaulting

Defendants, who will be liable jointly and severally.   The Court will also grant Plaintiffs'

requested declaratory relief but deny their requested injunctive relief.

An appropriate Order shall issue.

Date: 3/31/26
Richmond, Virginia

_____/s/_____
M. Hannah Lauck
Chief United States District Judge

27